UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETER RUTHERFORD and ANA RUTHERFORD, individually and as parents and natural guardians on behalf of P.R., and P.R. individually,

         Plaintiffs,

  v.

FLORIDA UNION FREE SCHOOL DISTRICT, DIANE MUNRO, JAN JEHRING, LISA TIGER, JEAN MARIE PAVLIK, each in her official capacity, RYAN WALL, in his official and individual capacity, KERRY BOYLAN, in her official and individual capacity, ORANGE-ULSTER BOARD OF COOPERATIVE EDUCATIONAL SERVICES, KERRI STROKA, DEBBIE BRUNJES, PATRICIA BAUER, and SUSAN ISAACSON, each in her official capacity,

         Defendants.

No. 16-CV-9778 (KMK)

OPINION & ORDER

---

<u>Appearances</u>

Angel A. Castro, III, Esq.
A.A. Castro Complex Litigation Appeals & Negotiation PLLC
New York, NY
*Counsel for Plaintiffs*

Mark C. Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendants Florida Union Free School District, Diane Munro, Jan Jehring, Lisa Tiger, Jean Marie Pavlik, Ryan Wall, and Kerry Boylan*

Caroline B. Lineen, Esq.
Lewis R. Silverman, Esq.
Stephen P. Illions, Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendants Orange-Ulster Board of Cooperative Educational Services, Kerri Stroka, Debbie Brunjes, Patricia Bauer, and Susan Isaacson*

KENNETH M. KARAS, District Judge:

Plaintiffs Peter Rutherford ("Mr. Rutherford") and Ana Rutherford ("Mrs. Rutherford") ("Plaintiff Parents"), individually and as parents and natural guardians of P.R., their minor son, and P.R. individually (collectively "Plaintiffs"), bring this Action against the Florida Union Free School District ("District"), former District Superintendent Diane Munro ("Munro"), District Superintendent Jan Jehring ("Jehring"), District Assistant Superintendent Lisa Tiger ("Tiger"), and District School Psychologist and Chairperson of the Committee on Special Education ("CSE") Subcommittee Jean Marie Pavlik ("Pavlik"), each in her official capacity, and District General and Physical Education Teacher, and Bus Duty Escort, Ryan Wall ("Wall"), in his official and individual capacity, and District Certified Special Education Teacher Kerry Boylan ("Boylan"), in her official and individual capacity (collectively "District Defendants"); and Orange-Ulster Board of Cooperative Educational Services ("O-U BOCES"), O-U BOCES Director of Special Education & Alternative Programs Kerri Stroka ("Stroka"), and Warwick Valley Satellite Program at Sanfordville Elementary School ("Warwick") Principal Debbie Brunjes ("Brunjes"), Certified Special Education Teacher Patricia Bauer ("Bauer"), and Licensed Clinical Social Worker and Speech Pathologist Susan Isaacson ("Isaacson"), each in her official capacity (collectively "BOCES Defendants") (all collectively "Defendants"), alleging Defendants denied P.R. a free and appropriate public education ("FAPE") for the 2013-14, 2014-15, 2015-16, and 2016-2017 school years, in violation of the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132 *et seq*. and 12203, the Fourth and Fourteenth Amendments to the United States Constitution, U.S. Const. amends. IV, XIV, 42 U.S.C. § 1983, the New York State Constitution,

the New York State Education Law, N.Y. Educ. Law §§ 3202, 3203, and 4401 *et seq*., and the

New York Codes, Rules, and Regulations ("N.Y.C.R.R.") §§ 100 *et seq*. and 200 *et seq* (Second

Amended Complaint ("SAC") (Dkt. No. 91).)[1][2]  Plaintiffs also bring assault and battery,

negligent infliction of emotional distress, negligent hiring, training, supervision and retention,

and lost earning claims under New York State law.  Before the Court are Defendants' Motions

To Dismiss.  (BOCES Defs.' Not. of Mot. (Dkt. No. 105); District Defs.' Not. of Mot. (Dkt. No.

114).)  For the following reasons, Defendants' Motions are granted in part and denied in part.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court considers the proper treatment of exhibits submitted by

Defendants in support of their Motions, and the absence of exhibits that Plaintiffs cite but do not

attach to their SAC.

---

[1] The Court notes that Plaintiffs reference and make allegations against several other individuals in their SAC.  For example, at one point they mention "§ 1983 Claims against Deborah Lisack," ("Lisack") (SAC ¶¶ 220–21), but they do not list her as a Defendant in the "Parties" section of their SAC where they list all other Defendants, nor do they include her as a Defendant in their case heading.  The Court will not consider as Defendants individuals who are only mentioned in passing in the SAC, even if they are mentioned as having "claims" brought against them, where those individuals have not been listed as Defendants and have never been served.  Plaintiffs have had ample opportunity to amend their Complaint to appropriately name and serve all Defendants.  (*See, e.g*., Dkt. Nos. 39, 50, 54, 58, 62, 72, 73, 78, 84, 89, 90, 91, 102, 112, 122.)

[2] BOCES Defendants in their Memorandum in Support of their Motion to Dismiss, state that Plaintiffs incorrectly spell the names of Defendant Orange-Ulster Board of Cooperative Educational Services ("O-U BOCES") as "Orange-Ulster BOCS," and Defendant Patricia Bauer ("Bauer") as "Patricia Baver."  (*See* BOCES Defs.' Mem. Law. in Supp. of Mot. To Dismiss ("BOCES Defs.' Mem.") 1 (Dkt. No. 107); *see generally* SAC.)  The Court will refer to these Defendants as O-U BOCES and Bauer respectively based on the spellings provided by BOCES Defendants.

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). "To go beyond the allegations in the [c]omplaint would convert the . . . motion to dismiss into one for summary judgment." *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). There are a few notable exceptions to this rule. In addition to the complaint, a court ruling on a Rule 12(b)(6) motion "may consider . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (citations, alterations, and quotation marks omitted); *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

"[I]n adjudicating a motion to dismiss for lack of subject-matter jurisdiction pursuant to [Rule] 12(b)(1), a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *JTE Enters., Inc. v. Cuomo*, 2 F. Supp. 3d 333, 339 (E.D.N.Y. 2014) (alterations and quotation marks omitted) (quoting *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 (2d Cir. 2007)).

Throughout their SAC, Plaintiffs cite to numerous exhibits in support of their allegations and ask the Court to consider these exhibits as incorporated by reference. (SAC ¶¶ 154–156.) However, Plaintiffs do not attach any exhibits to their SAC. Plaintiffs did attach exhibits to previous iterations of their SAC, (*see* Dkt. No. 50), but the Court will not consider these exhibits

on this basis because "an amended complaint ordinarily supersedes the original, and renders it of no legal effect," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (citation and quotation marks omitted); *see New York ex rel. Khurana v. Spherion Corp.*, 246 F. Supp. 3d 995, 998 n.1 (S.D.N.Y. 2017) (same).

Nevertheless, many of the exhibits Plaintiffs cite but fail to attach, were in fact submitted by Defendants in support of their Motions. (*See* Decl. of Caroline B. Lineen, Esq. ("Lineen Decl.") (Dkt. No. 106); Aff. of Mark C. Rushfield, Esq. ("Rushfield Aff.") (Dkt. No. 115); Aff. of Lisa Tiger ("Tiger Aff.") (Dkt. No. 116).) Most of the relevant exhibits are State administrative records such as the Decisions and Orders of Independent Hearing Officers ("IHO"), State Review Officers ("SRO"), and New York State Education Department ("NYSED") Office of Special Education ("OSE") Regional Associates. The Court is entitled to take judicial notice of matters of public record. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) (noting that "a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes" (citation omitted)); *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) ("In considering a motion to dismiss, a court is permitted to take judicial notice of public records . . . ." (citation omitted)); *see also Hason v. Office of Prof'l Med. Conduct*, 314 F. Supp. 2d 241, 246 (S.D.N.Y. 2004) (holding that court may consider state administrative decisions in ruling on a Rule 12(b)(6) motion). However, in taking judicial notice of such public records, the Court does so only to establish "the fact of such litigation," not for the truth of the matters asserted in each proceeding. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings." (citation and quotation marks

omitted)).  The Court will therefore consider the relevant IHO, SRO, and OSE Decisions, as well as the records of other state administrative proceedings that Defendants submitted.

One document that the Parties cite that is not a public record is a May 26, 2015 "Release and Settlement Agreement" ("May 2015 Agreement") between Plaintiffs and the District. Plaintiffs cite to an "Exhibit R" as the Release Agreement, (SAC ¶ 83), but fail to attach the exhibit.  District Defendants, however, attached the May 2015 Agreement as part of their "Exhibit A," which is actually a copy of an earlier version of Plaintiffs' SAC.  (Rushfield Aff. Ex. A at 1 ("May 2015 Agreement") (Dkt. No. 115-6).)[3]  The Court may consider the Agreement as it is incorporated by reference.  "To be incorporated by reference, the [c]omplaint must make a clear, definite[,] and substantial reference to the documents."  *Thomas*, 232 F. Supp. 2d at 275 (citation omitted).  Additionally, even if not attached or incorporated by reference, a document upon which the complaint "solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation, emphasis, and quotation marks omitted).  Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked."  *Thomas*, 232 F. Supp. 2d at 276; *see also Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (finding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint" (citation omitted)); *Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (collecting cases).  Additionally, "no serious question as to [the document's] authenticity can exist."  *Kramer v. Time Warner Inc*., 937 F.2d 767, 774 (2d Cir.

---

[3] The Court notes that District Defendants' Exhibit A was submitted as multiple attachments to Dkt. No. 115, as Dkt. Nos. 115-1 through 115-7.  Throughout this Opinion the Court indicates which attachment specifically each document can be found in.

1991).  Here, Plaintiffs discuss the Agreement in some detail.  (SAC ¶ 83.)  Plaintiffs also allege

that the District failed to comply with the May 2015 Agreement by continuing to deny P.R.

group counseling.  (*Id*. ¶ 144.)  Whether the District failed to comply with the Agreement by

failing to provide P.R. with certain services is a question that is at the core of this case.  The

Agreement is thus incorporated by reference.

Finally, the Court also considers statements in Defendants' counsels' affirmations

because in adjudicating "a motion to dismiss for lack of subject matter jurisdiction pursuant to

[Rule] 12(b)(1), a district court may resolve disputed factual issues by reference to evidence

outside the pleadings, including [affirmations]."  *JTE Enters., Inc.*, 2 F. Supp. 3d at 339.

B.  Factual Background

The facts recounted below are taken from Plaintiffs' SAC and are assumed to be true for

purposes of resolving the Motions.  Where relevant, the Court also recounts facts from the IHO,

SRO, and OSE Decisions, the May 2015 Agreement, and other materials the Court may consider

at this stage.

1.  The Parties

P.R. is an eleven-year-old male child diagnosed with Autism Spectrum Disorder,

Asperger Syndrome, ADHD combined type, and other mental impairments.  (SAC ¶ 7.)  P.R.

also suffers from a perforated eardrum and hyperacusis, a physical impairment that heightens his

sensitivity to certain frequencies and volumes of sound, and collapses his noise tolerance.  (*Id*.)

P.R. also suffers from incontinence, enuresis, and encopresis, physical impairments that cause

him to frequently soil himself.  (*Id*.)  These symptoms substantially limit his major life activities,

including learning, reading, concentrating, and communicating.  (*Id*.)  P.R. started presenting

speech and language delays as a three-year-old.  (*Id.* ¶ 63.)  P.R. has been classified as a student with disabilities by the District.  (*Id.*)

The District is a municipal corporation and school district formed pursuant to, and existing in accordance with, the laws of the State of New York.  The District operates Golden Hill Elementary School ("GHES") and the S.S. Seward Institute.  (SAC ¶ 12.)  O-U BOCES is a Board of Cooperative Educational Services organized and existing under Article 40 of the Education Law of the State of New York.  O-U BOCES operates the Warwick Valley Satellite Program at Sanfordville Elementary School ("Warwick"), the Minisink Valley Satellite Program at Otisville Elementary School ("Minisink-Otisville") in the Minisink Central School District, and the Extended School Year ("ESY") Summer Program at Goshen, New York.  (*Id.* ¶ 21.)

The District is a Local Education Agency ("LEA") within the meaning of the IDEA, and receives an allocation of federal funding to ensure that all children residing within the District have access to a FAPE.  (*Id.* ¶ 13.)  The District contracts with O-U BOCES to provide special education to its students with disabilities, among other services.  (*Id.* ¶ 22.)

Plaintiffs' allegations span across several years and educational institutions.  For ease of reference the Court briefly recounts the chronology of P.R.'s school attendance.  P.R. attended O-U BOCES-operated Warwick during the 2012-13 and 2013-14 school years, (*id.* ¶¶ 64–66), and through December 15, 2014 of the 2014-15 school year, (*id.* ¶¶ 72–75).  In December 2014, P.R. was removed from Warwick, (*id.* ¶¶ 77–78), and did not re-enter a classroom environment again until May 26, 2015 when he started at O-U BOCES-operated Minisink-Otisville, (*id.* ¶ 83).  P.R. began the 2015-16 school year at Otisville-Minisink, (*id.* ¶ 86), but was reassigned to home instruction in February 2016, (*id.* ¶ 92), and did not re-enter a classroom environment until the next school year in September 2016, (*id.* ¶ 111).  During Summer 2016, P.R. attended ESY at an

O-U BOCES facility in Goshen, New York. (*Id.* ¶ 104.) P.R. attended District-operated GHES during the 2016-17 school year until January 13, 2017, when Plaintiff Parents permanently removed him from GHES. (*Id.* ¶ 127.) From mid-May 2017 through the end of the 2016-17 school year, P.R. attended the District-operated S.S. Seward Institute. (*Id.* ¶ 132.) For part of Summer 2017, P.R. attended ESY at the S.S. Seward Institute. (*Id.* ¶ 133.) P.R. attended the Abilities First Annex in Cornwall, New York for the 2017-18 school year. (*Id.* ¶ 136.)[4]

### 2. The 2012-13 School Year

During the 2012-13 school year, P.R. attended first grade at Warwick. (SAC ¶ 64.) Because Warwick neglected to keep a school counselor in regular attendance, P.R. did not receive all of the counseling sessions required by his Individualized Education Plan ("IEP"). (*Id.*) Warwick Principal Brunjes refused to discuss the IEP failure or remediation with Plaintiffs, especially with regard to injuries P.R. was allegedly suffering. (*Id.*)

### 3. The 2013-14 School Year

During the 2013-14 school year, P.R. attended second grade at Warwick. Plaintiffs allege that P.R. was again denied related services required by his IEP, this time because Speech Pathologist and Licensed Clinical Social Worker Isaacson refused to perform the 2:1 group counseling sessions that were to be conducted once a week. (SAC ¶ 65.) Plaintiffs allege that on October 11, 2013, Isaacson telephoned Plaintiffs to tell them to write a letter to the District stating, "P.R. does not need counseling anymore." Plaintiffs refused. (*Id.*)

---

[4] Plaintiffs do not allege who operates the Abilities First Annex and make no claims with respect to the sufficiency of P.R.'s education there.

At a November 7, 2013 IEP meeting, Plaintiffs demanded the group counseling required by P.R.'s IEP. (*Id*. ¶ 66.) Brunjes did not deny that Isaacson refused P.R. counseling services, but asserted that P.R. was not fit to be at Warwick. (*Id*.) Shortly after that IEP meeting, Brunjes refused to hire additional staff and ultimately District Psychologist and CSE Subcommittee Chair Pavlik agreed to travel to Warwick weekly to perform individual counseling on P.R. (*Id*. ¶ 67.) However, the District adopted a policy of disallowing their employees from interacting with students not from their home district, so that Pavlik subsequently refused to perform group counseling at Warwick, and further denied P.R. needed services. (*Id*.)

At a May 22, 2014 CSE Subcommittee meeting, it was determined that P.R. continued to need weekly group counseling in a 2:1 setting, as he had been receiving since the 2011-12 school year. (*Id*. ¶ 70.) During the Summer of 2014, P.R. attended the O-U BOCES ESY Program. By this time, P.R. has been denied necessary group counseling services for two years, and his behavioral issues had worsened as a result. P.R. displayed aggressiveness, impulsivity, hyperactivity, and bolting behaviors. (*Id*. ¶ 71.) Defendant Bauer, P.R.'s teacher during this ESY Program, managed his behavior by routinely isolating him from his peers for large parts, if not the entire, school day. Plaintiff Parents were never consulted or informed, and only learned of the isolation tactics from P.R.'s 1:1 aide at that time, Ms. Stephanie. (*Id*.)

Plaintiffs allege that the District "implemented a policy of overloading hired related services providers and/or not hiring the adequate [number] of providers to service the needs of their entire student population, including, but not limited to service providers such as counselors, psychologists, social workers, therapists, etc." (*Id*. ¶ 68.) Plaintiffs further allege that the District knew CSE members would face students needing out-of-district placements and failed to institute a policy or train employees and members of CSEs to properly vet out-of-district

placements to ensure they were capable of providing the placed student's IEP. (*Id*.) Munro, Jehring, Tiger, and Pavlik, allegedly all knew "based on Plaintiffs' reporting [] to them, that [the District] needed additional related service providers and failed to remedy [the situation] by hiring additional staff needed to meet the needs of P.R. and other students." (*Id*. ¶ 69.)

### 4. 2014-15 School Year

At the beginning of the 2014-15 school year, P.R. attended Warwick to repeat the second grade. (SAC ¶ 72.) Pavlik again agreed to travel to Warwick weekly to perform individual counseling, but refused to perform group counseling. (*Id*.) As P.R.'s behaviors worsened, he regularly presented bruises and other injuries. Though the nurse would inform the Plaintiffs by telephone, Warwick did not provide consistent incident reports for the supposed falls and other accidents. (*Id*.) P.R. also began to repeat disturbing phrases, such as "[l]et's hit him in the brain," alarming Plaintiff Parents. (*Id*.)

On November 6, 2014, a CSE Subcommittee meeting was held at Brunjes's request. At the meeting, Brunjes asserted that P.R.'s speech and behavioral delays could not be met at Warwick and that he belonged in a more restrictive environment, specifically the only special education class in the District, an 8:1+2 special class placement at GHES, with children who were non-verbal and not P.R.'s age. (*Id*. ¶ 73.) At the same meeting, the CSE Subcommittee agreed to hire an independent behavioral analyst to perform a Functional Behavioral Assessment ("FBA") on P.R. (*Id*. ¶ 74.) On December 2, 2014, Heather Creese ("Creese"), a Board-Certified Behavioral Analyst ("BCBA") from Vital Behavior Services, performed an FBA on P.R. (*Id*.) Her assessment recommended that the District implement a behavioral plan to help with social skills, behavior self-management, sensory regulation, organization skills, and

functional communication training. The District allegedly failed to implement these recommendations. (*Id.*)

On December 8, 2014, Plaintiff Parents received an email from Pavlik informing them that the CSE Subcommittee had met that week and voted to remove P.R. from the O-U BOCES Warwick Satellite Program. (*Id.* ¶ 75.) This CSE Subcommittee allegedly occurred without notice to the Plaintiffs and without their participation or consent. (*Id.*)

On December 14, 2014, another CSE Subcommittee was convened to discuss the FBA recommendations. Brunjes and Bauer refused to implement the behavioral plan recommendations, which included showing cue cards and taking P.R. for short walks, among other recommendations. (*Id.* ¶ 76.) The CSE Subcommittee removed P.R. from Warwick and recommended his transfer to the 8:1+2 special class placement at GHES over Plaintiffs' objections. (*Id.* ¶ 77.) Plaintiffs opposed the transfer largely because another child in the class suffered from Angelman Syndrome and regularly exhibited symptoms, including shrieking, screaming, and screeching, which presented a serious problem given P.R.'s hearing sensitivities. (*Id.*) Plaintiffs were also concerned that GHES could not offer the specialized support or appropriate staff needed to allow P.R. to access a FAPE. (*Id.*) Plaintiffs allege that Brunjes and Bauer "simply did not want to deal with P.R., and that their refusal to implement the recommendations were a pretext to throw him out of Warwick." (*Id.* ¶ 76.)

From about December 15, 2014 to February 4, 2015, P.R. was precluded from attending Warwick, against Plaintiffs' will, and stayed home where he received no academic tutoring, counseling sessions, speech therapy, occupational therapy, behavioral therapy, nor any educational or related services. (*Id.* ¶ 78.) The District did not offer to re-evaluate P.R. to better

understand his unique needs, nor did it offer any plan to transition P.R. back to an educational placement.  (*Id*.)

Plaintiffs allege that the District, "by custom and practice" allows students to go "without any related or education services, let alone FAPE  . . . while educational placements are disputed and there is no agreeable pendency placement."  (SAC ¶ 79.)

By February 2015, Plaintiff Parents had identified an appropriate educational placement for P.R., and requested that he be placed at the New Beginnings Annex of the Gramon Family of Schools ("New Beginnings"), located in West Milford, New Jersey, an approximately 35-minute drive from P.R.'s home.  (*Id*. ¶ 80.)  This request was denied by the District, which maintained that the 8:1+2 special class placement at GHES was appropriate.  (*Id*.)

On April 8, 2015, Plaintiff Parents spoke with Assistant Superintendent Tiger "about P.R.'s educational crisis and their concern that, given the lack of communication, updates, or action, the [District] was neglecting the work of finding P.R. a proper educational placement." (*Id*. ¶ 81.)  Tiger told Plaintiff Parents that she had spoken to the staff at New Beginnings. Plaintiffs allege that contrary to Tiger's representation to them, no staff at West Milford ever documented speaking with Tiger, and that Tiger later testified at an impartial hearing that she never spoke to staff at West Milford.  (*Id*.)

On May 26, 2015, Plaintiffs, "desperate for P.R. to receive educational and related services," agreed to resume his repeat of second grade, this time at the out-of-district  O-U BOCES Otisville-Minisink Satellite Program, which P.R. attended until the end of the school year.  (*Id*. ¶ 83; May 2016 Agreement.)  As a part of this agreement, Plaintiffs released the District from liability for certain claims relating to the education of P.R.  Plaintiffs allege that the

contemplated period for which this release is in effect is unclear, as it states "for the period through and including June 30, 2015." (SAC ¶ 83.)

### 5. The 2015-16 School Year

#### a. 2015-16 IEP

On July 16, 2015, a CSE Subcommittee convened to develop P.R.'s IEP for the 2015-16 school year. At the meeting, Plaintiff Parents furnished the District with a psychological evaluation, conducted by Dr. Osiris Rivas on July 10, 2015, that clinically diagnosed P.R. with "Autism Spectrum Disorder ('ASD') Asperger Syndrome." (SAC ¶ 85.) The evaluation concluded that, due to P.R.'s behavioral and social needs, P.R. required an education environment that offered comprehensive behavioral supports, including "life skills, inclusion opportunities, applied behavioral analysis, reinforcement of appropriate behaviors, special applications of behavior change, and staff that possessed Handle With Care Crisis Prevention, Intervention, and Behavior Management training." (*Id.*) Plaintiffs allege that the District neglected to provide any prior notice denying or accepting the "reports, findings, and recommendations presented," neglected to implement the FBA recommendations in a Behavioral Intervention Plan ("BIP"), and declined to alter P.R.'s classification from speech-language delayed to autistic. (*Id.*) Plaintiffs do not specify what the other "reports, findings, and recommendations" in the BIP were.

The CSE Subcommittee recommended that P.R. attend a 6:1+2 O-U BOCES special class placement with the assistance of a 1:1 aide, receive individual occupational therapy ("OT"), as well as small group and individual speech-language therapy. (*Id.*)

P.R. began the 2015-16 school year at Otisville-Minisink.  By early October 2015, school staff began requesting Plaintiff Parents pick P.R. up from school when they encountered difficulty handling his behaviors.  (SAC ¶ 86.)  On October 8, 2015, Assistant Principal Kathleen Santiago ("Santiago") instructed Plaintiff Parents to keep P.R. at home from October 9 through October 14, [2015] to "give the staff a break."  (*Id.*)  Likewise, Plaintiff Parents were instructed to keep P.R. home during the October 30, 2015 Otisville-Minisink Halloween Party.  (*Id.*)  Later, O-U BOCES excluded P.R. from participating in the December 22, 2015 Christmas Party.  (*Id.*)

On October 30, 2015, the District had Creese, a BCBA from Vital Behavior Services, develop a BIP to address P.R.'s behaviors.  P.R. then began to receive approximately six hours a week of services from Vital Behavior Services.  (*Id.* ¶ 88.)  On November 13, 2015, a CSE meeting was convened to revise P.R.'s BIP.  Although P.R.'s teacher, Tina Guerrera ("Guerrera"), observed a decrease in P.R.'s problem behaviors since the implementation of the BIP, Assistant Principal Santiago determined that the BIP had to be revised to accord with O-U BOCES policy, which forbids related service providers from comforting, supporting, or touching students with disabilities in any way.  (*Id.* ¶ 89.)

Plaintiffs allege that Vital Behavior Services staff "were extremely disappointed, and opined that the no-touch policy greatly hampered the effectiveness of their services by limiting their teaching and technical abilities."  (*Id.*)  Plaintiffs allege that "[t]his O-U BOCES policy [a]ffects all students with BIPs that provide for comforting or supportive intervention as was included in P.R.'s BIP by depriving them of intervention tactics that work when no other tactics are effective."  (*Id.*)

The CSE reconvened on December 11, 2015, and again revised P.R.'s BIP to provide that "[Plaintiffs] have agreed to pick [P.R.] up at such time as it is determined that all interventions have been unsuccessful and P.R.'s behaviors continue to be unsafe to himself and others." (*Id.* ¶ 90.) Guerrera indicated that the revised BIP had thus far been unsuccessful, and confirmed that P.R. was still not receiving any academic instruction. (*Id.*) Plaintiffs allege that CSE Chair Pavlik refused, on the advice of her lawyer, to discuss placement alternatives. (*Id.*) Plaintiffs further allege that the District neglected to provide a behavioral services schedule for P.R. to resume after the Christmas vacation. (*Id.*)

On the morning of January 4, 2016, Plaintiff Parents were called to remove P.R. from school. At this time, Assistant Principal Santiago informed Plaintiffs that Vital Behavior Services would no longer be performing any on-site services. (*Id.* ¶ 91) As a result, P.R.'s problem behaviors continue unabated. Plaintiff Parents were routinely called to remove P.R. from school, and if unavailable, P.R. was allegedly isolated by school staff. (*Id.*)

Plaintiffs allege that from October 8, 2015 through February 4, 2016, the District subjected P.R. to over 20 days of disciplinary removal, either by in-school isolation or out-of-school suspension, where P.R. received no education or related services. The District allegedly did not provide Plaintiffs with any options to make up for lost class time. (*Id.*)

On February 4, 2016, a CSE Subcommittee was held wherein all in attendance agreed that P.R.'s educational placement at Otisville-Minisink was an inappropriate and dangerous setting for him, and recommended home instruction until an appropriate placement was secured. (*Id.* ¶ 92.) Plaintiffs allege that even after this determination, the District continued to refuse Plaintiffs' request that P.R. be placed at the New Beginnings Annex in West Milford, New Jersey. (*Id.*) After attending his current classroom for a few more days pending the initiation of

home instruction, P.R. stopped attending school and would not re-enter a classroom environment until September 2017. (*Id.*)

Beginning on February 10, 2016, P.R. was to receive home instruction for one hour a day, five days a week at home, and OT and speech-language services at GHES, however, this plan ultimately ended up not coming to fruition and P.R. did not receive the amount of home instruction he was scheduled to receive. (SAC ¶¶ 93–94.)

On March 28, 2016, the Plaintiffs filed a due process complaint alleging that the District had denied P.R. access to a FAPE when, between October 2015 and February 2016, P.R. was repeatedly removed from the Otisville-Minisink without an appropriate Manifestation Determination Review ("MDR") and related safeguards. (*Id.* ¶ 95.)

On April 6, 2016, the CSE Subcommittee held a meeting to attempt to resolve the issue of home instruction. (*Id.* ¶ 96.) Mrs. Rutherford, whose first language is Spanish, requested an English to Spanish interpreter. The District refused because she had allegedly demonstrated an understanding of English at prior meetings. (*Id.*) Despite Plaintiffs' many requests throughout their dealings with the District, and despite the fact that Mrs. Rutherford was often the only parent available for meetings, the District repeatedly refused to provide interpreter services, or any notices or other documents in both English and Spanish. (*Id.*)

On April 11, 2016, Plaintiffs, through their special education advocate Linda Montalbano ("Montalbano"), filed an amended due process complaint that raised numerous additional claims related to:

> P.R.'s classification; the district's Child Find obligations; the sufficiency of district evaluations of P.R.; unanswered requests for independent education evaluations (IEEs); the sufficiency of the speech-language therapy program provided to P.R. and the appropriateness of P.R.'s speech-language goals; assistive technology; the district's failure to meet the P.R.'s behavioral needs; the sufficiency of the minimal education P.R. received through home instruction; the lack of parent counseling

and training or other services to support the parents in managing P.R.'s behaviors at home; P.R.'s transportation; problems communicating with the district, including the district's failure to respond to e-mails and the lack of an interpreter for [Mrs. Rutherford] during CSE Subcommittee meetings; and the district's refusal to consider placing P.R. at New Beginnings.

(*Id.* ¶ 97.)

On May 17, 2016, IHO Michael Lazan ("Lazan") issued a decision on the expedited MDR issue raised in Plaintiffs' March 28, 2016 complaint, and found that, by requiring Plaintiff Parents to pick up P.R. from school, the District had effectuated a disciplinary change in placement without conducting an MDR, conduct that violated 20 U.S.C. § 1415(k)(1)(e)(i), 34 CFR 300.530(e), and 8 N.Y.C.R.R. 201.4(a)(3) and constituted a denial of a FAPE. (SAC ¶ 99; Rushfield Aff. Ex. A at 60 ("May 17, 2016 IHO Decision") (Dkt. No. 115-1).) The Plaintiffs were awarded 50 hours of compensatory education, to be provided by a certified special education teacher, and to be paid at the provider's usual rate. The District appealed. (*Id.*) On May 25, 2016 IHO Lazan issued a decision on the remaining issues, and among other things, ordered the District to reclassify P.R. as a student with autism. (*Id.* ¶ 100; Rushfield Aff. Ex. A at 99 ("May 25, 2016 IHO Decision") (Dkt. No. 115-1).) The IHO also held that the Plaintiffs "shall not raise any claims that accrued prior to July 1, 2015" because of the prior stipulation the Parties had entered into, specifically the May 2015 Agreement. (May 25, 2016 IHO Decision 2–3, 8.)

### 6.  The 2016-17 School Year

#### a.  The 2016-17 IEP

The CSE Subcommittee convened on June 13, 2016 and on June 23, 2016 to develop an IEP for P.R. for the 2016-17 school year. The CSE Subcommittee recommended a 12-month school year program, with P.R. attending an ESY 6:1+2 special class placement in an O-U

BOCES setting during July and August 2016. (SAC ¶ 101.) For September 2016 through June 2017, the CSE Subcommittee recommended that P.R. attend a previously nonexistent 6:1+2 special class placement, which the District assured would be offered at GHES by September 2016. (*Id*.) The District also assured Plaintiffs that additional counseling staff would be available at GHES. The Plaintiffs, wary of prior misrepresentations on the part of the District, were skeptical and would not agree to the placement without further information. (*Id*.)

The June 2016 CSE Subcommittee formally reclassified P.R. as autistic, as ordered by the IHO decision dated May 25, 2016. However, the IEP developed by the June 2016 CSE nevertheless indicated that the unsuccessful BIP in effect during the 2015-16 school year "will follow to summer." (*Id*. ¶ 102.) Important program modifications, such as the development of a sensory diet, noise canceling earphones, and updated goals were put off until September 2016. (*Id*.)

On June 22, 2016, Plaintiffs, through their special education advocate Montalbano, filed a State complaint against O-U BOCES, alleging that O-U BOCES had denied P.R the "[p]rocedural Safeguards for a student with disabilities subject to discipline."[5] (*Id*. ¶ 103.)

### b. Summer 2016 ESY

On July 6, 2016, P.R. began to attend ESY at an O-U BOCES facility in Goshen, New York. Plaintiffs allege that P.R. was suspended six out of the twenty-four total days he spent in

---

[5] Plaintiffs simultaneously filed "State complaints" with the NYSED OSE that were considered by Regional Associates, (Rushfield Aff. Ex. A, at 74 ("September 15, 2016 OSE Decision") (Dkt. No. 115-1)), and "due process complaints" requesting impartial hearings with NYSED that were considered by IHOs and appealed to SROs, (Rushfield Aff. Ex. A at 119 ("Aug. 9, 2016 IHO Decision") (Dkt. No. 115-1)). Plaintiffs do not allege how, if at all, these two separate processes were related. The Court recounts all events and state administrative decisions in chronological order because Plaintiffs allege a pattern of receiving judgments in their favor by State administrative agencies and having Defendants repeatedly fail to comply with those orders. (SAC ¶¶ 144, 149, 151.)

the program, and staff documented 131 "incidents" in that time. O-U BOCES Staff, such as Director of Special Education Stroka and Assistant Director of Special Education James Higgins ("Higgins"), physically restrained and/or isolated P.R. (SAC ¶ 104.) Plaintiffs allege that P.R. routinely returned home with scratches, cuts, bruises, and other bodily marks. Keith Sullivan ("Sullivan"), the acting principal of the ESY program, admitted that the placement did not address P.R.'s educational needs. (*Id.*) Plaintiffs allege that deficiencies in the June 2016 CSE process and in the June 2016 IEP, such as the District's neglect to update P.R.'s BIP, significantly contributed to this educational failure. (*Id.*)

On July 20, 2016, Mr. Rutherford met with Stroka and Higgins to discuss P.R.'s placement options. At the meeting, Stroka informed Mr. Rutherford that the O-U BOCES did not have any placement for P.R., claiming that none of its more than a dozen programs could properly service P.R. (*Id.* ¶ 105.) Plaintiffs understood Stroka's claim to be pretext for retaliation against Plaintiffs for recent complaints lodged against the District and O-U BOCES. (*Id.*)

On July 25, 2016, SRO Carol H. Hauge ("Hauge") issued a decision upholding the IHO's May 17, 2016 decision and dismissing the District's appeal. (*Id.* ¶ 106; Rushfield Aff. Ex. A at 109 ("July 25, 2016 SRO Decision") (Dkt. No. 115-1).)

On August 9, 2016, IHO Lazan issued a decision ordering the District to, among other things, place P.R. at a school that is specially designed for students with autism that have severe behavioral problems and require a significant amount of individualized attention, provide P.R. with an additional 100 hours of compensatory special education services, and provide P.R. with 50 hours of compensatory Applied Behavioral Analysis ("ABA"). (*Id.* ¶ 107.) IHO Lazan issued this decision based on the allegations in the March 28, 2016 and April 11, 2016

complaints alleging the denial of a FAPE in the 2015-16 school year, and testimony and evidence gathered at three subsequent hearings. (Rushfield Aff. Ex. A at 119 ("Aug. 9, 2016 IHO Decision") (Dkt. No. 115-1).)

On August 11, 2016, Plaintiffs filed an amended due process complaint notice alleging that the District failed to offer P.R. a FAPE for the 2016-17 school year, based upon deficiencies in the June 2016 CSE process and in the June 2016 IEP. (SAC ¶ 108.) This complaint was filed with leave of the IHO, who had consolidated Plaintiffs three prior complaints, into one action.[6] (*Id.*)

### c. 2016-17 Placement

After P.R.'s ESY experience, Plaintiffs allegedly repeatedly reached out to the District and new Superintendent Jehring, to confer as to the development, or the existence of, P.R.'s proposed 6:1+2 educational placement. (*Id.* ¶ 109.) Plaintiffs allege that the District refused to communicate with them because of ongoing litigation, and did not contact them until August 31, 2016, at which time the District sent Plaintiffs a letter offering them "an ultimatum." (*Id.*) Plaintiffs could either accept, without any further information, the GHES class proposed in the June 2016 IEP, or continue with a pendency program. Plaintiffs opted for the pendency program. (*Id.*) Plaintiffs further allege that the District has a policy "to limit communications, delay litigation, dismiss concerns and . . . frustrate claims made by parents who . . . make complaints to ensure their children receive [a] FAPE." (*Id.* ¶ 110.)

---

[6] Plaintiffs do not specify which three prior complaints were consolidated. Plaintiffs mention the March 28, 2016 and April 11, 2016 due process complaints, (SAC ¶¶ 95, 97), and a June 22, 2016 State complaint, (*id.* ¶ 103), but it is not clear that those are the referenced complaints.

On September 7, 2016, P.R. began his pendency program at GHES.  Plaintiffs allege P.R. was isolated from other children in a small room behind an administrative office, "in the bowels of the building."  (*Id*. ¶ 111.)  Two or three adults attended to him at all times.  P.R. presented problem behaviors, such as flopping, bolting, and screaming.  GHES staff did not start documenting these incidents until September 14, 2016.  (*Id*.)

On September 15, 2016, the NYSED OSE Regional Associate Pamela Christian ("Christian") issued a decision finding that the O-U BOCES had denied P.R. the Procedural Safeguards for students with disabilities subject to discipline.  (*Id*. ¶ 112.)  This decision was based on a complaint filed by Montalbano against O-U BOCES on July 22, 2016.  (Lineed Decl. at 185 ("September 15, 2016 OSE Decision").)[7]

On September 16, 2016, Plaintiffs received a letter detailing P.R.'s pendency schedule. Plaintiffs allege that P.R. was not scheduled to interact with any other children, and not afforded any gym class, art class, computer class, or assembly.  (SAC ¶ 113.)  That night Mr. Rutherford and Montalbano attended the District "Back to School" open night at GHES, and confirmed that the District never established a new 6:1+2 class as they had agreed to do.  (*Id*.)  The only special education class in the District continued to be the 8:1+2 class which included the child suffering from Angelman Syndrome.  (*Id*.)

To manage P.R.'s transitions between locations, such as to and from the hallway, the bathroom, or the bus, the District and the staff at GHES implemented a policy and practice of physical force, despite the fact that no staff possessed the necessary training.  (*Id*. ¶ 114.)

---

[7] Plaintiffs do not allege filing a complaint on July 22, 2016—they allege filing a complaint on June 22, 2016, specifically relating procedural safeguards.  (SAC ¶ 103.)  It is not clear to the Court whether those allegations are the same and Plaintiffs' SAC simply contains a typo, or whether those are separate claims.  The Parties did not submit copies of Plaintiffs' complaints with the state agencies.

Specifically, "P.R.'s tutor, aides, and paraprofessionals would loop their arms beneath his to carry or drag him to his destination or to force him to comply." (*Id*.) Plaintiffs further allege that if staff were having an especially difficult time forcing P.R.'s compliance, they would call on Defendant Wall, a general and physical education teacher at GHES. (*Id*.) P.R. was allegedly terrified of Wall. (*Id*.)

On September 26, 2016, education advocate Montalbano filed a State complaint against O-U BOCES on behalf of the Plaintiffs, alleging that during the 2015-16 school year O-U BOCES had failed to follow emergency intervention procedures for P.R. in accordance with regulatory requirements for situations in which alternative procedures and methods not involving the use of physical force could not be reasonably employed. (*Id*. ¶ 116.)

On October 6, 2016, SRO Hauge issued a decision reversing the August 9, 2016 IHO Order that had directed the District to locate a placement at a school specially designed for students with autism, and modified the relief award from 100 to 89 hours of compensatory special education services. (SAC ¶ 117; Rushfield Aff. Ex. A at 1 ("October 6, 2016 SRO Decision") (Dkt. No. 115-2).) The SRO noted in that decision that she did not consider issues related to the 2014-15 school year because Plaintiffs never appealed the IHO's May 25, 2015 Decision that Plaintiffs "shall not raise any claims that accrued prior to July 1, 2015." (October 6, 2016 SRO Decision 3 n.2.)

On October 21, 2016, special education advocate Montalbano filed a State complaint to the OSE on behalf of the Plaintiffs, alleging that the District failed to (i) develop an IEP for P.R. that detailed his unique needs and recommended services in the areas of reading and math; (ii) provide parent counseling and training in accordance with P.R.'s 2016-2017 IEP and regulatory

requirements; and (iii) develop and implement an IEP that reflected P.R.'s unique needs within the Special Transportation section of P.R.'s 2016-17 IEP. (*Id.* ¶ 118.)

Plaintiffs allege that on November 9, 2016, P.R. returned home from his pendency placement at GHES "visibly quaking and inconsolable." (SAC ¶ 119.) P.R. said he was sad, pleaded for a new school, for "no more Golden Hill." (*Id.*) Plaintiff Parents were "seriously concerned for P.R.'s health, safety and wellbeing," and again requested home instruction, and were again denied. (*Id.*)

On November 16, 2016, GHES Principal Lisack called Plaintiff Parents to report that P.R. was being treated for various abrasive marks on his rear torso that he sustained when he fell backwards onto a plastic bin. (*Id.* ¶ 120.) Plaintiffs allege that Lisack later told the Warwick Police Department that P.R. fell against a shelf, not a plastic bin. (*Id.*) Plaintiff Parents were skeptical of Lisack's explanation. (*Id.*)

On November 22, 2016, OSE Regional Associate Christian issued a decision on Plaintiffs' September 26, 2016 allegations and found that the documentation maintained by O-U BOCES on the use of the emergency intervention was deficient in that it lacked specific information such as the setting and location of incidents, statements regarding BIPs, and details of any injuries sustained. (*Id.* ¶ 121.) The OSE instructed O-U BOCES to take corrective actions and to appropriately documents emergency interventions. (Rushfield Aff. Ex. A at 82 ("November 22, 2016 OSE Decision") (Dkt. No. 115-2).)

Plaintiffs allege that on November 30, 2016, P.R. again returned home quaking and inconsolable. Plaintiffs again requested home instruction, but were denied, so that they began to withhold P.R. from school some days, as he became more apprehensive about attending. (*Id.* ¶ 122.)

Plaintiffs allege that in early December 2016, P.R. began to verbally convey his fear of his Special Education Tutor Kerry Boylan, saying "Ms. Kerry bad" and "Ms. Kerry hit me." (SAC ¶ 123.)  Plaintiffs reported P.R.'s allegations of corporal punishment and abuse to the District, but the District refused to investigate the allegations.  (*Id.*)

On December 6, 2016, Plaintiffs filed a complaint with OSE, alleging that, for the 2016-17 school year, the District failed to develop and implement a BIP that addressed P.R.'s behavioral needs when transitioning to the school bus.  (*Id.* ¶ 124.)  Plaintiff Parents also began to pick P.R. up directly from GHES to avoid bus transfers, which were stressful and traumatic for P.R.  (*Id.*)

On December 16, 2016, OSE Regional Associate Christian issued a decision on Plaintiffs' October 21, 2016 allegations regarding failures to develop an appropriate IEP for P.R. and ordered the District to take corrective action by convening a CSE Subcommittee meeting to determine the appropriate amount of compensatory parent counseling and training to be provided. (*Id.* ¶ 125; Rushfield Aff. Ex. A at 88 ("December 16, 2016 OSE Decision") (Dkt. No. 115-1).)  Plaintiffs allege that the District never complied with this required corrective action. (SAC ¶ 125.)

On December 20, 2016, IHO Lazan issued a decision finding that the District denied P.R. a FAPE through its June 2016 IEP, and ordered that P.R. immediately be placed at New Beginnings at the District's expense, with transportation and transportation aides to and from school to be provided by the District.  (*Id.* ¶ 126; Rushfield Aff. Ex. A at 24 ("December 20, 2016 IHO Decision") (Dkt. No. 115-2).)

On January 13, 2017, after conferring with P.R.'s pediatrician, Dr. Richard Fuchs, his hearing expert Dr. Billie Thompson, as well as independent clinicians Pascal Saremsky, M.D.,

and James Weatherstone, LMSW, Plaintiffs permanently removed P.R. from his pendency placement at GHES. (*Id*. ¶ 127.)

Plaintiffs allege that over the 67 days P.R. attended his pendency placement, GHES staff recorded data for 57 days, documenting 141 incidents of P.R. "acting out of control." (*Id*.) Plaintiffs further allege that P.R. developed new fears and phobias, and described suffering injuries at the hands of staff. Plaintiffs were suspicious of physical abuse and concerned for P.R.'s health, safety, and wellbeing. (*Id*.)

On February 2, 2017, OSE Regional Associate Christian issued a decision sustaining Plaintiffs' December 6, 2016 allegations, finding that from July 1, 2016 to January 26, 2017, the District failed to develop and implement a BIP that addressed P.R.'s behavioral needs when transitioning from an educational setting to the school bus. (*Id*. ¶ 128; Rushfield Aff. Ex. A at 1 ("February 2, 2017 OSE Decision") (Dkt. No. 115-3).) However, because P.R.'s BIP was revised on January 27, 2017 to address P.R.'s behavioral needs when transitioning to the school bus, the OSE did not require further corrective action. (SAC ¶ 128.)

On March 9, 2017, a CSE Subcommittee meeting was convened to discuss P.R.'s placement. Plaintiffs allege that Wall admitted to Mr. Rutherford that he had assisted with P.R.'s bus transfers. (*Id*. ¶ 129.) Plaintiffs allege that the District and the CSE Subcommittee refused to hear or consider P.R.'s allegations of abuse by his tutor, attributed them to echolalia, and dismissed them out of hand. Plaintiffs allege that the District refused to investigate, change tutors or provide home instruction. (*Id*.)

Plaintiffs allege that at the same meeting, the CSE Subcommittee also denied hearing therapies with specialists recommended by the Plaintiffs, and neglected to incorporate techniques to help P.R. with his hearing problems into a new BIP. (*Id*. ¶ 130.) CSE Chair Pavlik allegedly

asserted that "our data shows [P.R.] has no hearing issues," despite the fact that she attended a December 2016 conference call with two hearing specialists who described P.R.'s hearing problems in detail. (*Id.*)

On March 10, 2017, SRO Hauge issued a decision finding that, although the District had denied P.R. a FAPE for the 2016-17 school year, the District could provide P.R. with a FAPE by revising his BIP. (*Id.* ¶ 131; Rushfield Aff. Ex. A at 16 ("March 10, 2017 SRO Decision") (Dkt. No. 115-3).) SRO Hauge thus reversed the IHO's December 20, 2016 order that the District place P.R. at New Beginnings and remanded the case back to the IHO to determine the compensatory education award appropriate to remedy P.R.'s denial of a FAPE. (*Id.*; *Id.*)

From mid-May through the end of the 2016-17 school year, P.R. attended the S.S. Seward Institute, the District's combined Middle and High School, to receive related services, but still had no academic tutor. (SAC ¶ 132.)

### 7. The 2017-18 School Year

The CSE Subcommittee developed a Summer 2017 program for P.R. at the S.S. Seward Institute. P.R. only attended for a few days towards the end of the session. (SAC ¶ 133.) Though the ESY program offered a BCBA, an aide, speech therapy, and OT, Plaintiffs allege that P.R. still had no academic tutoring. (*Id.*) Plaintiffs allege they were wary of the District's historical approach of isolating P.R. in an empty school basement, which they knew to be "injurious and unproductive." (*Id.*)

Plaintiffs allege that on many ESY days no one other than administrative staff and maintenance workers were left in the building, and that large and dangerous equipment would be left in the same area where P.R. would receive services. (*Id.*) On one occasion, P.R.'s BCBA did not show up, so that only Tiger and P.R.'s 1+1 aide were there to watch P.R. On that day,

P.R. ran into the library and up to the second level atrium, where he hovered dangerously above a 20-foot drop. (SAC ¶ 133.) Mr. Rutherford arrived, and after almost twenty minutes in the atrium, he was finally was able to bring P.R. down to safety, and immediately took him home. (*Id*.)

On July 10, 2017, a CSE Subcommittee meeting was convened to discuss P.R.'s 2017-18 placement, and recommended the New York State-approved day program at a new Abilities First Annex in Cornwall, New York, approximately 35 minutes from P.R.'s home. (*Id*. ¶ 134.) Plaintiffs allege that the CSE Subcommittee still failed to address P.R.'s "specific and unique transportation needs." (*Id*.)

On July 7, 2017, the Plaintiffs filed a due process complaint against the District alleging that the District failed to appropriate evaluate P.R. and requesting funding for a private neuro-psychological evaluation and "QEEG brain mapping" by Dr. Susan Crum ("Dr. Crum"). (*Id*. ¶ 135.) Plaintiffs sought an "IEE and QEEG brain mapping" to properly quantify P.R.'s IQ and further demonstrate that P.R. suffers from "the Matthew Effect" as a result of years of FAPE deprivations. (*Id*.) Plaintiffs allege that P.R.'s I.Q. has nearly been cut in half from age three to present. (*Id*.) Plaintiffs do not define "IEE and QEEG brain mapping," or "Matthews Effect." On August 7, 2017, the Plaintiffs filed a second due process complaint asserting additional claims. (*Id*.)

In September of 2017, P.R. began attending the new day program at the Abilities First Annex in Cornwall, New York, his placement for the 2017-18 school year. (*Id*. ¶ 136.) Plaintiffs allege that this was the first year that P.R. was permitted to receive group counseling, despite group counseling being provided in each of his IEPs since about 2012. (*Id*.)

On September 25, 2017, Plaintiffs' special education advocate Montalbano filed a State complaint on their behalf, alleging that the District's CSE Subcommittee failed to develop an IEP to include the special transportation required to meet P.R.'s unique needs during the 2017-18 school year. (SAC ¶ 137.)

On October 23, 2017, IHO Lazan issued a remand Decision, per the SRO's March 10, 2017 remand instructions, (*id.* ¶ 131), and ordered the District to provide P.R. with 150 hours of compensatory education by a certified special education teacher together with a professional behavior specialist to remedy P.R.'s FAPE deprivation for the 2016-17 school year, (*id.* ¶ 138; Lineen Decl. at 215 ("October 23, 2017 IHO Decision")).

On November 20, 2017 OSE Regional Associate Christian issued a decision sustaining Plaintiffs' September 25, 2017 allegation, and ordered the District to convene a CSE meeting to ensure that P.R.'s 2017-18 IEP fully reflected P.R.'s needs for special transportation. (SAC ¶ 139; Rushfield Aff. Ex. A at 10 ("November 20, 2017 OSE Decision") (Dkt. No. 115-3).)

On December 29, 2017, SRO Hauge issued a decision upholding the October 23, 2017 IHO Decision. (SAC ¶ 140.)

On January 10, 2018, IHO James McKeever ("McKeever") issued a decision limited to claims arising from the 2016-17 school year, and denied the Plaintiffs' request for an IEE by Dr. Crum. (SAC ¶ 141; Rushfield Aff. Ex. A at 74 ("January 10, 2018 IHO Decision") (Dkt. No. 115-3).) McKeever found that the District did not have the ability to implement the 6:1+2 class placement recommended in the November 2016 and March 2017 IEPs. (*Id.* ¶ 143.) Plaintiffs allege their request for an evaluation by Dr. Crum was primarily denied because Plaintiffs could not afford to bring her in to testify at the hearing as to why the requested evaluation was warranted. (*Id.* ¶ 141.)

On January 23, 2018, Plaintiffs filed another State Complaint against the District alleging non-compliance with the October 6, 2016 SRO decision. (SAC ¶ 142.) On March 19, 2018, OSE Regional Associate Joanne P. Lanuto ("Lanuto") issued a written decision sustaining Plaintiffs' allegations and instructed the District to take corrective action and comply with the SRO Order. (SAC ¶ 142; Rushfield Aff. Ex. A at 106 ("March 19, 2018 OSE Decision") (Dkt. No. 115-3).)

On March 23, 2018, SRO Justyn P. Bates ("Bates") issued a decision sustaining in part the January 10, 2018 decision of IHO McKeever on an appeal brought by P.R., specifically affirming that the District did not have the ability to implement the 6:1+2 class placement recommended in the November 2016 and March 2017 IEPs. (SAC ¶ 143.) The SRO concluded that P.R. had not received a FAPE from January 28, 2017 through June 23, 2017, and ordered the District to provide relief in the form of 105 compensatory educational hours provided by both a special education teacher and a BCBA. (Rushfield Aff. Ex. A at 1 ("March 23, 2018 SRO Decision") (Dkt. No. 115-4).) Plaintiffs allege that the March 23, 2018 SRO Decision supports its allegations that the District failed to provide a FAPE when it offered Plaintiffs a 6:1+2 class placement it was not able to implement. (SAC ¶ 143.)

### 8. Alleged Noncompliance by Defendants and Erroneous State Agency Rulings

Plaintiffs allege that the District has failed to comply with the May 2015 Resolution Agreement by continuing to deny P.R. group counseling required by his then-current IEP. (*Id.* ¶ 144.)

Plaintiffs allege that the District has failed to comply with the May 2016 IHO decision by failing to provide 50 hours of compensatory education, (*id.* ¶ 145), and with the August 2016

IHO decision by failing to provide 150 hours of compensatory education (later reduced to 89 hours by the SRO in October 2016), (*id.* ¶ 146).

Plaintiffs allege that the SRO erred in its October 2016 decision reducing the amount of compensatory education and related services awarded in the August 2016 IHO decision. (*Id.* ¶ 147), and in its March 2017 decision reversing the part of the December 2016 IHO decision placing P.R. at the New Beginnings school, (*id.* ¶ 148).

Plaintiffs allege that the District has failed to comply with the October 2017 IHO decision by failing to provide 150 hours of compensatory education. (SAC ¶ 149.) Plaintiffs also allege that this award is insufficient to compensate P.R. for missing school for an entire year. (*Id.*)

Plaintiffs allege that the SRO erred in the December 2017 decision by denying Plaintiffs' appeal and upholding the compensatory award made in the October 2017 IHO decision. (*Id.* ¶ 150.)

Plaintiffs allege that the March 2017 "State Complaint Decision" contains findings that prove District's non-compliance with the October 2016 SRO decision. (SAC ¶ 151.) Plaintiffs allege that the District continues to fail to properly communicate with Plaintiffs with regard to the provision of compensatory education. (*Id.*)

Plaintiffs allege that the SRO erred in his March 2018 decision when he found Plaintiffs' appeal to be without merit on the issues of removing P.R. from a dangerous setting, the private evaluation sought, pendency services offered, and parent counseling. (*Id.* ¶ 152.)

Finally and generally, Plaintiffs allege that they are "an economically vulnerable family with a child with disabilities who has been victimized by a cycle of snowballing harms," including early deprivations of needed education services and a FAPE that have "caused significant deficits in P.R.'s social and academic skills." (*Id.* ¶ 61.)

Plaintiffs allege Defendants used "inappropriate tactics" that were "so obviously injurious to P.R. that his parents pulled him out of school on several occasions out of concern for his safety, health, and wellbeing." (*Id.* ¶ 62.) Defendants' tactics allegedly "exacerbate[d] P.R.'s behavioral barriers to learning, and his social and academic deficits," deprived P.R. of "the opportunity to interact with other children, make friends, and be a part of the larger community," and further exposed the family to economic vulnerability by causing Plaintiff Parents to miss work and job opportunities and thereby to lose significant earnings and income. (*Id.*) Plaintiffs allege that P.R. "languished in educational limbo for years," and as a result P.R. "experienced injuries and delays he would otherwise not have, and may never be able to overcome." (*Id.*)

Plaintiffs allege that Defendants caused P.R. to suffer the injuries and losses described herein, including but not limited to severe academic and developmental delays, physical pain, emotional distress, humiliation, trauma, post-traumatic stress disorder, anxiety, fear, and a loss of federally-protected rights. (SAC ¶¶ 166, 169.)

C.  Procedural Background

Plaintiffs filed their initial Complaint on December 15, 2016. (Compl. (Dkt. No. 2)). On May 12, 2017, the Court granted Plaintiffs' request to proceed in forma pauperis. (*See* Dkt. No. 7.) On June 14, 2017, the Court granted Plaintiffs' Application for the Court to Request pro bono counsel. (*See* Dkt. No. 9.)

On July 20, 2017, counsel for District Defendants submitted a pre-motion letter requesting permission to file a Motion to Dismiss. (*See* Letter from Mark C. Rushfield, Esq., to Court (Dkt. No. 11).) On August 1, 2017, the Court held a pre-motion conference and instructed the Parties to provide further information about certain factual questions that arose during conference, specifically the location of educational services being provided to P.R. at that time,

and whether P.R. had recently been subjected to physical violence. (*See* Dkt. (minute entry for Aug. 1, 2017); Dkt. Nos. 25, 27.)

On October 17, 2017, the Court held a status conference. (*See* Dkt. (minute entry for Oct. 17, 2017).) On December 18, 2017, the Court held another status conference at which Plaintiffs' appointed pro bono counsel appeared and at which the Parties agreed that Plaintiffs would file an Amended Complaint. (*See* Dkt. (minute entry for Dec. 18, 2017).)

Thereafter Plaintiffs filed several deficient versions of amended complaints and experienced significant delays in effecting proper and timely service on Defendants. Plaintiffs filed their First Amended Complaint ("FAC") in deficient form on January 19, 2018, and were instructed to refile. (Dkt. No. 39). The FAC added the New York State Education Department ("NYSED") and Mary Ellen Elia ("Elia") (together "NYSED Defendants"), as well as several additional individual District Defendants, including Wall and Boylan. (*See generally* FAC.)

On February 27, 2018, counsel for Plaintiffs filed a pre-motion letter requesting leave to amend the FAC to add and remove certain Defendants and claims, (*see* Letter from Angel A. Castro, III, Esq., to Court (Dkt. No. 42)), and an updated version of that letter on February 28, 2018, (*see* Letter from Angel A. Castro, III, Esq., to Court (Dkt. No. 44)), in order to comply with the Court's instructions, (Dkt. No. 43).

On March 6, 2017, counsel for District Defendants submitted a letter opposing Plaintiffs' request to amend. (*See* Letter from Mark C. Rushfield, Esq., to Court (Dkt. No. 46).) On March 8, 2017, counsel for BOCES Defendants also filed a letter opposing Plaintiffs' request. (*See* Letter from Lewis R. Silverman, Esq., to Court (Dkt. No. 47).) On March 16, 2018, the Court held another pre-motion conference at which it instructed Plaintiffs to inform the Court whether they would be filing their proposed Second Amended Complaint, or a Third Amended

Complaint, and instructed the Parties to inform the Court of a briefing schedule for any motions. (*See* Dkt. (minute entry for Mar. 16, 2018).)

On April 2, 2018, counsel for Plaintiffs informed the Court Plaintiffs intended to file their proposed Second Amended Complaint. (*See* Letter from Angel A. Castro, III, Esq., to Court (Dkt. No. 49).) On May 7, 2018, Plaintiffs filed their Second Amended Complaint ("SAC"). (Dkt. No. 50.) This SAC, however, was filed in deficient form. (Dkt. (entry for May 8, 2018).)

On May 9, 2018, counsel for the District Defendants submitted a letter raising concerns that the belated and improper filing of the SAC would lead to delays in litigating the case. (Letter from Mark Rushfield, Esq., to Court (Dkt. No. 53).) On May 10, 2018, the Court ordered that Plaintiffs serve the SAC on all Defendants by May 24, 2018. (Dkt. No. 54.) On May 29, 2018, counsel for District Defendants again alerted the Court that the District Defendants added by the SAC, specifically Defendants Wall and Boylan, had still not been served. (Letter from Mark Rushfield, Esq., to Court (Dkt. No. 57).) That same day the Court ordered Plaintiffs to address the service issue by June 4, 2018. (Dkt. No. 58.)

On May 31, 2018, the Court adopted a briefing schedule for the BOCES Defendants to file their proposed Motion To Dismiss. (Dkt. No. 60.) On June 13, 2018, the Court adopted a briefing schedule for the District Defendants to file their Motion To Dismiss, and warned Plaintiffs to address the continuing service issues by June 16, 2018 or "face serious consequences." (Dkt. No. 62.)

On June 18, 2018, counsel for District Defendants again alerted the Court that Wall and Boylan had not yet been served and requested that they be dismissed from the case. (Letter from Mark Rushfield, Esq., to Court (Dkt. No. 69).) On June 22, 2018, Plaintiffs' counsel asked for another extension to effect service. (Letter from Angel A. Castro, III, Esq., to Court (Dkt. No.

71).)  On June 26, 2018, the Court ordered that "Plaintiffs must serve all Defendants by 7/16/18. No more extensions."  (Dkt. No. 72.)

After numerous failed attempts, (Dkt. Nos. 74–77, 79–83, 85–88), electronic summonses were finally successfully issued as to the newly-added District Defendants and NYSED Defendants on July 20, 2018.  (Dkt. Nos. 96–99.)

Plaintiffs also refiled their SAC, again in deficient form, on July 11, 2018, (Dkt. No. 73), on July 15, 2018, (Dkt. No. 78), July 15, 2018, (Dkt. No. 84), and on July 18, 2018, (Dkt. Nos. 89, 90).  Plaintiffs finally filed their SAC in correct form on July 18, 2018.  (Dkt. No. 91.)

On July 23, 2018, Plaintiffs' counsel requested another extension to serve Defendants because his office had experienced technical issues with filing summonses through ECF.  (Letter from Angel A. Castro, III, Esq., to Court (Dkt. No. 100).)  On July 25, 2018, the Court granted Plaintiffs' request and ordered that service be completed by July 31, 2018.  (Dkt. No. 102.)

On August 15, 2018, Counsel for NYSED Defendants alerted the Court that NYSED Defendants had not yet been properly served and asked that they be dismissed from the case. (*See* Letter from D. Stan O'Loughlin, Esq., to Court (Dkt. No. 111).)  On August 17, 2018, the Court ordered Plaintiffs to explain why NYSED Defendants had not been properly served and why they should not be dismissed from this Action.  (Dkt. No. 112.)  Thereafter Plaintiffs made several additional attempts at serving NYSED Defendants and the Parties sent several more letters updating the Court on the status of service.  (Dkt. No. 118–21.)  On September 12, 2018, the Court scheduled a conference for October 16, 2018 to discuss the issue of service with respect to the NYSED Defendants.  (Dkt. No. 122.)  At the October 16, 2018 conference, Plaintiffs' counsel conceded that Plaintiffs had not yet served NYSED Defendants, Wall or Boylan.  (Dkt. (minute entry for Oct. 18, 2018).)  On October 24, 2018, the Court dismissed the

NYSED Defendants from this case pursuant to Federal Rule of Civil Procedure 4(m), because Plaintiffs failed to serve the NYSED Defendants after being granted numerous extensions. (*See* Dkt. No. 130.)[8]

While service issues were ongoing, Defendants filed their Motions To Dismiss. On August 1, 2018, BOCES Defendants filed their Motion To Dismiss and accompanying papers. (BOCES Defs.' Not. of Mot.; Lineen Decl.; BOCES Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("BOCES Defs.' Mem.") (Dkt. No. 107).) On August 29, 2018, District Defendants filed their Motion To Dismiss and accompanying papers. (District Defs.' Not. of Mot.; Rushfield Aff.; Tiger Aff.; District Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("District Defs.' Mem.") (Dkt. No. 117).)

On September 18, 2018, counsel for Plaintiffs filed an Affirmation in Opposition to BOCES Defendants' Motion To Dismiss. (*See* Aff. of Angel A. Castro, III, Esq., in Opp'n to BOCES Mot. To Dismiss ("Castro Aff. re BOCES Defs.") (Dkt. No. 123).) Counsel's Affirmation is a five-page recitation of facts from the SAC and conclusory arguments without citation to caselaw. On October 2, 2018, BOCES Defendants filed their Reply in Further Support of their Motion To Dismiss. (*See* BOCES Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss ("BOCES Defs.' Reply") (Dkt. No. 126).)

On October 23, 2018, counsel for Plaintiffs filed an Affirmation in Opposition to District Defendants' Motion To Dismiss. (*See* Aff. of Angel A. Castro, III, Esq., in Opp'n to BOCES Mot. To Dismiss ("Castro Aff. re District Defs.") (Dkt. No. 129).) This Affirmation too is a short recitation of facts from the SAC and conclusory arguments without citation to caselaw. On

---

[8] District Defendants maintain that service as to Wall and Boylan was improper. (District Defs.' Mem. 21) The Court did not address service issues with respect to District Defendants by separate hearing, but will decide the sufficiency of service as to District Defendants herein.

October 29, 2018, District Defendants filed their Reply in Further Support of their Motion To Dismiss.  (*See* District Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss ("District Defs.' Reply") (Dkt. No. 131).)

## II.  Discussion

### A.  Standard of Review

District and BOCES Defendants move to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (*See* District Defs.' Not. of Mot.; BOCES Defs.' Not. of Mot.)[9]

"The standards of review under Rules 12(b)(1) and 12(b)(6) . . . are substantively identical."  *Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (quotation marks omitted) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)), *aff'd*, 591 F. App'x 28 (2d Cir. 2015).  "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (citation and quotation marks omitted)).  However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)."  *Id.* (citing *Lerner*, 318 F.3d at 128); *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule

_____

[9] District Defendants also move to dismiss Boylan and Wall from this case pursuant to Federal Rule of Civil Procedure 12(b)(2), or in the alternative ask the Court to dismiss them pursuant to Federal Rule of Civil Procedure 4(m).  (*See* District Defs.' Not. of Mot.; District Defs.' Mem. 21.)

12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (citation and quotation marks omitted)). This allocation of the burden of proof is the "only substantive difference" between the standards of review under these two rules. *Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009).

### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (citation and quotation marks omitted)). "In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court may consider matters outside the pleadings." *JTE Enters., Inc.*, 2 F. Supp. 3d at 338 (citation, alterations, and quotation marks omitted).

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in

favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

### B. Personal Jurisdiction and Insufficient Service

The Court first considers Defendants' jurisdictional challenges. District Defendants argue that Boylan and Wall should be dismissed from this case pursuant to Fed. R. Civ. P. 12(b)(2), because the Court lacks personal jurisdiction over them due to insufficient service, or pursuant to Fed. R. Civ. P. 4(m) on the basis that Plaintiffs have failed to timely serve them. (District Defs.' Mem. 21.)

### 1. Rule 12(b)(2) — Insufficient Service of Process

A district court lacks personal jurisdiction over those defendants not properly served. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). In addition, "there must be a statutory basis for personal jurisdiction that renders such service of process effective." *Id.* "The available statutory bases in federal courts are enumerated by Federal Rule of Civil Procedure 4(k)," which provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Id.* at 59–60 (quotation marks omitted) (citing *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010) ("A district court's personal jurisdiction is determined by the law of the state in which the court is located.")).

The Second Circuit has "long made clear that [i]n deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway" so that the court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (citation and

quotation marks omitted). The burden is on Plaintiffs to establish that personal jurisdiction lies. *See Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." (citation omitted)).

In this case, no proof of service as to Wall and Boylan has been presented to the Court. Wall and Boylan were first named in the FAC on January 19, 2018. (Dkt. No. 39.) Since then, counsel for District Defendants has repeatedly alerted the Court and Plaintiffs that Wall and Boylan have not been served, and this Court has granted several extensions and issued several final warnings. (Dkt. Nos 57–58, 69, 72, 102.) Plaintiffs' counsel conceded that Plaintiffs were unable to serve Wall and Boylan, and Plaintiffs did not request an extension to further serve any Defendants. (Dkt. (minute entry for Oct. 18, 2018).) Counsel for District Defendants has also stated that counsel for Plaintiffs advised him that Plaintiffs "were unable to effect service on Wall or Boylan" and that they "do not plan to make any further requests for extensions on service to Wall or Boylan." (Rushfield Aff. ¶ 4.) Plaintiffs' counsel's only proffered explanations for the delay in serving Wall and Boylan was that counsel's office was having issues with the process server and technical issues with ECF. (Dkt. Nos. 71, 100.) Since the last conference in this case on October 16, 2018, Plaintiffs have not contacted the Court to request a further extension, nor to offer any explanation for their continued failure to serve Defendants. The Court is not aware of any further service attempts having been made, and Wall and Boylan both remain unserved.

The Court thus grants District Defendants' Motion to Dismiss Wall and Boylan from this case for lack of personal jurisdiction. *See Hack v. Stang*, No. 13-CV-5713, 2014 WL 4652596, at *3 (S.D.N.Y. Sept. 18, 2014) ("A prima facie case for personal jurisdiction has three elements[,]

[one of which is:] (1) the plaintiff's service of process upon the defendant must have been procedurally proper" (quotation marks omitted) (quoting *Licci*, 673 F.3d at 59)).

### 2. Rule 4(m) — Failure to Timely Serve

It is true that this Court has the authority to grant an extension of time to effect service, but the Court declines to do so at this stage. Fed. R. Civ. P. 4(m) requires a plaintiff to effect proper service on a defendant within 90 days of the filing of the complaint. *See* Fed. R. Civ. P. 4(m). If a plaintiff fails to do so, the Court "*must* dismiss the action without prejudice against [the] defendant or order that service be made within a specified time." *Id.* (emphasis added). However, if the plaintiff has demonstrated "good cause" for a failure to effect service, the Court "must" extend the time to effect service. *Id.* "'Good cause' is generally limited to 'exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond its control.'" *Barbosa v. City of New York*, No. 16-CV-7340, 2018 WL 4625620, at *2 (S.D.N.Y. Sept. 26, 2018) (quoting *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 419 (S.D.N.Y. 2013)). "In determining whether a plaintiff has shown good cause, courts weigh the plaintiff's reasonable efforts and diligence against the prejudice to the defendant resulting from the delay." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010) (citations omitted). That is, "[c]ourts generally consider three factors: (1) whether the delay resulted from inadvertence or whether a reasonable effort to effect service has occurred, (2) prejudice to the defendant, and (3) whether the plaintiff had moved for an extension of time to serve." *Nicholas v. Bratton*, No. 15-CV-9592, 2018 WL 1054567, at *1 (S.D.N.Y. Feb. 23, 2018) (citation omitted).

Even if a plaintiff cannot establish good cause, Rule 4(m) allows the Court, in its discretion, to extend the time for service. *See Zapata v. City of New York*, 502 F.3d 192, 193 (2d

Cir. 2007) ("[D]istrict courts may exercise their discretion to grant extensions under Rule 4(m) absent a showing of good cause under certain circumstances."). In determining whether a discretionary extension is warranted, the Court considers: "(1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether [the] defendant had attempted to conceal the defect in service; and (4) whether [the] defendant would be prejudiced by extending [the] plaintiff's time for service." *DeLuca*, 695 F. Supp. 2d at 66 (citations omitted).

Plaintiffs are not entitled to an extension to effect service. This is not a case where Plaintiffs can be said to have been unaware that service was not completed or where external circumstances interfered with Plaintiffs' ability to effect service. *See Guerrero v. City of New York*, No. 14-CV-8035, 2018 WL 4333985, at *6 (S.D.N.Y. Sept. 11, 2018) (holding that the plaintiff failed to demonstrate good cause where the "[d]efendants raised the issue of [defective] service in" five court filings); *Spinale v. United States*, No. 03-CV-1704, 2005 WL 659150, at *3 (S.D.N.Y. Mar. 16, 2005) ("[A] plaintiff must demonstrate that despite diligent attempts, service could not be made due to exceptional circumstances beyond his or her control." (citation omitted)), *aff'd*, 352 F. App'x 599 (2d Cir. 2009). The Court repeatedly warned Plaintiffs that service as to Wall and Boylan had not been completed. Plaintiffs' counsel's vague excuses that his firm's process server did not follow instructions, (Dkt. No. 71), or that his firm was experiencing technical difficulty with ECF, (Dkt. No. 100), do not constitute circumstances beyond Plaintiffs' control. Inadvertence, mistake or neglect, let alone prolonged neglect, does not constitute good cause for an extension. *See Spinale*, 2005 WL 659150, at *3. Moreover, since October 2018, Plaintiffs have made no further service attempts and have not requested any further extension. The Court thus concludes that Plaintiffs have failed to demonstrate good

cause excusing their failure to timely serve Wall and Boylan.  *See Brunson-Bedi v. New York*, No. 15-CV-979, 2018 WL 2084171, at *9 (S.D.N.Y. May 1, 2018) (holding that the "[p]laintiff's utter failure to provide an explanation for the extensive delay in service warrants dismissal" (citation omitted)); *Smith v. Bray*, No. 13-CV-7172, 2014 WL 5823073, at *5 (S.D.N.Y. Nov. 10, 2014) (affirming dismissal for insufficient service of process where court had previously warned plaintiffs that service on defendants was insufficient and where plaintiffs "offer[ed] no explanation for their failure to effect proper service"); *Spinale*, 2005 WL 659150, at *4 (holding the "failure of service is due not to extraordinary circumstances, but to neglect," after citing, inter alia, the "noteworthy" fact that "the plaintiffs made no effort to request an extension until  . . . more than ten months after the deadline for service had passed"); *see also Harper v. City of New York*, 424 F. App'x 36, 40–41 (2d Cir. 2011) (upholding dismissal under Rule 4(m) against a backdrop of counsel's "troubling pattern of carelessness").

Even though dismissal may prejudice some of Plaintiffs' claims based on applicable statutes of limitations, this factor is not dispositive.  *See Etheredge-Brown v. Am. Media, Inc.*, No. 13-CV-1982, 2015 WL 4877298, at *4–5 (S.D.N.Y. Aug. 14, 2015) (declining to exercise discretion to grant extension of time to serve even though statute of limitations likely barred refiling of claims); *Vaher v. Orangetown*, 916 F. Supp. 2d 404, 421 (S.D.N.Y. 2013); ("[E]ven if the balance of hardships favors the plaintiff a district court may still decline to excuse a failure to timely serve the summons and complaint where the plaintiff fails to advance some colorable excuse for neglect." (citing *Zapata*, 502 F.3d at 198 & n.7)).  Plaintiffs have had over a year to serve Wall and Boylan, have received repeated warnings that they have failed to serve those Defendants, and yet have not sought an extension to serve Wall and Boylan nor have they offered a colorable excuse for their continued failure to serve them.  Indeed, Plaintiffs do not

argue that Wall and Boylan should not be dismissed. The Court accordingly grants District Defendants' Motion to dismiss Wall and Boylan from this Action for failure to timely serve them.

Because Wall and Boylan are dismissed from this case, Plaintiffs' Fifth Claim for assault and battery, which names only Wall and Boylan as Defendants, is dismissed.

The portions of Plaintiffs' Fourth Claim, brought pursuant to § 1983, alleging violations of P.R.'s substantive due process rights under the Fourteenth Amendment, (SAC ¶¶ 220–21), and Plaintiffs' Fourth Amendment rights to be free from the use of excessive and unreasonable force, (*id.* ¶¶ 223–24), which name only Lisack, Wall, and Boylan as Defendants, are also dismissed because Wall and Boylan are dismissed from this case, and Lisack is not a named Defendant.

C.  Subject Matter Jurisdiction and Exhaustion

Before proceeding to an analysis of the merits, the Court must first determine whether it has subject matter jurisdiction over the federal claims in this case. BOCES and District Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs did not exhaust their administrative remedies as required by the IDEA with respect to all claims that relate to P.R.'s education. (BOCES Defs.' Mem. 7–14; District Defs.' Mem. 14–17.) District Defendants additionally argue that the May 2015 Settlement Agreement bars Plaintiffs' claims with respect to the 2013-14 and 2014-15 school years, and that this Court does not have the authority to enforce SRO decisions. (District Defs.' Mem. 14–17.)

1.  Legal Standard — IDEA Exhaustion

"The IDEA's purpose is 'to ensure that all children with disabilities have available to them a free appropriate public education,'" which, "[i]n practice, . . . means that [s]tates have an affirmative obligation to provide a basic floor of opportunity for all children with disabilities."

*T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C.

§ 1400(d)(1)(A)). Accordingly, the IDEA requires that "states receiving federal funds . . .

provide 'all children with disabilities' a 'free appropriate public education.'" *Hardison v. Bd. of*

*Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 376 (2d Cir. 2014) (quoting 20 U.S.C.

§ 1412(a)(1)(A)). To provide a FAPE, a school district must offer "special education and related

services tailored to meet the unique needs of a particular child, which are reasonably calculated

to enable the child to receive educational benefits." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d

236, 238–39 (2d Cir. 2015) (citation and quotation marks omitted).

"It is well-settled that, prior to bringing a suit in federal court under [the] IDEA, plaintiffs

must exhaust all available administrative procedures." *See Scaggs v. N.Y. Dep't of Educ.*, No.

06-CV-799, 2007 WL 1456221, at *4 (E.D.N.Y. May 16, 2007) (citing 20 U.S.C. § 1415(l)).

"Failure to exhaust the [IDEA's] administrative remedies deprives the court of subject matter

jurisdiction." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008)

(citation omitted); *Polera v. Bd. of Educ.*, 288 F.3d 478, 483 (2d Cir. 2002) (same). Under the

IDEA, parents of disabled children are guaranteed "a variety of procedural safeguards," *Mr. P v.*

*W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018) (citation omitted), including the right

"to request a due process hearing in order to present complaints as 'to any matter relating to the

identification, evaluation, or educational placement of the child, or the provision of a free

appropriate public education,'" *Cave*, 514 F.3d at 245 (quoting 20 U.S.C. § 1415(b)(6)(A)).

These administrative proceedings are adjudicated and conducted in accordance with the laws of

each state. § 1415(f)–(g). "New York has opted for a two-tier administrative system" for review

of IEPs:

> First, an impartial hearing officer is selected from a list of certified officers and
> appointed by the local board of education or the competent state agency to conduct

the initial hearing and issue a written decision. That decision can then be appealed to a state review officer of the New York Education Department.

*Cave*, 514 F.3d at 245. "Only after exhaustion of these procedures has an aggrieved party the right to file a suit in a federal or state court." *Id*. (citing § 1415(i)(2)(A)). However, for exhaustion purposes, a party need not appeal a favorable IHO decision, since under IDEA only a "party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency." § 1415(g)(1).

"The IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." *Polera*, 288 F.3d at 487. "Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." *Id.* (citation and quotation marks omitted).

"[T]he exhaustion requirement does not apply 'in situations in which exhaustion would be futile.'" *Coleman v. Newburgh Enlarged City Sch. Dist*., 503 F.3d 198, 205 (2d Cir. 2007) (quoting *Polera*, 288 F.3d at 488). "To show futility, a plaintiff must demonstrate that adequate remedies are not reasonably available or that the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process." *Id*. (citation and quotation marks omitted). Futility may exist where the case involves "systemic violations that could not be remedied by local or administrative agencies." *Cave*, 514 F.3d at 249; *accord J.S. ex rel. N.S. v. Attica Cent. Schs*., 386 F.3d 107, 113 (2d Cir. 2004). "The rationale behind this exception is that while the administrative hearing officers have the authority to enforce established regulations,

policies[,] and procedures, they generally do not have the authority to set new policies or to alter existing ones." *King v. Pine Plains Cent. Sch. Dist.*, 918 F. Supp. 772, 781 (S.D.N.Y. 1996). While claims of systemic violations are often asserted as part of a class action, they "can be made at the individual level, provided 'a systemic policy is at stake' and 'the administrative officer has no power to correct the violation.'" *J.Z. v. N.Y.C. Dep't of Educ.*, 281 F. Supp. 3d 352, 362 (S.D.N.Y. 2017) (citation omitted). Another "potential bas[is] for futility [is] . . . that defendants 'failed to implement services that were specified or otherwise clearly stated in an IEP.'" *Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.*, 827 F. Supp. 2d 130, 138 (E.D.N.Y. 2010) (quoting *Polera*, 288 F.3d at 489). "The burden of demonstrating futility rests with the party seeking to avoid the exhaustion requirement." *Coleman*, 503 F.3d at 205 (citation omitted).

The Court also must assess whether the other federal claims raised by Plaintiff—those claims arising under the ADA, Section 504, and § 1983, are also subject to exhaustion. "The exhaustion requirement applies to all suits that 'seek relief for the denial of a FAPE,' regardless of whether the suit was brought under the IDEA or 'similar laws,' including the ADA, the Rehabilitation Act, and 42 U.S.C. § 1983." *Martinez v. N.Y.C. Dep't of Educ.*, No. 17-CV-3152, 2018 WL 4054872, at *4 (E.D.N.Y. Aug. 24, 2018) (quoting *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 752 (2017)). "[I]n determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." *Fry*, 137 S. Ct. at 752. "[I]f, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." *Id*. at 754; *see Polera*, 288 F.3d at 487–88) (holding that if the theory behind a claim relates to the education of disabled children, IDEA exhaustion is required).

## 2. Application to Claims Addressed in IHO and SRO Decisions

The Court first considers the claims in this case that have been addressed by IHO and subsequent SRO decisions and that have made their way through New York State's "two-tier administrative system." *Cave*, 514 F.3d at 245. District Defendants argue that even as to the claims that made their way through the two-tier system, this Court lacks subject matter jurisdiction because Plaintiffs are not "aggrieved parties" based on IHO and SRO decisions that ruled in their favor. (District Defs.' Mem. 16–17.) The Court thus first briefly recounts the holding of each IHO and SRO decision and which portions of those decisions Plaintiffs are contesting or seeking to enforce.

The first administrative decision in this case was issued on May 17, 2016 by IHO Lazan and held that the District denied P.R. a FAPE between October 30, 2015 and February 2016, while he was a student at OU-BOCES-operated Otisville-Minisink, and awarded Plaintiffs 50 hours of compensatory education. (*See* May 17, 2016 IHO Decision.) On July 25, 2016, SRO Hauge upheld the IHO's May 17, 2016 decision. (*See* July 25, 2016 SRO Decision.) Plaintiffs allege that the District has failed to comply with the May 2016 IHO decision by failing to provide 50 hours of compensatory education. (SAC ¶ 145.)[10]

---

[10] BOCES Defendants argue that OU-BOCES was not P.R.'s home district and that it is therefore not the proper party to address allegations of the denial of a FAPE. (BOCES Defs.' Mem. 12.) Defendants' "argument" is two sentences long, fails to cite to any caselaw or to the record, and fails to meaningfully explain why the Court should at this stage, without further discovery or proper argument by the Parties, dismiss the entity that operated the school at which the SRO concluded that P.R. was denied a FAPE during the 2015-16 school year, and that is mentioned throughout the IHO and SRO decisions. "The defendant has simply failed to support its argument with any meaningful measure of factual or legal argument. Courts need not consider cursory arguments of this kind, and the Court declines to do so here." *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at 12 *n.12 (N.D.N.Y. 2017) (citation, alterations, and quotation marks omitted).

Second, on August 9, 2016, IHO Lazan issued a decision ordering the District to, among other things, place P.R. at a school specially designed for students with autism with severe behavioral problems and provide P.R. with an additional 100 hours of compensatory special education services for the 2015-16 school year.  (*See* Aug. 9, 2016 IHO Decision.)  On October 6, 2016, SRO Hauge reversed the August 9, 2016 IHO Order directing the District to locate a placement at a special school and modified the relief award from 100 to 89 hours of compensatory special education services.  (*See* October 6, 2016 SRO Decision.)  Plaintiffs allege that the District has failed to comply with these orders and has not yet provided the compensatory education hours, (SAC ¶ 146), and that the SRO erred in its October 2016 decision reducing the amount of compensatory education and related services awarded in the August 2016 IHO decision.[11]  (*Id*. ¶ 147.)

Third, on December 20, 2016, IHO Lazan issued a decision finding that the District denied P.R. a FAPE through its June 2016 IEP, and ordered that P.R. immediately be placed at New Beginnings at the District's expense, with transportation and transportation aides to and from school to be provided by the District.  (*See* December 20, 2016 IHO Decision.)  On March 10, 2017, SRO Hauge issued a decision finding that, although the District had denied P.R. a FAPE for the 2016-17 school year, the District could provide P.R. with a FAPE by revising his BIP.  (*See* March 10, 2017 SRO Decision.)  SRO Hauge thus reversed the IHO's December 20, 2016 Order that the District place P.R. at New Beginnings and remanded the case back to the IHO to determine the compensatory education award appropriate to remedy P.R.'s denial of a

---

[11] The Court notes that both the July 25, 2016 and the October 6, 2016 SRO decisions relate to the 2015-16 school year for part of which P.R. was a student at a UO-BOCES-operated Otisville-Minisink.  (SAC ¶¶ 86, 92.)

FAPE.  (SAC ¶ 131.)  Plaintiffs allege that the SRO erred in its March 2017 decision reversing the part of the December 2016 IHO decision placing P.R. at the New Beginnings school.  (*Id.* ¶ 148).

Fourth, on October 23, 2017, IHO Lazan issued a remand Decision, per the SRO's March 10, 2017 remand instructions, and ordered the District to provide P.R. with 150 hours of compensatory education by a certified special education teacher together with a professional behavior specialist to remedy P.R.'s FAPE deprivation for the 2016-17 school year, (*see* October 23, 2017 IHO Decision).  On December 29, 2017, SRO Hauge upheld the October 23, 2017 IHO Decision.  (*See* December 29, 2017 SRO Decision.)  Plaintiffs also allege the District has failed to comply with the October 2017 IHO decision by failing to provide 150 hours of compensatory education.  (SAC ¶ 149.)  Moreover, Plaintiffs allege that this award is insufficient to compensate P.R. for missing school for an entire year.  (*Id.*)  Plaintiffs allege that the SRO erred in its December 2017 decision "by denying Plaintiffs['] appeal and upholding the compensatory award made in the October 2017 IHO decision."  (*Id.* ¶ 150.)

Finally, on January 10, 2018, IHO McKeever issued a Decision limited to claims arising from the 2016-17 school year, and denied Plaintiffs' request for an IEE by Dr. Crum.  (*See* January 10, 2018 IHO Decision.)  McKeever also found that the District did not have the ability to implement the 6:1+2 class placement recommended in the November 2016 and March 2017 IEPs.  (SAC ¶ 143.)  On March 23, 2018, SRO Bates issued a decision sustaining in part the January 10, 2018 decision of IHO McKeever, specifically affirming that the District did not have the ability to implement the 6:1+2 class placement recommended in the November 2016 and March 2017 IEPs.  (*Id.*)  The SRO concluded that P.R. had not received a FAPE from January 28, 2017 through June 23, 2017, and ordered the District to provide relief in the form of 105

hours of compensatory educational hours provided by both a special education teacher and a

BCBA. (*See* March 23, 2018 SRO Decision.) Plaintiffs allege that the SRO erred, in its March

2018 decision when it found Plaintiffs' appeal to be without merit on the issues of removing P.R.

from a dangerous setting, the private evaluation sought, pendency services offered, and parent

counseling. (SAC ¶ 152.)

Plaintiffs have thus gone through the two-tier administrative system with respect to their

claims raised in the July 25, 2016 SRO Decision, October 6, 2016 SRO Decision, March 10,

2017 SRO Decision, December 29, 2017 SRO Decision, and March 23, 2018 SRO Decision.

*Cave*, 514 F.3d at 245. Plaintiffs substantively challenge portions of the findings in the October

6, 2016, March 10, 2017, December 29, 2017, and March 23, 2018 SRO Decisions. Plaintiffs do

not, however, challenge any of the findings in the July 25, 2016 SRO Decision—they instead

allege that the District failed to comply with the decision by failing to provide 50 hours of

compensatory education. Moreover, with respect to each of the SRO Decisions that Plaintiffs do

challenge at least in part, Plaintiffs also allege a failure of the District to comply with those SRO

decisions.

District Defendants argue that Plaintiffs are not "aggrieved parties" based on the SRO

decisions that ruled in their favor and of which they only seek enforcement. (District Defs.'

Mem. 17.) The Court is aware that there is a circuit split as to whether a particular provision of

the IDEA—20 U.S.C. § 1415(i)(2)(a)—provides a cause of action to enforce a favorable hearing

officer decision in federal court. This provision grants "[a]ny party aggrieved by the findings

and decision" of a hearing officer "the right to bring a civil action . . . in any State court of

competent jurisdiction or in a district court of the United States, without regard to the amount in

controversy." § 1415(i)(2)(A). *Compare B.D. v. D.C.*, 817 F.3d 792, 801–02 (D.C. Cir. 2016)

(holding that IDEA does not provide plaintiffs an enforcement cause of action, but noting that § 1983 may provide such a cause of action to enforce a hearing officer's decision), *with Nieves–Márquez v. Puerto Rico*, 353 F.3d 108, 115–17 (1st Cir. 2003) (allowing enforcement action under § 1415(i)(2)(A)); *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1069 n.7 (9th Cir. 2002) ("Nor do the parties dispute that the IDEA's right of action provides a proper means to enforce a due process hearing order . . . .").

Closer to home, "[t]he Second Circuit has ruled that an action may be brought under [] § 1983 in order to remedy a violation of the IDEA." *A.T. v. N.Y. State Educ. Dep't*, No. 98-CV-4166, 1998 WL 765371, at *7 (E.D.N.Y. Aug.4, 1998) (citing *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir. 1987)).[12] It is true that, "[o]nly a 'party aggrieved by the findings and decision' of an SRO may bring a federal or state court action." *Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 415 n.11 (S.D.N.Y. 2011) (quoting 20 U.S.C. § 1415(i)(2)(A)); *see also McAdams v. Bd. of Educ.*, 216 F. Supp. 2d 86, 93–94 (E.D.N.Y. 2002) ("It is well-settled that only a party aggrieved by the findings and decision of the SRO may commence an action in federal court."). Where Plaintiffs do not seek to "challenge . . . the state review officer's findings against them, they are before the Court solely for the purpose of enforcement, and cannot be characterized as aggrieved parties under the IDEA." *A.T.*, 1998 WL 765371, at *6. This does not, however, divest the Court of subject matter jurisdiction. "[P]laintiffs may seek to enforce their IDEA claim under § 1983, under which [this Court] ha[s] subject matter jurisdiction to enforce favorable administrative decisions rendered under the provisions of the IDEA." *Id.* at

---

[12] The Court notes that in *Mrs. W.*, 832 F.2d 748, the Second Circuit analyzed the Education of the Handicapped Act ("EHA"), the pre-cursor to the IDEA, and concluded that despite the "extensive remedial scheme" of the statute, Congress intended to "allow resort to other judicial remedies for claims based on the EHA." *Id.* at 755.

*7, 9–10 & n.16; *see also Blazejewski v. Bd. of Educ. of Allegany Cent. Sch. Dist.*, 560 F. Supp.

701, 705 (W.D.N.Y. 1983) (issuing preliminary injunction ordering the defendant to implement

the decision of an SRO finding that the court had jurisdiction and could issue injunctive relief

under § 1983).  "Limiting the actions plaintiffs might take to force implementation of an IHO's

decision can only reduce the urgency school districts would attribute to the implementation of an

IHO's decision and thereby lessen the credibility of the IHO process.  To uphold the IDEA's

purpose of providing educational services to disabled children, parents must be able to choose

litigation if they believe that is necessary to effectively enforce orders given by IHOs." *SJB ex*

*rel. Berkhout v. N.Y.C. Dep't of Educ.*, No. 03-CV-6653, 2004 WL 1586500, at *4 (S.D.N.Y.

July 14, 2004); *see also M.H. v. Bristol Bd. of Educ.*, 169 F. Supp. 2d 21, 28–29 (D. Conn. 2001)

(holding that the IDEA may serve as the basis for a § 1983 cause of action); *Butler v. S. Glens*

*Falls Cent. Sch. Dist.*, 106 F. Supp. 2d 414, 420 (N.D.N.Y. 2000) (same); *R.B. v. Bd. of Educ. of*

*City of New York*, 99 F. Supp. 2d 411, 418 (S.D.N.Y. 2000) (same); *Cappillino v. Hyde Park*

*Cent. Sch. Dist.*, 40 F. Supp. 2d 513, 515–16 (S.D.N.Y. 1999) (same).

This Court follows the sound reasoning of the other district courts in the Second Circuit

in holding that § 1983 may provide a cause of action to enforce a hearing officer's decision.[13]

This Court has subject matter jurisdiction over all of Plaintiffs' claims exhausted in the New

York's two-tier administrative system—both the substantive challenges to SRO decisions, and

the allegations of non-compliance with SRO decisions.  With respect to substantive challenges to

the SRO decisions and the amount of the compensatory education awards, Plaintiffs are properly

characterized as "aggrieved parties" under the IDEA, and this Court may review those SRO

---

[13] The Court notes that one of Plaintiffs' claims is in fact a § 1983 claim for violations of
Plaintiffs' rights under the IDEA.

decisions under the appropriate standard applicable at the next stage of this litigation. *See Mr. &*
*Mrs. P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008) (describing the
standard of review applicable to IDEA cases at the summary judgment stage and the deference
owed to the decisions of state agencies). With respect to Plaintiffs' allegations of non-
compliance, this Court has subject matter jurisdiction under § 1983 to enforce favorable
administrative decisions rendered under the provisions of the IDEA.

Accordingly, Plaintiffs have administratively exhausted the claims discussed in the SRO
decisions, specifically with respect to the 2015-16 and 2016-17 school years, and this Court has
jurisdiction to review the contested findings in those SRO decisions, and to issue relief where
Defendants have failed to comply with those decisions. [14]

### 3. Exceptions to the IDEA Exhaustion Requirements

With respect to all Plaintiffs' claims not addressed by IHO or SRO decisions, specifically
all allegations predating the May 17, 2016 IHO Decision, Plaintiffs do not allege any facts
suggesting that they sought relief through New York's two-tier administrative system.

---

[14] The Court's holding that it has subject matter jurisdiction to consider all claims decided
by the SROs applies equally to the IDEA, ADA, Section 504, and § 1983 claims, inasmuch as
the facts alleged before the state administrative agencies are the facts that support each of those
claims, even if Plaintiffs did not specifically invoke the relevant federal statutes during the state
administrative proceedings. *See Robert F. v. N. Syracuse Cent. Sch. Dist*, No. 18-CV-594, 2019
WL 1173457, at *8–9 (N.D.N.Y. Mar. 13, 2019) (denying motion to dismiss for failure to
exhaust because the "facts alleged in the [i]mpartial [h]earing [r]equests are the same facts that
support Plaintiffs' Rehabilitation Act claim" even where hearing request did not discuss the
Rehabilitation Act or certain elements thereof specifically).

Therefore, the Court must ask whether any exception to the IDEA exhaustion requirement applies to Plaintiffs' IDEA claims for the 2013-14 and 2014-15 school years.[15]

### a.  District Defendants —The May 2015 Settlement Agreement

District Defendants argue that Plaintiffs' claims concerning the 2013-14 and 2014-15 school years were not exhausted as required by the IDEA, because "[P]laintiffs . . . provided a release to the District [D]efendants as concerns such claims" and any claims not covered by the Agreement were not raised in any due process complaints.  (District Defs.' Mem.  16.)

In their SAC, Plaintiffs allege that when they entered the agreement in May 2015 they were "desperate for P.R. to receive educational and related services."  (SAC ¶ 83.)  P.R. had been out of school since December 2014 and Plaintiff Parents' attempts to meet with District officials to find a new placement for P.R. had been unsuccessful.  (*Id.* ¶¶ 78–81.)  Plaintiffs allege that "the contemplated period for which this release is in effect is unclear."  (*Id.* ¶ 83.)  In briefing the current Motions, Plaintiffs argue that the Agreement should be interpreted so that the release is valid only from "the date it was signed [May 19, 2015] through June 30, 2015." (Castro Aff. re District Defs. ¶¶ 6–7.)  Plaintiffs' counsel states in his Affirmation, that Plaintiffs entered the Agreement on the advice of their counsel at the time.  (*Id.* ¶ 6.)

Plaintiffs do not argue that they exhausted their administrative remedies with respect to the 2013-14 and 2014-15 school years—Plaintiffs in effect ask the Court to ignore the Settlement

---

[15] BOCES Defendants argue that Plaintiffs failed to exhaust their administrative remedies with respect to the 2012-13 school year, (BOCES Defs.' Mem. 11), but the Court does not read Plaintiffs' SAC as raising an IDEA claim with respect to the 2012-13 school year.  The SAC specifically states that Defendants denied P.R. access to a FAPE during the 2013-14, 2014-15, 2015-16, and 2016-17 school years.  (SAC ¶ 158.)

Agreement and to instead decide whether it would have been futile for Plaintiffs to pursue administrative remedies in any event. The Court declines to do so.[16]

The May 19, 2015 "Release and Settlement Agreement" between Plaintiffs and the District provided that P.R. would resume his education at Otisville-Minisink. (May 2015 Agreement ¶ 1.) In relevant part, the "Agreement resolves any and all issues raised or which could have been raised in connection with the provision to Student by the District of an education meeting all applicable State and Federal legal requirements for the period through June 30, 2015." (*Id.* ¶ 6.) The Agreement further provided that Plaintiffs "release and discharge the District from any past, present and future liabilities, duties, obligations or other responsibilities under any State or Federal law, known or unknown, relating to the education of Student for the period through and including June 30, 2015." (*Id.* ¶ 9.)

Notably, the Agreement was discussed during the State administrative proceedings. The May 25, 2016 IHO Order held that the Plaintiffs "shall not raise any claims that accrued prior to July 1, 2015 . . . given a prior stipulation between the parties." (May 25, 2016 IHO Decision 3, 8.) The IHO specifically noted that "[t]he parents agree on this . . . contention." (*Id.* at 3.) The October 6, 2016 SRO Decision noted that although Plaintiffs appealed several other findings of the IHO, they had not appealed the IHO's May 25, 2016 finding that Plaintiffs would not raise any claims that accrued prior to July 1, 2015 and therefore the SRO did not consider issues related to the 2013-14 and 2014-15 school years. (October 6, 2016 SRO Decision 3.)

---

[16] The BOCES Defendants are not parties to the Settlement Agreement. Inasmuch as the Court finds that Plaintiffs' futility argument with respect to District Defendants fails because the Settlement Agreement demonstrates that Plaintiffs chose to pursue some claims and not others against District Defendants, that conclusion does not apply to BOCES Defendants. The Court will engage in a separate futility analysis with respect to BOCES Defendants.

There is some lower court precedent in the Second Circuit that a waiver of IDEA claims may be invalid if not knowingly and voluntarily made. *See Somoza v. N.Y.C. Dep't of Educ.*, 475 F. Supp. 2d 373, 388–89 (S.D.N.Y. 2007) (holding that a stipulation releasing a disabled student's rights under the IDEA was not a voluntary and knowing waiver because the stipulation was unclear and contained no explicit waiver of IDEA rights, the student's parent did not receive adequate explanation of the stipulation and was not represented by counsel) (citing *W.B. v. Matula*, 67 F.3d 484, 497 (3d Cir. 1995)), *rev'd on other grounds*, 538 F.3d 106 (2d Cir. 2008). A waiver of IDEA claims must be "knowing and voluntary" as judged by the "totality of the circumstances." *W.B.*, 67 F.3d at 497. Aside from the voluntariness question of waivers, there is caselaw that holds that district courts do not have to defer to IHOs' and SROs' interpretations of settlement agreements. *See Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 323 (S.D.N.Y. 2005) (holding that court would not defer to decisions of IHO and SRO because their decisions depended on interpretation of a settlement agreement between the parents and school district, and the court was equally able to interpret terms of contract).

Plaintiffs do not allege that they unknowingly or involuntarily signed the Agreement, or that they were somehow coerced into signing it. Nor do Plaintiffs allege that they did not understand the terms of the Agreement or that they were confused at the time they entered into it. Plaintiffs were represented by counsel at the time, and they did not contest the IHO's holding that Plaintiffs would not raise any claims that accrued before July 1, 2015. (May 25, 2016 IHO Decision 3, 8; October 6, 2016 SRO Decision 3.) And Plaintiffs do not allege that they attempted to raise claims that accrued before July 1, 2015 at any point while they were exhausting their administrative remedies with respect to claims that accrued after that date, or that they were prevented from doing so. Finally, this is not a case in which Plaintiffs allege that

they did not have notice of their administrative remedies or that they did not know how to file administrative due process complaints. *Cf. Martinez,* 2018 WL 4054872, at *4 ("Exhaustion is excused if the defendant failed to notify the plaintiff of her procedural rights under the IDEA." (alterations and quotation marks omitted) (quoting *Dervishi ex rel. T.D. v. Stamford Bd. of Educ.*, 691 F. App'x 651, 652 (2d Cir. 2016))). Plaintiffs actively engaged in the state administrative process with respect to a significant portion of their claims—and as part of those proceedings did not to pursue claims that accrued prior to July 1, 2015.

Because Plaintiffs entered into the Settlement Agreement, did not contest the IHO's holding that they could not raise claims that accrued before July 1, 2015, and indeed did not raise such claims before the IHOs and SROs, there is no administrative record in this case with respect to the 2013-14 and 2014-15 school years. Plaintiffs here ask this Court to evaluate the sufficiency of P.R.'s education during the 2013-14 and 2014-15 school years without the benefit of the state administrative agencies having applied their expertise to these claims. *See Heldman v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992) (explaining that exhaustion requirement "permits an agency to bring its expertise to bear on a problem").

Plaintiffs' argument that "[NY]SED's failure to enforce [the IHOs and SROs' Decisions] should lead this Court to find that filing the due process hearing requests for any of the contemplated school years was futile because Plaintiffs have sufficiently pled a pattern of non-compliance with decisions and there is no enforcement mechanism for any resulting awards," (Castro Aff. re District Defs. ¶ 16), fails because it ignores the reality that Plaintiffs made the choice to pursue certain claims, and not others, through the state administrative process. Plaintiffs cannot credibly argue that they did not pursue their administrative remedies with respect to the 2013-14 and 2014-15 school years because adequate remedies were not available

during those years, when Plaintiffs did pursue administrative remedies with respect to the 2015-16 and 2016-17 school years and secured rulings in their favor. That those rulings have not yet been enforced is not dispositive.[17] Plaintiffs let the IHO holding that Plaintiffs' pre-July 1, 2015 claims were resolved by the Settlement Agreement stand, and only pursued administrative remedies with respect to claims that accrued after that date.

The Court is sympathetic to Plaintiffs' allegation that they were desperate to ensure P.R. started receiving educational services again—but this allegation does not negate that Plaintiffs elected not to pursue their administrative remedies with respect to the 2013-14 and 2014-15 school years, nor does this allegation put this Court in a position to take on the role of state administrative agencies as expert on the education of disabled children and decide the sufficiency of P.R.'s education during the 2013-14 and 2014-15 school years for the first time in this Action. *Cf. Scott ex rel. C.S. v. N.Y.C. Dept. of Educ.*, 6 F. Supp. 3d 424, 438–39 (S.D.N.Y. 2014) (declining to review issues parent did not raise in her initial due process complaint because the parent's failure to exhaust administrative remedies deprived federal court of jurisdiction to consider claim on appeal from SRO); *B.P. v. N.Y.C. Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is

---

[17] In their SAC, Plaintiffs make certain "systemic claims" against the District, (SAC ¶¶ 168(i)–(viii)),—the type of systemic claims a court may consider in determining whether it would have been futile for a plaintiff to seek administrative remedies. *See Kalliope R. ex rel. Irene D*, 827 F. Supp. 2d at 138 (holding that systemic violations that cannot be addressed by the available administrative procedures are a basis of futility that may excuse failure to exhaust IDEA claims). The Court does not, however, consider these systemic claims here because it concludes that Plaintiffs chose to only pursue administrative remedies with respect to the 2015-16 and 2016-17 school years, but not with respect to the 2013-14 and 2014-15 school years. That Plaintiffs made the decision to raise some claims but not others during the state administrative proceedings, does not retroactively render administrative remedies futile with respect to the claims the Plaintiffs chose not raise in the state administrative proceedings.

limited to matters either raised in the [p]laintiffs' impartial hearing request or agreed to by [the] [d]efendant.").[18]

Accordingly, Plaintiffs have failed to exhaust their administrative remedies as required by the IDEA with respect to the 2013-14 and 2014-15 school years as related to the District Defendants and have failed to meet their burden of demonstrating futility. *See O.V. v. Durham Pub. Schs. Bd. of Educ.*, 2018 WL 2725467, at *16–17 (M.D.N.C. June 6, 2018) (holding that plaintiffs could not "seek refuge in the futility exception" based on the fact that they did not exhaust administrative remedies for schools years that were covered by a settlement agreement, because "regardless of [the SRO's] power to declare the Settlement Agreement voided, [] the SRO possessed authority to overrule [the] ALJ . . . dismissal of [p]laintiffs' claims as barred by its release" (citation, alterations, and quotation marks omitted)), *adopted by* 2018 WL 3370644 (M.D.N.C. July 10, 2018); *S.M. ex rel. Allen v. W. Contra Costa Cty. Unified Sch. Dist. Fin. Corp.*, No. 07-CV-5829, 2009 WL 1033826, at *3–4 (N.D. Cal. Apr. 16, 2009) (holding that plaintiffs' claims under the IDEA that arose prior to a settlement agreement were barred by the agreement where the plaintiffs did not dispute the authenticity of the agreement, and the language of the agreement was unambiguous and released all federal claims asserted by plaintiffs).

---

[18] The Parties do not argue the validity or enforceability of the Settlement Agreement, and this Court does not decide whether to consider the 2013-14 and 2014-15 school years based on the enforceability of that Agreement or in terms of contract law. However, the Court notes that courts outside the Second Circuit have applied contract law principles to estop plaintiffs from litigating IDEA claims where they had entered settlement agreements releasing school districts from liability. *See, e.g., I.K. ex rel. B.K. v. Sch. Dist. of Haverford Tp.*, 961 F. Supp. 2d 674, 700–01 (E.D. Pa. 2013) (holding that even where there was no valid settlement agreement between the parties, promissory estoppel made parent's promises to settle Pennsylvania special education-eligible student's IDEA and discrimination claims enforceable).

### b. BOCES Defendants — Exhaustion of IDEA Claim

The Court next considers whether Plaintiffs are exempt from the exhaustion requirement of the IDEA with respect to their IDEA claims against BOCES Defendants during the 2013-14 and 2014-15 school years.

BOCES Defendants argue that Plaintiffs failed to exhaust their administrative remedies and exhaustion would not have been futile, specifically not on the grounds that OU-BOCES committed systemic violations. (BOCES Defs.' Mem. 11–13.) Plaintiffs broadly counter, but without specifically addressing the absence of an administrative record for the 2013-14 and 2014-15 school years, that they "have sought administrative intervention on numerous occasions," and have "tried to obtain administrative relief, but [that] even when determinations were made in their favor, the problems raised persisted." (Castro Aff. re BOCES Defs. ¶¶ 2–3.) Plaintiffs specifically argue that the OU-BOCES "no-touch policy" was widespread and not only negatively impacted P.R., but all students entitled to a Behavioral Intervention Plan or BIP. (*Id.* ¶¶ 10–11.)

Plaintiffs have "[t]he burden of demonstrating futility," *Coleman*, 503 F.3d at 205, and may either do so by plausibly alleging that their case involves "systemic violations that could not be remedied by local or administrative agencies," *Cave*, 514 F.3d at 249, or by plausibly alleging that defendants "failed to implement services that were specified or otherwise clearly stated in an IEP," *Polera*, 288 F.3d at 489.

With respect to the 2013-14 school year, the only allegation specific to BOCES Defendants that conceivably fits into one of the exception categories is that while P.R. was a student at Warwick, Speech Pathologist and Licensed Clinical Social Worker Isaacson refused to perform the 2:1 group counseling sessions that were to be conducted once a week in accordance

with P.R.'s IEP. (SAC ¶ 65). Plaintiff Parents again requested group counseling at a November 7, 2013 IEP meeting, but Principal Brunjes, who did not deny that Isaacson refused P.R. counseling services, took no further action and merely asserted that P.R. was not fit for O-U BOCES Warwick. (*Id.* ¶ 66.) Plaintiffs allege that Brunjes refused to hire additional staff to allow P.R. to receive his counseling services. (*Id.* ¶ 67.) Plaintiffs also allege that at the May 22, 2014 CSE Subcommittee meeting, it was determined that P.R. continued to need weekly group counseling in a 2:1 setting, as he had since the 2011-12 school year. (*Id.* ¶ 70.) During Summer 2014, P.R. attended the O-U BOCES ESY Program, and by that time, P.R. has been denied necessary group counseling services for two years, and his behavioral issues had worsened as a result. (*Id.* ¶ 71.)

Given these allegations, Plaintiffs plausibly allege that BOCES Defendants "failed to implement services that were specified or otherwise clearly stated in an IEP." *Polera*, 288 F.3d at 489; *cf. Piazza v. Fla. Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 684–85 (S.D.N.Y. 2011) (holding that "failure to implement" exception did not apply where plaintiffs alleged that the district failed to provide student with home instruction of appropriate quality and duration because only the claim that "the District simply failed to provide [the student] with any home instruction, . . . [would] fit within the implementation exception to the exhaustion requirement" (emphasis omitted)); *Gardner v. Uniondale Pub. Sch. Dist.*, No. 08-CV-847, 2008 WL 4682442, at *12–13 (E.D.N.Y. Oct. 21, 2008) (holding that where an alleged failure to implement a provision of an IEP may be traced to the IEP's lack of clarity regarding the school district's obligations, exhaustion should not be excused because the inadequacies in the IEP could have been corrected via administrative proceedings); *Scaggs*, 2007 WL 1456221, at *6 (finding plaintiffs failed to invoke futility exception when they alleged that "defendants may not have

provided the students with any IEP-plan whatsoever, rather than declining to implement services 'specified' or 'clearly stated' in IEPs that had already been created for the students"). Here, Plaintiffs and BOCES Defendants did not dispute the propriety of providing P.R. with 2:1 group counseling services—Plaintiffs allege that P.R.'s IEP expressly provided for such services and that BOCES Defendants failed to provide those services for over two years, well into Summer 2014. Exhaustion would thus have been futile with respect to Plaintiffs' request for 2:1 group counseling, and this claim is exempted from the IDEA's exhaustion requirement.[19]

Plaintiffs make no allegations with respect to the 2014-15 school year that can be read to allege that BOCES Defendants committed systemic violation or denied P.R. a service specifically provided by his IEP. Instead, Plaintiffs make allegations about disputes between the Parties as to what P.R.'s IEP should have included. (SAC ¶ 74–75, 77, 80.) However, such disputes do not constitute failures to implement services clearly provided for by P.R.'s IEP. *See Piazza*, 777 F. Supp. 2d at 684–85 (holding that only the claim that "the [defendant] simply

_____

[19] BOCES Defendants summarily raise a statute of limitations argument, (BOCES Defs.' Mem. 14), only to misstate the applicable statute of limitations for IDEA claims. BOCES Defendants' statute of limitations argument is one paragraph long and does not apply the law to any facts in this case. This Court "need not consider cursory arguments of this kind, and the Court declines to do so here." *Grant*, 2017 WL 5564605, at *12 n.12. District Defendants notably do not raise any statute of limitations defenses.

The Court notes, however, that the IDEA applies a two-year statute of limitations to complaints asserting a FAPE violation. *See* 20 U.S.C. § 1415(b)(6)(B) (noting that administrative complaint may assert "an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint . . . ."); *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 114 n.7 (2d Cir. 2008) (holding that IDEA claims for the denial of a FAPE are subject to a two-year statute of limitations). Plaintiffs initiated this Action on December 15, 2016, (Dkt. No. 2),— almost three years after Plaintiffs' Summer 2014 allegation. However, the Court will not, without further briefing from the Parties regarding the applicable statute of limitations, accrual dates, and whether any time was tolled during the mandatory exhaustion of administrative remedies, decide the statute of limitations issue at this point. *See Gonzalez v. Hasty*, 651 F.3d 318, 324 (2d Cir. 2011) (stating that claims are tolled during mandatory administrative exhaustion process).

failed to provide [the student] with [the service provided for by the student's IEP], . . . [would] fit within the implementation exception to the exhaustion requirement").

Accordingly, Plaintiffs have failed to exhaust their administrative remedies as required by the IDEA with respect to the 2013-14 and 2014-15 school years as related to the BOCES Defendants, with the exception of Plaintiffs' claim regarding their request for 2:1 group counseling during the 2013-14 school year.

### 4. IDEA Exhaustion of ADA, Section 504, and § 1983 Claims

The Court next addresses whether the other federal claims raised by Plaintiffs were also subject to the IDEA's exhaustion requirement. BOCES Defendants argue that because the IDEA explicitly requires a plaintiff to exhaust any administrative remedies prior to filing a civil action seeking relief available under the IDEA regardless of the specific statutes under which the action is brought, 20 U.S.C. § 1415(1), Plaintiffs had to exhaust their administrative remedies with respect to their Section 504, ADA, and § 1983 claims pursuant to the IDEA's exhaustion requirement. (BOCES Defs.' Mem. 8.)[20]

### a. *Fry v. Napoleon Community Schools*

In *Fry* , the U.S. Supreme Court held that in determining whether a claimant has exhausted IDEA's administrative remedies, courts are to ask whether "the gravamen of a complaint against a school concerns the denial of a FAPE." 137 S. Ct. at 756. If so, plaintiffs must exhaust the IDEA's administrative remedies. *Id*. at 755. However, where the gravamen of a plaintiff's action is something other than a FAPE, such as "disability-based discrimination," the

---

[20] BOCES Defendants cite caselaw that predates the Supreme Court's recent decision in *Fry,* 137 S. Ct. 743, which outlines the test courts are to apply to determine when administrative exhaustion of claims alleging the denial of a FAPE brought under statutes other than the IDEA is required. (BOCES Defs.' Mem. 8–10 (collecting cases).)

exhaustion requirement is inapplicable.  *Id*. at 756.  The Supreme Court gave some guidance for

handling such cases in proposing two hypothetical questions: "First, could the plaintiff have

brought essentially the same claim if the alleged conduct had occurred at a public facility that

was not a school—say, a public theater or library? And second, could an adult at the school—

say, an employee or visitor—have pressed essentially the same grievance?" *Id*.  If the answer to

both of those questions is yes, the claim is unlikely to be about the denial of a FAPE.  *Id*.  If the

answer to both of those questions is no, the complaint is likely about the denial of a FAPE.  *Id*.

Another sign of the gravamen of a suit "can emerge from the history of the proceedings.

. . .  [P]rior pursuit of the IDEA's administrative remedies may provide strong evidence that the

substance of a plaintiff's claim concerns the denial of a FAPE." *Id*.

Although the Second Circuit has yet to interpret *Fry*, a few lower courts have applied the

*Fry* test and their reasoning is instructive.  In *Martinez*, the court held that plaintiff's ADA and

Section 504 claims alleging a failure to provide a reasonable accommodation for the plaintiff's

nut allergy were subject to the IDEA's exhaustion requirement and dismissed them for failure to

exhaust.  2018 WL 4054872 at *5.  The court noted that the plaintiff's complaint explicitly

alleged that defendants had violated the IDEA by failing to provide plaintiff with a FAPE, and in

considering the two questions posed in *Fry*, answered each in the negative.  *Id*.

In *Lawton v. Success Academy Charter Schools, Inc*., 323 F. Supp. 3d 353 (E.D.N.Y.

2018), the court held that students' ADA and Section 504 claims alleging that a former school

principal had maintained a "Got to Go" list, which was intended to remove the plaintiff-students

and other disabled students from the school, and based on which the principal deliberately

targeted and discriminated against disabled students, were outside of the IDEA's exhaustion

requirement because, "while plaintiffs' allegations occasionally touch on denial of a FAPE

. . . the vast majority of the allegations, and thus the gravamen of the complaint, concern intentional discrimination and retaliation." *Id.* at 362. In applying *Fry*, the Court reasoned that the two questions posed by *Fry* supported this conclusion because disabled children and disabled adults alike would have a claim against a public library that placed them on a list of excluded patrons, and used other restrictive disciplinary rules against them. *Id.*

Most recently in *Patrick v. Success Academy Charter Schools, Inc.*, 354 F. Supp. 3d 185 (E.D.N.Y. 2018), the court held that plaintiffs' ADA and Section 504 claims were beyond the reach of the IDEA's exhaustion requirement because defendants prevented the plaintiff student from returning to school based on the false accusation that he had bedbugs on his clothing. *Id.* at 227–29. The court reasoned that although there was no "smoking-gun evidence of discrimination or retaliation . . . application of the two-question *Fry* inquiry yield[ed]" the result that the gravamen of plaintiffs' ADA and Section 504 claims did not concern the denial of a FAPE. *Id.* at 228.

### b. Section 504 and ADA Claims

Plaintiffs' Second Claim is for Disability Discrimination under Section 504 and the ADA against District and BOCES Defendants. Plaintiffs allege that the District denied P.R. access to a FAPE on the basis of his disability, specifically that it denied him "an appropriate academic education, the society of his peers, or a classroom setting on the basis of his disabilities." (SAC ¶ 181.) Plaintiffs further allege that the District CSE Subcommittee discriminated against P.R. on the basis of his disability, specifically at a March 9, 2017 meeting when Chair Pavlik "refused to hear, let alone consider, Plaintiffs' allegations that P.R.'s current placement was inappropriate (because P.R.'s academic tutor, [Boylan], was physical abusing him) on account of P.R.'s disabilities." (*Id.* ¶ 197.) Plaintiffs also allege that the District excluded P.R. from activities on

the basis of his disability, (*id*. ¶ 186), but do not specify which activities he was excluded from. With respect to the District Defendants, the Court concludes that the gravamen of the complaint is the denial of a FAPE. The SAC expressly alleges that P.R. was discriminated against by being denied a FAPE, and by being denied an opportunity to participate and be heard in the CSE Subcommittee process. The rights to a FAPE and to participate in a CSE Subcommittee are rights expressly granted to students and to parents in their capacity as guardians—they are not rights a visitor to the school could avail him or herself of, and they are not rights that would apply in a setting outside of a school. Put another way, the answer to the two questions posed in *Fry* is no. Therefore, the Plaintiffs' ADA and Section 504 claims are subject to the IDEA's exhaustion requirement, and those claims are only exhausted to the extent the IDEA claims have been exhausted. *See Martinez*, 2018 WL 4054872, at *5 (holding that plaintiff's ADA and Section 504 claims alleging a failure to provide a reasonable accommodation for the plaintiff's nut allergy were subject to the IDEA's exhaustion requirement in part because plaintiff's complaint explicitly alleged that defendants had violated the IDEA by failing to provide plaintiff with a FAPE).

With respect to BOCES Defendants, Plaintiffs allege that O-U BOCES excluded P.R. from activities on the basis of his disabilities, (SAC ¶ 190), specifically from the October 30, 2015 Otisville-Minisink Halloween Party and the December 22, 2015 Christmas Party, (*id*. ¶ 86). Plaintiffs also allege that by October 2015, OU-BOCES school staff began requesting Plaintiff Parents pick up P.R. from school when they encountered difficulty handling his behavior, and that on October 8, 2015, Assistant Principal Santiago instructed Plaintiff Parents to keep P.R. at home from October 9 through October 14, [2015] to "give the staff a break." (*Id*.) Plaintiffs allege that during the Summer 2016 ESY program at an O-U BOCES facility in Goshen, New

York, P.R. was suspended six out of the 24 total days he spent in the program, and staff documented 131 "incidents" in that time.  Plaintiffs allege that O-U BOCES Staff, such as Director of Special Education Stroka and Assistant Director of Special Education Higgins, physically restrained and/or isolated P.R.  (SAC ¶ 104.)  The Court concludes that Plaintiffs' ADA and Section 504 claims against BOCES Defendants are beyond the reach of the IDEA's exhaustion requirement, because Defendants allegedly kept P.R. out of and away from public events, kept him out of class based on his disability, and disciplined him by suspending him and noting "incidents" with him in disproportionately large numbers.  Plaintiffs' allegations here are similar to those of the plaintiff in *Patrick*, who had EMS called on him repeatedly and unnecessarily, and who suffered the "intentionally discriminatory administration of disciplinary procedures," including repeated suspensions and expulsions.  354 F. Supp. 3d at 227–29. Plaintiffs do not just allege that O-U BOCES was involved in formulating an inadequate IEP for P.R. or that it denied him a FAPE—Plaintiffs allege O-U BOCES kept P.R. out of schools and excluded him from school events because of his disability.  In other words, the answer to the two questions posed in *Fry* is yes.  Accordingly, Plaintiffs' ADA and Section 504 claims against BOCES Defendants alleging they excluded, isolated, and disciplined him because of his disability are not subject to the IDEA's exhaustion requirements.  *See Lawton*, 323 F. Supp. 3d at 362 (holding that students' ADA and Section 504 claims alleging that a school principal maintained a list of students to exclude from school and to discriminate against, were outside of the IDEA's exhaustion requirement); *see also J.S., III, ex rel. J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017) (holding that, post-*Fry*, allegations that a disabled

student was repeatedly removed from class could not be analyzed simply as a FAPE violation but were "cognizable as a separate [ADA/Rehab Act] claim for intentional discrimination").[21]

Plaintiffs' Third Claim is for retaliation under Section 504 and the ADA against BOCES Defendants. Plaintiffs allege that when they named O-U BOCES as a Defendant in their due process complaint for its role in depriving P.R. of access to a FAPE in the 2015-16 school year, O-U BOCES and its Director of Special Education, Stroka, learned of this activity when they received the IHO's May 17, 2016 Decision, and subsequently retaliated against Plaintiffs by refusing to place P.R. in any O-U BOCES program, despite knowing that the District would not otherwise be able to find an appropriate placement for him. (SAC ¶¶ 204–06.) This retaliation claim against BOCES Defendants, like the disability discrimination claim against them, is not subject to the IDEA's exhaustion requirements, because the gravamen of Plaintiffs' complaint is not just the denial of a FAPE—it is the *pretextual* denial of access to education. *See Patrick*, 354 F. Supp. 3d at 227–29 (holding that plaintiffs' ADA and Section 504 claims were beyond the reach of the IDEA's exhaustion requirement because defendants prevented the plaintiff student from returning to school based on the false accusation that he had bedbugs on his clothing).[22]

_____

[21] The Court rules herein that Plaintiffs did exhaust their administrative remedies with respect to BOCES Defendants for the 2015-16 school year to the extent that BOCES Defendants were involved in the claims presented to the IHOs and SROs who adjudicated whether P.R. received a FAPE during that year. Therefore, the Court need not separately consider Plaintiffs' systemic claims against BOCES Defendants for the 2015-16 year, specifically that OU-BOCES and Stroka "denied P.R. access to a FAPE by adopting policies and procedures that forbid related service providers from comforting, supporting, or touching students with disabilities in any way." (SAC ¶¶ 88–89, 164) Plaintiffs raised and exhausted this allegation in the state administrative proceedings and the Court has jurisdiction to consider it.

[22] Because the conduct that is alleged in the Second and Third Claims occurred within the period during which Plaintiffs exhausted their administrative remedies, and because this conduct specifically was mentioned in the Plaintiffs' due process complaints, the Court's finding that some of the claims are subject to the IDEA's exhaustion requirements while others are not, is of no practical significance in this instance, because those claims satisfy the exhaustion requirement

<u>c. Section 1983 Claims</u>

Plaintiffs bring their Fourth Claim pursuant to § 1983 for various deprivations and violations of statutory and constitutional rights. First, Plaintiffs allege the District violated P.R.'s rights under the IDEA and Section 504 by "(a) adopting inappropriate policies and procedures; (b) engaging in a widespread practice that constituted custom or usage; (c) failing to supervise and train their employees to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with such employees, and (d) failing to adopt appropriate policies and procedures; with respect to," the development of IEPs, the provision of special education services, and the provision of related services. (SAC ¶¶ 211–13.) Second, Plaintiffs allege a violation of P.R.'s Fourteenth Amendment right to due process by the District, O-U BOCES, Pavlik, and Brunjes, who allegedly denied P.R. his property interest in his education by removing him from his placement at Warwick without due process by holding a CSE Subcommittee meeting during the week of December 8, 2014 "without Plaintiffs' notice, participation, or consent." (*Id.* ¶ 216.) Third, Plaintiffs allege a violation of P.R.'s Fourteenth Amendment right to due process by the District and Pavlik for their conduct in denying P.R. his property interest in his education by "maintaining [him] in an inappropriate education placement without due process of law . . . by refusing to afford Plaintiffs, at the March 9, 2017 CSE Subcommittee meeting, a meaningful opportunity to be heard with respect to the claim that [Boylan] was an inappropriate academic tutor because she subjected him to physical abuse." (*Id.* ¶ 218.)

---

in any event. This distinction is significant, however, when the Court considers claims that are outside the period during which Plaintiffs exhausted their administrative remedies, or claims that were not necessarily raised before the state administrative agencies. The Court may consider such claims if it finds they are not subject to the IDEA exhaustion requirement, even if they were not properly exhausted.

The Court concludes that these three Fourteenth Amendment claims arise from an "educational harm" and relate directly to P.R.'s educational rights, his status within his school, and his ability to participate in the processes by which his educational placements were determined.  Therefore, these claims are subject to IDEA's exhaustion requirement.  *See Vlasaty v. Wake Cty. Pub. Sch. Sys. Bd. of Educ.*, No. 17-CV-578, 2018 WL 4515877, at *6 (E.D.N.C. Sept. 20, 2018) (holding that the IDEA exhaustion requirement applied to ADA and Section 504, claims because "[p]laintiffs' claims are uniquely tied to the school environment and to [the plaintiff child's] status as a student within the school"); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 274–75 (3d Cir. 2014) (holding that the "plain language of the IDEA required exhaustion" of retaliation claims because of the clear "logical path" between those claims and the defendants' failure to provide a FAPE to the student); *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1158–59 (11th Cir. 2006) (holding that retaliation claims "clearly relate[d]" to student's evaluation and education and were subject to the exhaustion requirement).  This determination only impacts Plaintiffs' § 1983 claim with respect to the December 8, 2014 Subcommittee meeting, as that is a claim that Plaintiffs have failed to exhaust, thus depriving the Court of jurisdiction to consider it.[23]

To summarize, Plaintiffs' ADA and Section 504 disability discrimination claim against District Defendants are subject to the IDEA's exhaustion requirement, but Plaintiffs' ADA and Section 504 disability discrimination and retaliation claims against BOCES Defendants are not. Among Plaintiffs' § 1983 claims under the IDEA and Section 504, their claim for a violation of

---

[23] Because the Court dismisses Wall and Boylan from this case, *see supra* Section II.B, and because Lisack is not a named Defendant, the Court dismisses the portions of Plaintiffs' § 1983 claim alleging violations of P.R.'s substantive due process rights under the Fourteenth Amendment, (SAC ¶¶ 220), and Plaintiffs' Fourth Amendment right to be free from the use of excessive and unreasonable force, (*id.* ¶¶ 223–24).

Fourteenth Amendment due process rights with respect to the December 8, 2014 and March 9, 2017 CSE Subcommittee meetings, are all subject to the IDEA's exhaustion requirement, and consequently the Court cannot consider the allegations with respect to the December 8, 2014 meeting.

The Court therefore grants in part and denies in part Defendants' Motions To Dismiss for failure to exhaust. The Court dismisses Plaintiffs' IDEA claims with respect to the 2013-14 and 2014-15 school years for failure to exhaust, with the exception of Plaintiffs' allegation that P.R.'s IEP provided for 2:1 group counseling and BOCES Defendants failed to implement this service. The Court denies Defendants' Motions as to Plaintiffs' IDEA claims for the 2015-16 and 2016-17 school years to the extent that the SRO and IHO decisions considered the claims now before the Court. The Court also denies Defendants' Motions with respect to most of Plaintiffs Section 504, ADA, and § 1983 claims, with the exception of the § 1983 claim against O-U BOCES, the District, Pavlik, and Brunjes, regarding the December 8, 2014 CSE Subcommittee meeting—that claim is dismissed for failure to exhaust.

### D. Merits Analysis[24]

#### 1. ADA and Section 504 Disability Discrimination Claims

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.

---

[24] Both BOCES and District Defendants challenged Plaintiffs IDEA claims on exhaustion grounds but neither challenged the IDEA claims on the merits. BOCES Defendants did make the cursory statute of limitations and "U-O BOCES is not P.R.'s home district" arguments, (BOCES Defs.' Mem. 14–15), that the Court has already stated herein it will not consider. *See supra* n.10. The Court therefore only dismisses Plaintiffs' IDEA claims to the extent noted in the exhaustion section of this Opinion. *See supra* Section II.C.

§ 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance." 29 U.S.C. § 794(a). To make out a prima facie case under either of these statutes, a plaintiff must show: "(1) [the] plaintiff is a qualified individual with a disability; (2) [the] plaintiff was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity; and (3) such exclusion or discrimination was due to [the] [plaintiff's] disability." *B.C. v. Mount Vernon Sch. Dist*., 837 F.3d 152, 158 (2d Cir. 2016) (citation and quotation marks omitted); *see Ortiz v. Westchester Med. Ctr. Health Care Corp*., No. 15-CV-5432, 2016 WL 6901314, at *9 (S.D.N.Y. Nov. 18, 2016) (holding that "the same legal standards govern the disability provisions of the ADA [and] [Section 504]").

To plead a claim under either statute, Plaintiffs must show that Defendants acted in bad faith or with gross misjudgment when administering disability services. *See Maus v. Wappingers Cent. Sch. Dist*., 688 F. Supp. 2d 282, 301 (S.D.N.Y. 2010). Because the ADA and Section 504 "address discrimination against disabled students, rather than incorrect or erroneous special education treatments, as in the case of [the] IDEA," there must be "something more than a mere violation of the IDEA . . . in order to show a violation of [either statute] in the context of educating children with disabilities." *Scaggs*, 2007 WL 1456221, at *15. The plaintiff is not required to show personal animosity or ill will. Rather, intentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE. *See R.B. ex rel. L.B. v. N.Y.C. Bd. of Educ*., 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000).

a. BOCES Defendants

BOCES Defendants argue Plaintiffs fail to state an ADA and Section 504 disability

discrimination claim because Plaintiffs do not allege specific facts that plausibly demonstrate bad

faith or gross misjudgment and because Defendants only had to provide a reasonable, not a

perfect, accommodation.  (BOCES Defs.' Mem. 15–17.)  Plaintiffs counter that "O-U BOCES[']

failure to implement P.R.'s IEP . . . demonstrate[s] that O-U BOCES exercised either bad faith or

gross misjudgment when it actively participated in CSE meetings recommending placement of

P.R. at O-U BOCES and then acted with deliberate indifference when it failed to implement the

IEP it helped create."  (Castro Aff. re BOCES Defs. ¶ 12)

For purposes of this motion, BOCES Defendants do not dispute that P.R. is a person with

a disability and that he was excluded from participating in some services and activities.  BOCES

Defendants do dispute, however, that P.R. was discriminated against and denied reasonable

accommodation by reason of his disability.  (BOCES Defs.' Mem. 15–16.)

Plaintiffs allege that OU-BOCES excluded P.R. from activities *on the basis of his*

*disabilities*, (SAC ¶ 191), specifically from the October 30, 2015 Otisville-Minisink Halloween

Party, (*id.* ¶ 86), and the December 22, 2015 Christmas Party, (*id.*).  Plaintiffs also allege that O-

U BOCES failed to provide P.R. with the 2:1 group counseling sessions that were in his IEP, and

that he was denied this necessary service for years.  (*Id.* ¶¶ 65–67, 71.)  Plaintiffs also allege that

by October 2015, OU-BOCES school staff began requesting Plaintiff Parents pick up P.R. from

school when they encountered difficulty handling his behavior, and that on October 8, 2015,

Assistant Principal Santiago instructed Plaintiff Parents to keep P.R. at home from October 9

through October 14, [2015] to "give the staff a break."  (*Id.* ¶ 86.)  Plaintiffs also allege that the

ESY program P.R. attended during the Summer of 2016 was "manifestly inappropriate," (*id.*

¶ 104), as (1) P.R. was suspended six out of the 24 total days he spent in the program, and staff

documented 131 "incidents" in that time; (2) O-U BOCES Staff, such as Stroka and Higgins,

allegedly physically restrained and/or isolated P.R, (*id.* ¶ 104); and (3) P.R. routinely returned

home with scratches, cuts, bruises, and other bodily marks.  Indeed, according to Plaintiffs, the

acting principal of the ESY program, admitted that the placement did not address P.R.'s

educational needs.  (*Id.*)[25]

      "[I]ntentional discrimination may be inferred when a policymaker acted with at least

deliberate indifference to the strong likelihood that a violation of federally protected rights will

result from the implementation of the challenged policy or custom."  *Butler*, 106 F. Supp. 2d at

420.  Plaintiffs' allegations with respect to bad faith are admittedly sparse, however, at the

nascent stage of this case, the Court concludes that Plaintiffs have plausibly stated an ADA and a

Section 504 claim.  BOCES Defendants allegedly excluded P.R. from school functions based on

his disability, told Plaintiff Parents that they needed a "break" from P.R., excluded him from

class, suspended him, isolated him, admitted that he was in a placement that was not appropriate

for him, and at the end of the school day often returned P.R. to Plaintiff Parents with cuts and

bruises.  Plaintiffs have thus plead sufficient facts to plausibly allege that BOCES Defendants

acted with bad faith or gross misjudgment.  *See S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282,

291–292 (S.D.N.Y. 2007) (denying motion to dismiss where plaintiffs alleged that defendants

implemented policies which limited the availability of services and thereby impeded IEPs for

---

[25] Plaintiffs also allege that "O-U BOCES, has violated and continues to violate
Plaintiffs' rights under the ADA by, inter alia: (a) adopting inappropriate policies and
procedures; (b) engaging in widespread practice that constitutes custom or usage; (c) failing to
supervise and train their employees to such an extent that it amounts to deliberate indifference to
the rights of those who come into contact with such employees; and (d) failing to adopt
appropriate policies and procedures; with respect to excluding students on the basis of disability
from participating in and benefitting from events put on by the O-U BOCES."  (SAC ¶ 192.)

preschoolers, "at this stage [the court] can infer that [the] plaintiffs may be able to show bad faith or gross misjudgment"); *Gabel ex. Rel. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 334–37 (S.D.N.Y. 2005) (denying summary judgment because issue of material fact remained as to whether school district's numerous errors in handling disabled student's placement rose to the level of gross negligence or reckless indifference where district had placed student in improper class and failed to provide recommended services over a series of years); *R.B.*, 99 F. Supp. 2d at 414–16, 419 (denying motion to dismiss Section 504 claim where the school board, among other things (1) failed to return the parent's calls when she attempted to determine the status of the child's placement; (2) waited until school was about to start before alerting the parent to the lack of appropriate programs; (3) placed the student in an inappropriate program; and (4) failed to promptly develop an interim services plan after the student was suspended).[26]

The Court accordingly denies BOCES Defendants' Motion to Dismiss Plaintiffs' ADA and Section 504 Disability Discrimination Claims.

### b.  District Defendants

District Defendants, like BOCES Defendants, argue that Plaintiffs failed to allege bad faith or gross misjudgment.[27]  (Dist. Defs.' Mem. 18.)  The Court disagrees.  The inference that

---

[26] BOCES Defendants also argue that U-O BOCES was only required to provide reasonable accommodations, not "optimal accommodations."  (BOCES Defs.' Mem. 16 (citing *inter alia Moody v. New York City Dept. of Educ.*, 513 F. App'x 95, 96 (2d Cir. 2013) (holding that district was not required to provide optimal accommodations or those exactly requested by the parents)).  However, BOCES Defendants do not state what accommodation, if any, they made—especially in light of Plaintiffs' allegations that BOCES Defendants told Plaintiff Parents that they in fact could not accommodate P.R. and that his placement was not addressing his educational needs.  (SAC ¶¶ 87, 104.)

[27] District Defendants also raise the inapposite argument that the removal of P.R. from school holiday parties does not amount to a deprivation of access to school programs.  (Dist.

Plaintiffs "may be able to show bad faith or gross misjudgment," *S.W.*, 528 F. Supp. 2d at 291, is even stronger with respect to District Defendants.

Plaintiffs allege that the District denied P.R. access to a FAPE on the basis of his disability, specifically by denying him "an appropriate academic education, the society of his peers, or a classroom setting on the basis of his disabilities." (SAC ¶ 181.) District Defendants allegedly refused to "ascertain and implement the reasonable accommodations necessary to provide P.R. with access to a FAPE . . . [and instead] decided to place P.R. in an unduly restrictive and inappropriate environment because of his disabilities and deprive him of related services, with deliberate indifference to the strong likelihood that a violation of federally protected rights would result or that Plaintiffs would more than likely suffer damages." (*Id.* ¶ 182.)

Plaintiffs allege a pattern of selecting improper placements for P.R., or failing to secure a placement at all or not until the last minute, and failing to communicate with Plaintiff Parents, among other conduct. For example, Plaintiffs allege that during the December 11, 2015 CSE Subcommittee meeting, CSE Chair Pavlik refused, on the advice of her lawyer, to discuss placement alternatives for P.R. (*Id.* ¶ 90.) Plaintiffs also allege that District Defendants refused to communicate with them before the start of the 2016-17 school year to discuss P.R.'s placement, but instead sent them a letter ultimatum on August 31, 2016, offering Plaintiffs one of two choices regarding P.R.'s placement. (*Id.* ¶ 109.) Plaintiffs further allege that the District CSE Subcommittee discriminated against P.R. on the basis of his disability at a March 9, 2017

Defs.' Mem. 18 (collecting cases).) This argument ignores the numerous other occasions on which the District took actions to keep P.R. out of school and to indeed deprive him of access to school programs. The Court here does not look at instances of either removal or accommodation in isolation, but at the District's whole course of conduct to determine whether an inference of bad faith or gross misjudgment can be drawn.

meeting when Chair Pavlik "refused to hear, let alone consider, Plaintiffs' allegations that P.R.'s current placement was inappropriate because P.R.'s academic tutor Boylan was physical[ly] abusing him." (*Id.* ¶ 197.)

Plaintiffs also allege that the District was responsible for or caused P.R. to miss much class time and caused him to be out of school. From about December 15, 2014 to February 4, 2015, P.R. was allegedly precluded from attending Warwick, against Plaintiffs' will, and stayed home where he received no academic tutoring, counseling sessions, speech therapy, occupational therapy, behavioral therapy, nor any educational or related services. (SAC ¶ 78.) The District allegedly did not offer to re-evaluate P.R. to better understand his unique needs, nor did it offer any plan to transition P.R. back to an educational placement. (*Id.*) Plaintiffs also allege that from October 8, 2015 through February 4, 2016, the District subjected P.R. to over 20 days of disciplinary removal, either by in-school isolation or out-of-school suspension, where P.R. received no education or related services. (*Id.* ¶ 91.) The District allegedly did not provide Plaintiffs with any options to make up for lost class time. (*Id.*) Plaintiffs allege that over the 67 days P.R. attended his pendency placement, GHES staff recorded data for 57 days, documenting 141 incidents of P.R. "acting out of control." (*Id.* ¶ 127.)

Plaintiffs allege that the District, "by custom and practice," allows for students to go "without any related or education services, let alone FAPE . . . while educational placements are disputed and there is no agreeable pendency placement." (*Id.* ¶ 79.) Moreover, Plaintiffs allege that the District knew P.R.'s placements were inappropriate for him and not in conformity with his IEP. For example, on October 28, 2015, Plaintiffs attended an informal meeting with District Assistant Superintendent Tiger and CSE Chair Pavlik, (*id.* ¶ 87), where District officials

acknowledged that O-U BOCES did not have the behavioral support training to appropriately accommodate P.R. (*Id*.)

Finally, Plaintiffs have made numerous allegations related to their fear for P.R.'s safety and the injuries he sustained while in the care of the District. For example, Plaintiffs allege that on November 16, 2016, GHES principal Lisack called Plaintiff Parents to report that P.R. was being treated for various abrasive marks on his rear torso that he sustained when he fell backwards onto a plastic bin, (SAC ¶ 120), but that Lisack subsequently changed her story and that Plaintiff Parents were skeptical of her explanation for how P.R. got the abrasions to his torso. (*Id*.) Plaintiffs also allege that while P.R. attended his pendency placement at GHES, he developed new fears and phobias, and described suffering injuries at the hands of staff. (*Id*. ¶ 127.) Plaintiffs allege that on November 30, 2016, for example, P.R. returned home quaking and inconsolable. (*Id*. ¶ 122.) On another occasion, Plaintiffs allege P.R. was not appropriately supervised and climbed up to the library atrium and placed himself in a precarious situation. (*Id*. ¶ 133.) Plaintiffs allege that District officials had a "historical approach of isolating P.R. in an empty school basement, which they knew to be injurious and unproductive." (*Id*.)

Added up, Plaintiffs have alleged a pattern of not being able to contact District teachers and officials, of being kept in the dark about P.R.'s education plans until the last minute, of P.R. being kept out of class and placed in programs that District officials knew were inappropriate, and of P.R. being isolated, and at times unsupervised. Given these allegations, the Court concludes that Plaintiffs have plausibly alleged that District Defendants acted with bad faith or gross misjudgment. *See R.B.*, 99 F. Supp. 2d at 414–16 (S.D.N.Y. 2000) (denying motion to dismiss Section 504 claim where the school board, among other things (1) failed to return the parent's calls when she attempted to determine the status of the child's placement; (2) waited

until school was about to start before alerting the parent to the lack of appropriate programs; (3) placed the student in an inappropriate program; and (4) failed to promptly develop an interim services plan after the student was suspended); *see also J.L. on behalf of J.P. v. New York City Dep't of Educ.*, 324 F. Supp. 3d 455, 468 (S.D.N.Y. 2018) (holding that plaintiffs sufficiently pleaded ADA and Section 504 claims where plaintiffs asserted that defendants' failure to provide services "resulted from gross misjudgment" because plaintiffs sufficiently asserted defendants had "no proper or reasonable basis for the policy limiting available services for [disabled students afflicted with severe medical conditions], knowing it would result in a failure to adequately implement IEPs" (citation and quotation marks omitted)); *S.W.*, 528 F. Supp. 2d at 291–292 (holding that where plaintiffs alleged that defendants implemented policies which limited the availability of services and thereby impeded IEPs for preschoolers, "at this stage [the Court] can infer that [the] plaintiffs may be able to show bad faith or gross misjudgment"); *Butler*, 106 F. Supp. 2d at 420 (denying summary judgment because plaintiff presented evidence that the defendant school officials failed to develop IEP's for the plaintiff, developed several IEP's that were determined to be inappropriate for his educational needs, and failed to provide him with certain special education services).

The Court accordingly denies District Defendants' Motion to Dismiss Plaintiffs' ADA and Section 504 Disability Discrimination Claims.

### 2.  ADA and Section 504 Retaliation Claim

In the Third Cause of Action, Plaintiffs claim that BOCES Defendants retaliated against them after Plaintiffs named them as defendants in a due process complaint.  (SAC ¶¶ 202–07.) To state a claim for retaliation under Section 504 or the ADA, a plaintiff must establish that: "[1] a plaintiff was engaged in protected activity; [2] the alleged retaliator knew that [the] plaintiff

was involved in protected activity; [3] an adverse decision or course of action was taken against plaintiff; and [4] a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (citation and quotation marks omitted). The term "protected activity" refers to an "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citation omitted), *superseded by regulation as stated in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013)). "In order to constitute protected activity, a plaintiff's complaint must be sufficiently pointed to be reasonably understood as a complaint of discrimination ." *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013) (citation and quotation marks omitted), *aff'd*, 597 F. App'x 19 (2d Cir. 2015). "A plaintiff's burden at this prima facie stage is de minimis." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation and italics omitted).

Plaintiffs allege that O-U BOCES and its Director of Special Education, Stroka, learned about Plaintiffs' due process complaint against O-U BOCES for its role in depriving P.R. of access to a FAPE in the 2015-16 school year, on May 17, 2016 when the IHO released its decision concluding that P.R. had undergone a disciplinary change in placement which resulted in denial of a FAPE while at Otisville-Minisink. Plaintiffs allege that BOCES Defendants subsequently retaliated against Plaintiffs by refusing to place P.R. in any O-U BOCES program, despite knowing that the District would not otherwise be able to find an appropriate placement for him. (SAC ¶¶ 204–06.) Specifically, on July 20, 2016, Mr. Rutherford met with Stroka and Higgins to discuss P.R.'s placement options, and was told by Stroka that O-U BOCES did not have any placement for P.R., claiming that none of its more than a dozen programs could

properly service P.R. (*Id.* ¶ 105.) Plaintiffs allege that Stroka's claim was pretext for retaliation against them for filing a due process complaint. (*Id.*)

BOCES Defendants argue that Plaintiffs' retaliation claim fails because Plaintiffs fail to set forth a plausible connection between the protected activity and the alleged adverse action. Specifically, BOCES Defendants point out that, "even prior to the filing of that Due Process Complaint and its subsequent litigation, OU-BOCES personnel had opined that the OU-BOCES' placement or specific program was not appropriate or capable of meeting P.R.'s needs." (BOCES Defs.' Mem. 18 (citing SAC ¶¶ 66, 73).) Plaintiffs counter that they did complain about O-U BOCES policies surrounding forcing parents to pick up students from school for disability-based discipline during the time leading up to O-U BOCES statement that they would not consider P.R. for any of their placements. (Castro Aff. re BOCES Defs. ¶ 14.) Indeed, Plaintiffs filed a State complaint on June 22, 2016, against O-U BOCES, alleging that O-U BOCES had denied P.R the "Procedural Safeguards for a student with disabilities subject to discipline." (SAC ¶ 103.)

"[T]o establish the last element of a prima facie case of retaliation, [Plaintiffs] must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. [The Second Circuit has] held that a close temporal relationship between a plaintiff's participation in protected activity and [a defendant's] adverse actions can be sufficient to establish causation." *Treglia*, 313 F.3d at 720 (citation omitted); *see also Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (citation and quotation marks omitted)); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (holding that two months between protected activity and allegedly adverse action were sufficient to establish causation). A plaintiff's

"presentation of a temporal connection" can be "enough, in and of itself . . . to permit a reasonable jury to find causation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," and a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* at 128 (citation and quotation marks omitted).

Here, one IHO Decision was issued on May 16, 2016, and another state complaint regarding separate issues was filed on June 22, 2016.[28]  Plaintiffs allege a retaliatory action occurred on July 20, 2016—within a little over two months of the alleged protected activities. The Court concludes that the causal connection element is satisfied at this stage. *See Quinn*, 159 F.3d at 769 (holding that two months between protected activity and allegedly an adverse action were sufficient to establish causation); *see also Fahrenkrug v. Verizon Servs. Corp.*, No. 11-CV-1014, 2015 WL 13021890, at *21 (N.D.N.Y. May 14, 2015) (same), *aff'd*, 652 F. App'x 54 (2d Cir. 2016).

Accordingly, the Court denies BOCES Defendants Motion to Dismiss Plaintiffs' ADA and Section 504 retaliation claim.

---

[28] That O-U BOCES staff had previously, in November 2013, expressed that P.R. was not "fit for Warwick," (SAC ¶ 66), and in November 2014 recommended that P.R. attend GHES, (*id.* ¶ 73), does not negate that the ultimate adverse action, specifically declining to place P.R. in any of its programs, occurred on July 20, 2016.

### 3. Section 1983 Claims

The only remaining § 1983 claims are those against the District for violations of the IDEA and Section 504, (SAC ¶¶ 211–14), and against the District and Pavlik for violations of P.R.'s due process rights under the Fourteenth Amendment , (*id.* ¶¶ 218–19).[29]

#### a. Deprivation of Rights Under the IDEA and Section 504

Plaintiffs allege that the District violated P.R.'s right under ¶ 1983 by: (a) adopting inappropriate policies and procedures; (b) engaging in a widespread practice that constituted custom or usage; (c) failing to supervise and train their employees to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with such employees, and (d) failing to adopt appropriate policies and procedures; with respect to," the development of IEPs, the provision of special education services, and the provision of related services. (SAC ¶¶ 211–13.)

District Defendants argue that Plaintiffs are foreclosed from asserting a § 1983 claim for deprivations of rights under the IDEA and Section 504 because each of those statutes has its own structure for private enforcement independent of § 1983. (District Defs.' Mem. 20–21.) Plaintiffs counter that the IDEA may be enforced through other statutory schemes to ensure the protection of disabled students, and point to portions of their SAC where they do in fact allege municipal policies and customs. (Castro Aff. re District Defs. ¶¶ 24–25.) District Defendants cite to cases in which courts concluded plaintiffs could not seek to enforce rights under other statutory schemes through § 1983. (District Defs.' Mem. 20–21 (citing inter alia *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 125 (2005) (holding that plaintiff could not enforce,

---

[29] Because the Court has dismissed the § 1983 claim against BOCES Defendants, *see supra* Section II.C.4.c, the Court does not consider BOCES Defendants' arguments regarding the § 1983 claims. (BOCES Defs.' Mem. 19–22.)

through a § 1983 action, limitations placed by the Telecommunications Act on regulation by local zoning authorities of facilities for wireless communications ); *Morris–Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 160–61 (2d Cir. 2005) (holding that plaintiff could not enforce, through a § 1983 action, protections provided by Uniformed Services Employment and Reemployment Rights Act against employment discrimination based on military service obligations) *Grassel v. Dep't of Educ. of City of New York*, No. 12-CV-1016, 2015 WL 5657343, at *12 (E.D.N.Y. Sept. 24, 2015) (holding that because Title VII and ADA have their own structures for private enforcement, plaintiffs may not bring §1983 claims based upon the substantive rights provided by those statutes); *Wasser v. N.Y.S.Office of Vocational and Edu. Serv. for Individuals With Disabilities*, 683 F. Supp. 2d 201, 213–14 (E.D.N.Y. 2008) (holding that a plaintiff could not use § 1983 to seek enforcement of rights under Section 722(c)(5)(J) of the Rehabilitation Act, which regulates federally-funded vocational rehabilitation services), *aff'd*, 602 F.3d 476 (2d Cir. 2010)).  District Defendants ignore the fact that these cases analyze *other* statutory schemes and do not make any reference to the IDEA and Section § 504 of the Rehabilitation Act.  District Defendants also ignore the fact that courts in the Second Circuit have expressly held that Plaintiff may bring a § 1983 claim to enforce IDEA rights.  *See M.H.*, 169 F. Supp. 2d at 28–29 (holding that the IDEA may serve as the basis for a § 1983 cause of action); *Butler*, 106 F. Supp. 2d at 420  (same); *R.B.*, 99 F. Supp. 2d at 418 (same).  The Court has already held herein that it adopts the holding of other courts in the Second Circuit that have held that the IDEA may serve as the basis for a § 1983 cause of action.  *See supra* Section II.C.2. The Court therefore rejects District Defendants' argument that Plaintiffs are foreclosed from asserting § 1983 claims for deprivations of rights under the IDEA and Section 504.

District Defendants' other argument for the dismissal of Plaintiffs' § 1983 claim is that Plaintiffs fail to allege the existence of a municipal custom or policy. "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258–59 (2009) (holding that a § 1983 plaintiff claiming a violation of a constitutional right by a school district or other municipal entity must show that the violation was the result of municipal custom, policy, or practice). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (citation and italics omitted).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability); *see also Ryan v. County of Nassau*, No. 12-CV-5343, 2018 WL

354684, at *3 (E.D.N.Y. Jan. 10, 2018) ("In order for a municipality . . . to be liable for deliberate indifference to medical needs under *Monell* . . . the plaintiff must show that the action that caused the constitutional violation was undertaken pursuant to an official policy." (citation and quotation marks omitted)). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue.").

"A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 630–31 (E.D.N.Y. 2011) (quoting *Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423, 424–25 (2d Cir. 2004)); *N.Y. by Schneiderman v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 751 (N.D.N.Y. 2016) (same). In addition, "[i]n limited circumstances, a [municipal entity's] decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted); *see also Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 06-CV-15509, 2011 WL 1079944, at *8 (S.D.N.Y. Mar. 24, 2011) ("A school district may be held liable for inadequate training, supervision or hiring where the failure to train, hire or supervise amounts to deliberate indifference to the rights of those with

whom municipal employees will come into contact." (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))).  Only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a policy or custom actionable under § 1983 be established.  *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (citation and quotation marks omitted); *see also Connick*, 563 U.S. at 61–62 (same); *City of Canton*, 489 U.S. at 388 (same).

Here, Plaintiffs allege that with respect to the shortage of related service providers, the District implemented a policy of overloading hired related services providers and/or not hiring an adequate amount of providers to service the needs of their entire student population, including, but not limited to service providers such as counselors, psychologists, social workers, and therapists.  (SAC ¶ 68.)  Plaintiffs allege that the District knew CSE members would face students who would be given out of district placements but failed to institute a policy or train employees and members of CSE's to properly vet out of district placements to ensure they are capable of providing related services included in the placed student's IEP.  (*Id.*)  Plaintiffs specifically allege that Defendants former District Superintendent Munro, current District Superintendent Jehring, District Assistant Superintendent Tiger, and CSE Subcommittee Chair Pavlik, all knew, based on Plaintiffs reporting so to them, that the District needed additional related service providers and failed to remedy this issue by hiring additional staff needed to meet the needs of P.R. and other students enrolled within the District.  (*Id.* ¶ 69.)  Plaintiffs arguably rely on two of the three theories on which a school district's *Monell* liability may be premised: either that a district employee was acting pursuant to an expressly adopted official policy, or that a district employee was acting pursuant to a longstanding practice or custom.  *Tyrrell,* 792 F. Supp. 2d at 630–31.  It is not clear whether the policy Plaintiffs reference was an official policy

under the first theory, or a longstanding practice or custom under the second theory—but

Plaintiffs do plausibly allege that there was a policy with respect to hiring related service

providers is clear.  This is sufficient at this stage.  *See Schneiderman*, 177 F. Supp. 3d at 751–53

(holding that allegation that senior district officials enacted and directed the enforcement of

ongoing policy of deliberately diverting students aged 17–20 seeking to enroll at one particular

high school into an alternative, unequal education programs based on the actual or perceived

status of those students as immigrants and/or having limited English proficiency was sufficient to

state municipal policy).

The Court thus finds that Plaintiffs plausibly allege a municipal custom or policy.

Accordingly, the Court denies District Defendants' Motion to Dismiss with respect to Plaintiffs'

§ 1983 claim alleging violations of the IDEA and Section 504.

### b.  Deprivation of Rights Under the Fourteenth Amendment

Plaintiffs allege a violation of P.R.'s Fourteenth Amendment right to due process by the

District and Pavlik for their conduct in denying P.R. his property interest in his education by

"maintaining [him] in an inappropriate education placement without due process of law . . .  by

refusing to afford Plaintiffs, at the March 9, 2017 CSE Subcommittee meeting, a meaningful

opportunity to be heard with respect to the claim that [Boylan] was an inappropriate academic

tutor because she subjected him to physical abuse."  (SAC ¶¶ 218.)  District Defendants argue

that Plaintiffs' due process claim fails because their available IDEA post-deprivation process

satisfied their due process rights.  (District Defs.' Mem. 20.)

"There are three elements to a procedural due process claim: (1) that the plaintiff

possessed a constitutionally protected interest, (2) that such interest was deprived as a result of

government action, (3) and that the deprivation occurred without constitutionally adequate pre-or

post-deprivation process." *Toth ex rel. Toth v. Bd. of Educ., Queens Dist*. 25, No. 07-CV-3239,

2008 WL 4527833, at *4 (E.D.N.Y. Sept. 30, 2008) (citation and quotation marks omitted); *see*

*also Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist*., No. 07-CV- 8828, 2013 WL 3929630,

at *9 (S.D.N.Y. July 30, 2013) ("When protected liberty interests like public education,' are at

issue, 'the government may deprive one of that interest so long as the process afforded provides

minimal constitutional procedural protections.'" (citation and quotation marks omitted)).

 Even assuming that Plaintiffs have pleaded the first two elements, Plaintiffs fail to

plausibly allege that the New York State regulations do not provide Plaintiffs with sufficient

post-deprivation process. Plaintiffs were afforded several IHO hearings and secured several

decisions in their favor. Constitutional due process requirements are satisfied by the procedural

safeguards provided by the IDEA and New York implementing regulations. *See Frank v.*

*Sachem Sch. Dist*., 84 F. Supp. 3d 172, 193–94 (E.D.N.Y. 2015) (holding that constitutional due

process requirements are satisfied by the procedural safeguards provided by the IDEA and New

York implementing regulations), *aff'd*, 633 F. App'x 14 (2d Cir. 2016); *Does v. Mills*, No. 04-

CV-2919, 2005 WL 900620, at *9 (S.D.N.Y. Apr. 18, 2005) ("[I]n the context of IDEA impartial

hearings, numerous federal courts have held that constitutional due process requirements are

satisfied where, as here, the parties are provided the procedural safeguards found in the IDEA

and its implementing regulations.").

 Thus, there was no due process violation, as the caselaw is clear that constitutional due

process requirements are satisfied where the parties are provided sufficient post-deprivation

process in accordance with the IDEA. *See B.L. v. New Brit. Bd. of Educ*., 394 F. Supp. 2d 522,

541–42 (D. Conn. 2005) (holding that "plaintiffs received an appropriate post-deprivation

remedy, and, concomitantly, received all of the due process that was available to them" when

after rejecting proposed IEPs parents requested and received due process hearings at which they presented evidence and testimony) ; *M.H.*, 169 F. Supp. 2d at 32–33 (holding that plaintiffs received due process required by Fourteenth Amendment when they were afforded IHO hearings, following a school presentation of an IEP that the plaintiffs deemed inadequate under the IDEA and were allowed to petition for rehearing following IHOs affirmance of school's action); *B.D. v. DeBuono*, 130 F. Supp. 2d 401, 431-34 (S.D.N.Y. 2000) (holding that IDEA's provision for impartial hearings provides adequate due process even though those hearings are post-deprivation). [30]

The Court accordingly dismisses Plaintiffs' § 1983 claim against the District and Pavlik for violations of P.R.'s due process rights under the Fourteenth Amendment.[31]

### 4. Individual Defendants

BOCES Defendants argue that the ADA, Section 504, and IDEA claims should be dismissed against the individual defendants because there is no individual liability pursuant to those statutes. (BOCES Defs.' Mem. 20.) The Court agrees.

"Individual defendants may not be held personally liable for alleged violations of the ADA or the Rehabilitation Act. Nor can individuals be named in their official or representative

---

[30] That the District has thus far allegedly not complied with SRO Decisions does not change the adequacy of the process Plaintiffs received in securing those Decisions. Whether a party suffered a due process violation, is separate from, and a different question than, whether a defendant failed to comply with a favorable judgment. The fact remains that when Plaintiffs were dissatisfied with a District policy, they could and did file due process complaints and State complaints and subsequently presented evidence at hearings. And ultimately, Plaintiffs' post-deprivation process under the IDEA included bringing an Action in this Court seeking enforcement of the SRO Decisions and other relief.

[31] Because the Court concludes that Plaintiffs cannot plausibly plead a due process violation, it need not consider District Defendants' other argument that Plaintiffs fail to allege the existence of a municipal custom or policy. (District Defs.' Mem. 20–21.)

capacities as defendants in ADA or Rehabilitation Act [actions]." *Menes v. CUNY Univ. of N.Y.*, 92 F. Supp. 2d 294, 306 (S.D.N.Y. 2000) (citations and quotation marks omitted). The same is true for IDEA claims. *Patrick*, 354 F. Supp. 3d at 206 n.18 (stating that there is no individual liability under the IDEA, ADA, and Rehabilitation Act); *see also Dorsey v. Sullivan*, No. 10-CV-744, 2013 WL 4776344, at *6 (W.D.N.Y. Sept. 3, 2013) (holding that there is no individual liability under the ADA and Rehabilitation Act) (citing *Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001))); *S.W.*, 528 F. Supp. 2d at 298 (holding that individual defendants may not be held personally liable for alleged violations of the ADA, Section 504, or the IDEA); *Harris v. Mills*, 478 F. Supp. 2d 544, 547–48 (S.D.N.Y. 2007) (holding that "claims under the Rehabilitation Act may not be brought against individuals, either in their personal or official capacity"), *aff'd*, 572 F.3d 66 (2d Cir. 2009); *B.D.*, 130 F. Supp. at 439–40 (holding that plaintiffs were barred from bringing Rehabilitation Act claims against individual defendants).

Additionally, "to the extent official capacity claims can be alleged under [the ADA, IDEA, and Section 504], . . . these claims against [the individual Defendants] in [their] official capacity . . . are 'wholly redundant' to Plaintiffs' claims against [the District and O-U BOCES]." *Patrick*, 354 F. Supp. 3d at 206 n.18; *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 408 (E.D.N.Y. 2010) (dismissing plaintiff's ADA and Rehab Act claims against the individual university employees in their official capacities, because they are wholly redundant to plaintiff's claims against the university itself); *B.D.S. v. Southold Union Free Sch. Dist.*, No. 08-CV-1319, 2009 WL 1875942, at *21 (E.D.N.Y. June 24, 2009) (dismissing official capacity ADA and Rehab Act claims because the school district and state educational agency were "the real parties

in interest with respect to plaintiff's official capacity claims under the ADA, Rehabilitation Act[,] and IDEA" (citing *Kentucky v. Graham*, 473 U.S. 159, 165–55 (1985))).

Here, Plaintiffs name Munro, Jehring, Tiger, and Pavlik, all District employees, and Stroka, Brunjes, Bauer, and Isaacson, all U-O BOCES employees, in their official capacity only.[32]  Because there is no individual liability under the IDEA, ADA, and Section 504, and because claims against these individual defendants would be redundant, the IDEA, ADA, and Section 504 claims against the individual defendants are dismissed.

E.  State Law Claims

District and BOCES Defendants argue that all state claims must be dismissed because Plaintiffs have failed to serve a notice of claim to the District and to U-O BOCES, and to plead in the SAC that they have served such notice, as required by state law.  (BOCES Defs.' Mem. 22–23; District Defs.' Mem. 22.)

New York Education Law § 3813 requires that no action shall proceed against a board of cooperative educational services unless the claimant has served a notice of claim in compliance with General Municipal Law §50-e.  *See* N.Y. Educ. L. § 3813.  Similarly, New York General Municipal Law ("GML") § 50-i also provides that no proceeding shall be maintained against a municipality, unless a notice of claim shall have been made and served in compliance with GML § 50-e.  N.Y. Gen. Mun. Law § 50-i; *see also Benitez v Bd. of Higher Educ. of City of N.Y.City Univ. of N.Y.*, 765 N.Y.S.2d 22, 22  (App. Div. 2003).  Further, § 3813(2) requires that a timely notice of claim must be served in accordance with GML § 50-e prior to asserting a claim for tort against a teacher, member of the supervisory staff or administrative staff, or employee.  N.Y.

---

[32]  Plaintiffs also name Wall and Boylan in their official and in their individual capacity. Those Defendants are dismissed herein on other grounds.  *See supra* Section II.B.

Educ. L. § 3813(2). New York law also requires a plaintiff plead statutory compliance. *See Hardy v. N.Y.C. Health and Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999); *Stoetzel v. Wappingers Cent. Sch. Dist.*, 561 N.Y.S.2d 71, 72 (App. Div. 1990).

Plaintiffs concede that they have failed to comply with the notice of claim requirements and ask the Court to not dismiss these claims with prejudice, specifically because P.R. is still an infant and may yet seek leave to file a late notice of claim.[33] (Castro Aff. re District Defs. ¶ 26; Castro Aff. re BOCES Defs. ¶ 16.)

Because Plaintiffs have failed to comply with the notice of claim requirements under New York state law, the Court dismisses all state claims in the SAC.

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motions To Dismiss. The Court dismisses Wall and Boylan from this case, and accordingly dismisses all claims in which they are the only named Defendants, specifically Plaintiffs' Fifth Claim for assault and battery, Plaintiffs' Fourth Claim under § 1983 against Wall and Boylan for violations of P.R.'s substantive due process rights under the Fourteenth Amendment, and P.R.'s Fourth Amendment rights to be free from the use of excessive and unreasonable force; dismisses

---

[33] BOCES Defendants further argue that this Court should not allow Plaintiffs to file a late notice of claim because only state courts have authority to grant such an application. (BOCES Defs.' Reply 8 (collecting cases).) BOCES Defendants misunderstand Plaintiffs' request—Plaintiffs request that this Court at most dismiss the state claims without prejudice so that they may seek leave to file a late notice. The Court does not understand Plaintiffs to be requesting leave to file a late notice from this Court, and therefore does not address this issue. *Cf. Humphrey v. County of Nassau*, No. 06-CV-3682, 2009 WL 875534, at *21 (E.D.N.Y. Mar. 30, 2009) ("This [c]ourt agrees with the overwhelming weight of authority among district courts in the Second Circuit and finds that Section 50-e(7) permits only certain state courts—'the supreme court or the county court' in certain counties—to consider and to grant an application for an extension of time in this context." (citation omitted)); *Costabile v. County of Westchester*, 485 F. Supp. 2d 424, 431 (S.D.N.Y. 2007) (holding that the district court "lack[ed] jurisdiction to decide [the] plaintiffs' application to serve a late notice of claim" (citation omitted)).

Plaintiffs' § 1983 claim against the District and Pavlik for violations of P.R.'s due process rights under the Fourteenth Amendment relating to the March 9, 2017 CSE Subcommittee meeting; dismisses Plaintiffs' IDEA claims relating to the 2013-14 and 2014-15 school years, with the exception of Plaintiffs' allegation that P.R.'s IEP provided for 2:1 group counseling and BOCES Defendants failed to provide this service; dismisses Plaintiffs' § 1983 claim against O-U BOCES, the District, Pavlik, and Brunjes, regarding the December 8, 2014 CSE Subcommittee meeting; dismisses the IDEA, ADA, and Section 504 claims against all individual defendants; and dismisses all state law claims in the SAC. The Court denies Defendants' Motions To Dismiss with respect to all other claims as described in this Opinion.

The state law claim are dismissed without prejudice to allow Plaintiffs to re-file in state court if they so choose. *See LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 590 (S.D.N.Y. 2017) (dismissing state claims without prejudice to allow plaintiffs to re-file in state court); *Jaouad v. City of New York*, 39 F. Supp. 2d 383, 389 (S.D.N.Y. 1999) (same).

The remaining claims that are dismissed are dismissed with prejudice, as Plaintiffs have already twice amended, including in response to Defendants' pre-motion letters raising the arguments addressed in the instant Opinion, and based on conversations with opposing counsel and the Court during conferences. *Justice v. McGovern*, No. 11-CV-5076, 2013 WL 1809634, at *3 (E.D.N.Y. Apr. 29, 2013) ("Although when a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint, when the plaintiff is put on notice of the deficiencies in his complaint and fails to correct them in the amended complaint[,] dismissal with prejudice is proper" (citation, alterations, and quotation marks omitted)); *Tyler v. Liz Claiborne, Inc.*, 814 F.

Supp. 2d 323, 344 (S.D.N.Y. 2011) ("[A]s plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation." (citation omitted)).

The Clerk of Court is respectfully direct to terminate the pending Motions. (Dkt. Nos. 105, 114.) The Court will hold a Status Conference on April 24, 2019 at 2:00 p.m.

SO ORDERED.

Dated:     March 29, 2019
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE