UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

P.C.R. *and* A.D.R., individually and as
parents and natural guardians on behalf of
P.R., *and* P.R., individually,

                                Plaintiffs,

        v.

FLORIDA UNION FREE SCHOOL
DISTRICT *and* ORANGE-ULSTER BOARD
OF COOPERATIVE EDUCATIONAL
SERVICES,

                                Defendants.

No. 16-CV-9778 (KMK)

OPINION & ORDER

---

Angel A. Castro, III, Esq.
A.A. Castro Complex Litigation Appeals & Negotiation PLLC
New York, NY
*Counsel for Plaintiffs*

Mark C. Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendant Florida Union Free School District*

Caroline B. Lineen, Esq.
Amanda E. D'Amico, Esq.
Silverman & Associates
White Plains, NY
*Counsel for Defendant Orange-Ulster Board of Cooperative Educational Services*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs Peter Rutherford ("P.C.R." or "Mr. Rutherford") and Ana Rutherford ("A.D.R."

or "Ms. Rutherford"; together, "Plaintiff Parents"), individually and as parents and natural

guardians of P.R., their minor son, and P.R. individually (collectively, "Plaintiffs"), bring this

Action against the Florida Union Free School District ("FUFSD" or the "District") and the

Orange-Ulster Board of Cooperative Educational Services ("BOCES"; collectively,

"Defendants"), alleging that Defendants denied P.R. a free and appropriate public education

("FAPE") between 2013 and 2018, in violation of the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400, et seq., and Section 504 of the Rehabilitation Act ("Section 504"),

29 U.S.C. § 794, and discriminated against P.R. in violation of Section 504 and the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, et seq.  (*See generally* Third Am. Compl.

("TAC") (Dkt. No. 154).)  Before the Court are Defendants' Motions for Summary Judgment

and Plaintiffs' Cross-Motion for Summary Judgment.  (*See* FUFSD's Not. of Mot. (Dkt.

No. 203); BOCES's Not. of Mot. (Dkt. No. 208); Pls.' Not. of Mot. (Dkt. No. 223).)  For the

foregoing reasons, Defendants' Motions are granted and Plaintiffs' Cross-Motion is denied.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Rule 56.1,

(*see* FUFSD's Rule 56.1 Statement ("FUFSD's 56.1") (Dkt. No. 206); BOCES's Rule 56.1

Statement ("BOCES's 56.1") (Dkt. No. 211); Pls.' Rule 56.1 Statement ("Pls.' 56.1") (Dkt.

No. 220); FUFSD's Rule 56.1 Counter-Statement ("FUFSD's Counter 56.1") (Dkt. No. 226);

BOCES's Rule 56.1 Counter-Statement ("BOCES's Counter 56.1") (Dkt. No. 229)), and the

admissible evidence submitted by the Parties.  The facts are recounted "in the light most

favorable to" Plaintiffs, the non-movants on the claims subject to Rule 56.  *Torcivia v. Suffolk

County*, 17 F.4th 342, 354 (2d Cir. 2021).  The facts as described below are in dispute only to the

extent indicated.[1]

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise
statement, in numbered paragraphs, of the material facts as to which the moving party contends
there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must
submit "a correspondingly numbered paragraph responding to each numbered paragraph in the

statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A nonmoving party's failure to respond to a Rule 56.1 statement permits the [C]ourt to conclude that the facts asserted in the statement are uncontested and admissible."  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  Here, both Defendants filed their Statements pursuant to Rule 56.1.  (*See* FUFSD's 56.1; BOCES's 56.1.)  While Plaintiffs filed their Statement pursuant to Rule 56.1 in support of their Cross-Motion for Summary Judgment, (*see* Pls.' 56.1), Plaintiffs have failed to respond to Defendants' 56.1 Statements.  By contrast, both Defendants have responded to Plaintiffs' 56.1 Statement.  (*See* FUFSD's Counter 56.1; BOCES's Counter 56.1.)  Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statements are uncontested and admissible.  *See Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (explaining that "[t]o the extent that this [c]ourt relies on facts drawn from [the] [d]efendants' Rule 56.1 [s]tatement, it does so because [the] [p]laintiff has not disputed those facts" since "[the] [p]laintiff did not submit a Rule 56.1 statement").

As for Plaintiffs' Cross-Motion for Summary Judgment, which is fully submitted with competing 56.1 Statements: where the Parties "identify disputed facts but with semantic objections only or by asserting irrelevant facts, . . . which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact."  *New Jersey v. N.Y.C. Dep't of Educ.*, No. 18-CV-6173, 2021 WL 965323, at *2 n.1 (S.D.N.Y. Mar. 15, 2021) (citing *Gjini v. United States*, No. 16-CV-3707, 2019 WL 498350, at *1 n.4 (S.D.N.Y. Feb. 8, 2019)); *see also Nimkoff v. Drabinsky*, No. 17-CV-4458, 2021 WL 4480627, at *1 n.2 (E.D.N.Y. Sept. 30, 2021) ("[T]o the extent a party's Rule 56.1 statement improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party without specifically controverting those facts [with admissible evidence], the [c]ourt has disregarded the statement." (quotation marks and alterations omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [the plaintiff's] admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant['s] asserted facts without specifically controverting those same facts. . . . [A] number of [the] [p]laintiff's purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[].").  And, "[a]s the Second Circuit has observed, 'where there are no citations [to admissible evidence] or where the cited materials do not support the assertions in the Statements, the Court is free to disregard the assertion.'"  *Genova v. County of Nassau*, No. 17-CV-4959, 2020 WL 813160, at *4 (E.D.N.Y. Feb. 19, 2020) (alteration omitted) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73–74 (2d Cir. 2001)).

Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

### 1.  Background to FUFSD & BOCES

FUFSD is a public school district located in Orange County, New York, which operates Golden Hill Elementary School ("Golden Hill") and the S.S. Seward Institute ("Seward"), a middle and high school.  *See* About Us, Florida Union Free School District, https://www.floridaufsd.org/about-us/.  In any given year, FUFSD usually serves a total of between 800 and 900 students across Warwick and Seward, approximately 50 of which are typically classified as students with disabilities under the IDEA.  (*See* Decl. of Amanda E. D'Amico in Supp. of Mot. for Summ. J. ("D'Amico Decl.") (Dkt. No. 209) Ex. D ("Pavlik Dep."), at 96:18–97:23 (Dkt. No. 209-4).)[2]

BOCES is a regional public education service organization that provides special education among other services for its component school districts in Orange and Ulster Counties in New York state.  *See* About Us, Orange-Ulster BOCES, https://www.ouboces.org/about-us.  FUFSD is a component school district of BOCES.  *See* Component Districts, Orange-Ulster BOCES, https://www.ouboces.org/about-us/component-districts.  Among other programs, BOCES operates the Warwick Valley Satellite Program at Sanfordville Elementary School ("Warwick") and the Minisink Valley Satellite Program at Otisville Elementary School ("Otisville").  *See* Programs, Orange-Ulster BOCES, https://www.ouboces.org/students-of-all-ages/special-and-alternative-education/programs.

### 2.  P.R.'s Academic History (September 2013–October 2018)

P.R. is a male child who was born in 2006, (*see* D'Amico Decl. Ex. Z ("A.D.R. Dep."), at 21:5–6 (Dkt. No. 209-8)); at the time the operative complaint was filed, P.R. was 12 years old, (*see generally* TAC).  Plaintiff Parents are P.R.'s natural parents and guardians.  (*See* Answer of

---

[2] Certain of the exhibits to the D'Amico Declaration were filed under seal.  Those exhibits were filed at Dkt. No. 210.

FUFSD to TAC ("FUFSD Answer") ¶ 1 (Dkt. No. 155); BOCES's 56.1 ¶ 2.)  P.R. was born with

a neurodevelopmental disorder, which was first diagnosed as a speech or language impairment

and later as Autism Spectrum Disorder.  (*See* A.D.R. Dep. 23:6–8; D'Amico Decl. Ex. L

("P.C.R. Dep."), at 188:5–8 (Dkt. No. 230)); D'Amico Decl. Exs. F (Dkt. No. 210-1), I (Dkt.

No. 210-4).)[3]  At various times in his life, P.R.'s doctors have also diagnosed him with certain

other emotional and psychological impairments, including Attention-Deficit/Hyperactivity

Disorder ("ADHD"), Post-Traumatic Stress Disorder ("PTSD"), anxiety, and depression, in

addition to physical impairments, including hearing sensitivities, incontinence, enuresis, and

encopresis.[4]  (*See* A.D.R. Dep. 28:3–32:2; P.C.R. Dep. 41:3–42:21, 82:20–83:23, 192:19–195:4,

347:20–348:9.)

　　While P.R. is verbal and able to communicate with others under certain circumstances,

P.R.'s ability to express himself is limited and inconsistent.  For example, Ms. Rutherford

explained that if P.R. does not know an individual, then it is unlikely that he would be capable of

responding to questions that individual asks him; rather, P.R. would likely either stay silent,

leave the room, or physically lash out at the individual.  (*See* A.D.R. Dep. 38:20–40:25.)[5]  When

P.R. does verbally communicate, it is with prompting; he cannot engage in conversations,

---

[3] Exhibit L to the D'Amico Declaration was filed at Dkt. No. 230 across two docket entries.  (*See* Dkt. No. 230-1–230-2.)  When citing to Exhibit L, the Court will refer to the native page and line numbering.

[4] Enuresis refers to urinary incontinence; encopresis refers to fecal incontinence.  *See* Bed-wetting, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bed-wetting/symptoms-causes/syc-20366685; Encopresis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/encopresis/symptoms-causes/syc-20354494.

[5] It is because of P.R.'s communicative limitations with those he does not know—made all the more challenging by the need to use videoconferencing technology due to the COVID-19 pandemic—that the Parties' attempt to hold a deposition of P.R. was not successful.  (*See* Aff. of Mark. C. Rushfield in Supp. of Mot. for Summ. J. ("Rushfield Aff.") (Dkt. No. 204) Exs. O (Dkt. No. 204-16), P (Dkt No. 204-17).)

express himself in full sentences, or follow multi-step directions.  (*See* FUFSD's 56.1 ¶ 156.)

P.R.'s vocabulary is also limited, and at times, P.R.'s speech is unclear or unintelligible.  (*See id.*

¶¶ 156, 169.)  Moreover, much of P.R.'s communication is "scripted language," or the imitation

and repetition of words and phrases P.R. has heard somewhere else, a behavior known as

echolalia.  (*Id.* ¶¶ 157–60.)  For instance, P.R. at times refers to himself in the third party or uses

words that are not in his vocabulary.  (*See* Pavlik Dep. 88:17–25; P.C.R. Dep. 40:4–41:2.)

As relevant to the instant Action, P.R. lived with Plaintiff Parents in Florida, New

York—within the FUFSD geographic boundaries—and attended special education programs in

public schools operated by FUFSD and BOCES between September 2013 and September 2018.

(*See* D'Amico Decl. Ex. F; A.D.R. Dep. 79:10–12; P.C.R. Dep. 17:25–18:7.)

### a.  BOCES Warwick Satellite Program (September 2013–December 2015)

#### i.  2013–14 School Year

During the 2013–14 school year, P.R. attended Warwick, where he was placed in a 9:1+3

(a ratio of 9 students to 1 teacher plus 3 instructional aides) classroom designed for children with

special needs.  (*See* BOCES's 56.1 ¶ 12.)  At this point in time, P.R. was classified as a student

with a disability as defined by the IDEA under the category of Speech and Language

Impairment.  (*See id.* ¶ 10.)  Based on this classification, P.R.'s Individualized Education Plan

("IEP") for the 2013–14 school year provided that P.R. was to receive individual speech and

language therapy three times per week, individual occupational therapy three times per week,

and small group counseling (at a 2:1 ratio of 2 students to 1 counselor) once per week.  (*See*

D'Amico Decl. Ex. J (Dkt. No. 210-5).)

For the first several months of the 2013–14 school year, P.R. received group counseling

from Susan Isaacson ("Isaacson"), a licensed clinical social worker and speech pathologist.  (*See*

BOCES's 56.1 ¶ 20.)  But after a number of group sessions with P.R., Isaacson formed a professional opinion that group counseling was not appropriate for P.R. based on the behaviors he had exhibited during counseling sessions—an opinion she shared with both Deborah Brunjes ("Brunjes"), the then-principal of Warwick, and Plaintiff Parents.  (*See* BOCES's 56.1 ¶¶ 6, 20; D'Amico Decl. Ex. C ("Brunjes Dep."), at 65:25–66:11 (Dkt. No. 209-3); A.D.R. Dep. 252:25–253:23.)  Brunjes then had a conversation with Plaintiff Parents, in which they informed Brunjes that they did not want Isaacson to provide counseling to their son, for two reasons.  (*See* BOCES's 56.1 ¶ 21; Brunjes Dep. 66:7–67:13.)  First, Plaintiff Parents disagreed with Isaacson's opinion that group counseling was not appropriate for P.R., and second, Plaintiff Parents felt that it was inappropriate and unprofessional for Isaacson to provide individual counseling to P.R. since Isaacson was at that time also providing counseling to Ms. Rutherford.  (*See* BOCES's 56.1 ¶¶ 21, 27; P.C.R. Dep. 465:8–466:4.)  Brunjes then relayed Plaintiff Parents' concerns to Kerri Stroka ("Stroka"), the Director of Special Education for BOCES, and asked if another counselor could be sent to Warwick to provide counseling services to P.R.  (*See* BOCES's 56.1 ¶¶ 5, 22.)  Stroka informed Brunjes that no other BOCES counselor was available to provide services to P.R., and recommended that Brunjes contact FUFSD.  (*See id.* ¶ 23.)  Brunjes then contacted Lisa Tiger ("Tiger"), the then-Director of Instruction for FUFSD, to inquire about finding a new counselor for P.R.  (*See id.* ¶¶ 8, 24.)  Several days later, Tiger contacted Brunjes to inform Brunjes that Jeanne Marie Pavlik ("Pavlik")—an FUFSD school psychologist and the Chairperson for the Committee on Special Education ("CSE")—would be sent over to Warwick to counsel P.R.  (*See id.* ¶¶ 7, 25; *see also* Pavlik Dep. 7:3–9.)  However, Tiger advised Brunjes that Pavlik would not be able to provide group counseling, because as an FUFSD counselor, Pavlik could only provide counseling to FUFSD students, and no other FUFSD students were

then enrolled at Warwick who could be pulled into P.R.'s counseling sessions to meet the 2:1 ratio.  (*See* BOCES's 56.1 ¶ 25.)

During this period of time, Brunjes also began to develop concerns regarding the appropriateness of P.R.'s placement at Warwick based on her observations of his behavior.  (*See id.* ¶ 16.)  Brunjes observed that P.R. was "becoming stressed in the smallest of group environments, . . . self-harming, grabbing toys from other students, climbing on toilets and windowsills, eloping from the classroom, biting himself[,] and scratching staff."  (*Id.* ¶ 17.)  Warwick's program was not designed for children with these types of behavioral challenges, but rather, was designed for children with learning disabilities or mild emotional disabilities.  (*See id.* ¶ 51; *see also* Brunjes Dep. 111:7–113:12.)   For instance, the Warwick program occupied only a few classrooms in the back hallway of the Sanfordville Elementary School, so BOCES staff "could not dedicate a sensory or de-escalation room for P.R. to go if he needed to calm down or take a time away."  (BOCES's 56.1 ¶ 18; *see also* Brunjes Dep. 98:2–22.)  Instead, when P.R. became agitated and staff were unable to calm him, his teacher "would need to clear the other students from the classroom and place them in another classroom while other staff attempted to address P.R.'s behavior."  (BOCES's 56.1 ¶ 19.)  This caused significant disruptions to the learning environment of the other students in P.R.'s class.  (*See id.*)  As a result, Brunjes felt that the Warwick program was not able to meet P.R.'s needs.  (*See id.* ¶ 16.)

On November 5, 2013, the CSE held a meeting at Plaintiff Parents' request "to discuss some concerns that exist with some of [P.R.'s] current program."  (D'Amico Decl. Ex. F.)  During the meeting, Brunjes expressed her opinion to Plaintiff Parents that Warwick was not an appropriate placement for P.R.  (*See* BOCES's 56.1 ¶ 28.)  The CSE and Plaintiff Parents also discussed the issue with P.R.'s counseling, which minutes from the meeting note "seem[ed] to be

a concern on all parts." (D'Amico Decl. Ex. F.) Plaintiff Parents expressed their concern that "sessions have not been held," "that the ratio wasn't followed in the beginning of the year," and "that the current counselor is [Ms. Rutherford's] personal therapist and that a conflict exists in this relationship." (*Id.*) BOCES staff "indicat[ed] that individual sessions would be more beneficial at this point as [P.R.] is not engaging in any type of play with others." (*Id.*) As a result of both parties' concerns, CSE revised P.R.'s IEP to include individual counseling services only; FUFSD sent a notice to Plaintiff Parents notifying them of the change the same day. (*See* BOCES's 56.1 ¶¶ 30–31.) On November 21, 2013, Plaintiff Parents were notified that the CSE recommendation was formally approved by the FUFSD Board of Education. (*See id.* ¶ 32.) Thereafter, Pavlik provided P.R. with individual counseling. (*See* Pavlik Dep. 15:7–17:21.)

During the summer of 2014, P.R. was placed at Warwick for the Extended School Year ("ESY"), in a 6:1+2 class. (*See* D'Amico Decl. Ex. G (Dkt. No. 210-2).) P.R.'s IEP for the 2014 ESY provided for only individual counseling, in addition to occupational therapy and speech/language therapy. (*See id.*; BOCES's 56.1 ¶ 34.)

### ii.  2014–15 School Year

P.R. remained at Warwick for the 2014–15 school year, in the same 9:1+3 classroom. (*See* D'Amico Decl. Ex. G.) During the annual review of P.R.'s IEP for the 2014–15 school year, the CSE decided to add group counseling back into P.R.'s IEP, since "his desire to interact ha[d] increased." (*Id.*) Pavlik continued to provide P.R. with individual counseling, but because there continued to be no other FUFSD students available at Warwick for group counseling, the CSE and Plaintiff Parents agreed that Pavlik would bring P.R. into his gym class, so that Pavlik could work with P.R. to develop his social skills in a group setting. (*See* Pavlik Dep. 19:12–20:24.)

P.R. continued to exhibit many of the same behavioral challenges in the 2014–15 school year that he had exhibited in the 2013–14 school year.  (*See* D'Amico Decl. Ex. K ("Brunjes Aff.") ¶ 5 (Dkt. No. 210-6).)  When Brunjes had discussed her concerns with Plaintiff Parents the previous year, Plaintiff Parents had suggested that BOCES staff implement certain behavior interventions, such as playing classical music for P.R. or having P.R. call his mother when he was upset or on the verge of becoming upset.  (*See* BOCES's 56.1 ¶ 37.)  BOCES staff did so, but eventually, P.R. became obsessive over wanting to speak with his mother and would ask to call her constantly, which proved to be upsetting to Ms. Rutherford; as a result, Plaintiff Parents requested that this attempt at intervention cease.  (*See id.* ¶¶ 37–38.)  BOCES staff also implemented other academic and behavioral modifications to P.R.'s program at Warwick, including providing P.R. with his own individualized behavior system, a highly modified curriculum, and a specific spot in the classroom for P.R. to go to when he became agitated or upset.  (*See id.* ¶¶ 39–41.)  BOCES staff also allowed P.R. to take unlimited time away from class as needed for P.R. to deescalate, and modified P.R.'s diet per Plaintiff Parents' instructions. (*See id.* ¶¶ 42–43.)  Each of these various interventions required constant monitoring and adjustment to avoid negative reactions from P.R.; for instance, staff would periodically need to reconfigure the classroom to provide a new spot for P.R. to deescalate, because once he became used to a particular area, he would refuse to return to it.  (*See id.* ¶ 41.)

On November 6, 2014, the CSE convened a meeting to review P.R.'s current status and placement.  (*See id.* ¶ 44.)  During the meeting, Pavlik reviewed a report that Plaintiff Parents had sent from Mary Camarata ("Camarata"), a consultant that Plaintiff Parents had used for years to help P.R.  (*See id.* ¶ 45; *see also* D'Amico Decl. Ex. O (Dkt. No. 210-9).)  Brunjes explained that Warwick was not able to implement certain behavioral interventions that Camarata had

suggested.  (*See* BOCES's 56.1 ¶ 46.)  For instance, Warwick did not have access to a

gymnasium or other area for P.R. to engage in aerobic activity on an hourly basis, as suggested

by Camarata.  (*See id.* ¶ 48.)  Brunjes expressed to Plaintiff Parents her belief that Warwick was

not the appropriate placement for P.R., because she felt that P.R. required a placement in a

behavior intervention program.  (*See id.* ¶¶ 49, 52.)  However, the CSE agreed to add a

Behavioral Intervention Consultation to P.R.'s IEP, to conduct a Functional Behavior

Assessment ("FBA"), and to meet again to review the FBA and P.R.'s program.  (*See id.* ¶¶ 53–

54.)  Plaintiff Parents agreed to look at alternative programs that may be better suited to P.R.'s

needs.  (*See* D'Amico Decl. Ex. O.)

　　　Heather Creese ("Creese"), a Board-Certified Behavior Analyst ("BCBA") with Vital

Behavior Services ("VBS")—an outside agency—conducted an FBA of P.R. following this CSE

meeting.  (*See* BOCES's 56.1 ¶ 58.)  On December 15, 2014, the CSE reconvened to discuss

Creese's FBA report, which all parties agreed "correctly identified [P.R.'s] areas of needs."

(D'Amico Decl. Ex. Q (Dkt. No. 210-11).)  Pavlik—in her capacity as CSE chairperson—

reviewed P.R.'s current placement and expressed the CSE's belief that Warwick was

inappropriate and could not meet P.R.'s needs.  (*See* BOCES's 56.1 ¶ 61.)  Plaintiff Parents were

upset by this, since P.R. had success at Warwick in the past, but Pavlik explained that "while

Warwick may have been able to [address P.R.'s needs] in the past, the current program no longer

can and it is no longer an appropriate placement for [P.R.]"  (D'Amico Decl. Ex. Q.)  Pavlik

reviewed several other placement options with Plaintiff Parents, and explained that an in-district

class run by FUFSD and a class at BOCES's Otisville Satellite Program would be able to address

P.R.'s needs.  (*See id.*)  After the November 2014 CSE meeting, Plaintiff Parents had reviewed

both options and did not agree with Otisville, because "they [felt] it [was] for students with

Autism and [P.R.] is not diagnosed with Autism." (*Id.*) At the conclusion of the December 2014 meeting, Pavlik recommended that P.R. be placed in the in-district 8:1+2 class at Golden Hill, run by FUFSD, a recommendation to which all CSE members agreed, though Plaintiff Parents did not. (*See* BOCES's 56.1 ¶¶ 66–67.) Following the meeting, the CSE sent Plaintiff Parents a prior written notice formally memorializing the CSE's decision that P.R.'s program be changed to "an in-district special class placement" because "[t]he satellite program at Warwick can no longer meet [P.R.'s] needs." (D'Amico Decl. Ex. R (Dkt. No. 210-12).) Plaintiff Parents were notified on December 18, 2014 that the CSE recommendation was formally approved by the FUFSD Board of Education. (*See* BOCES's 56.1 ¶ 69.) Thereafter, P.R. no longer attended Warwick. (*See id.* ¶ 70.)

### b.   First Stint of Home Instruction (December 2014–May 2015)

Because Plaintiff Parents did not agree with the CSE's recommendation, between December 2014 and May 2015, P.R. received educational services at home from a tutor hired by FUFSD. (*See* FUFSD's 56.1 ¶ 25.) Plaintiff Parents did not feel that this round of home instruction was successful, including because it was difficult for Plaintiff Parents and the tutor to agree upon times to provide services to P.R. (*See* D'Amico Decl. Ex. FF (Dkt. No. 210-22).)

On May 15, 2015, the CSE met to review P.R.'s program, and the CSE and Plaintiff Parents agreed to place P.R. in a 6:1+2 classroom at Otisville for the remainder of the 2014–15 school year and the 2015–16 school year. (*See* BOCES's 56.1 ¶¶ 71, 72; *see also* D'Amico Decl. Ex. U (Dkt. No. 210-15).)

### c.   BOCES Otisville Satellite Program (May 2015–February 2016)

P.R. attended Otisville for the remainder of the 2014–15 school year, during which time certain of his behaviors improved. On July 6, 2015, the CSE met to conduct an annual review of P.R.'s program, during which "[t]he [BOCES] team reported on [P.R.'s] improved peer

interaction and happy demeanor" and "[Plaintiff Parents] both reported they are thankful to the [BOCES] team for all of the efforts by all providers and his teacher" and "were very appreciative of the consistent communication." (D'Amico Decl. Ex. H (Dkt. No. 210-3).) The CSE and Plaintiff Parents agreed that P.R. would continue to be classified as Speech and Language Impaired and continue in his 6:1+2 classroom at Otisville for the 2015–16 school year, where he would also be assigned two BCBAs from VBS for additional behavioral management assistance. (*See id.*; BOCES's 56.1 ¶ 75.)

P.R.'s behaviors regressed during the 2015–16 school year. Tina Guerrera ("Guerrera") was P.R.'s special education teacher at Otisville, and she observed that "P.R. had great difficulty with transitions and would often engage in intense and dangerous behaviors when staff attempted to transition him from the bus to the classroom each morning," which included "behaviors such as running, climbing on furniture, [and] hitting and scratching staff and other students." (D'Amico Decl. Ex. Y ("Guerrera Decl.") ¶¶ 1, 3, 4 (Dkt. No. 231-1).) Guerrera also reported that "P.R.'s behaviors often became so intense that it required four staff members to calm P.R. down and redirect him." (*Id.* ¶ 13.) In or around October 6, 2015, Kathleen Santiago ("Santiago")—the then-Assistant Principal at Otisville and acting administrator in the building— called Plaintiff Parents to discuss P.R.'s behavior and find out if anything at home had changed. (*See* BOCES's 56.1 ¶¶ 76, 81.) Ms. Rutherford told Santiago that P.R. had previously had a corn allergy, but Ms. Rutherford had reintroduced corn into his diet, which could be affecting P.R.'s behavior until the corn was out of P.R.'s system. (*See id.* ¶ 82.) However, P.R.'s behaviors did not improve, and in the month of October, BOCES staff called Plaintiff Parents on three occasions to ask them to pick P.R. up early when his behaviors became too intense for BOCES staff to manage and unsafe for himself and others. (*See id.* ¶¶ 83, 84.) Over the course of the

fall, Plaintiff Parents would also sometimes choose to keep P.R. home from school; for instance, Plaintiff Parents would often choose to keep P.R. home when they knew his BCBAs from VBS would be absent.  (*See id.* ¶ 99.)

In late October 2015, VBS staff began coming into the classroom on almost a daily basis to collect behavior data and to work with Guerrera on techniques to help P.R.  (*See id.* ¶ 86.) During this time, VBS conducted another FBA, in which VBS staff observed P.R. engage in many of the behaviors that Guerrera and BOCES staff had observed, including "bolting"; "flopping onto the floor"; "running"; "climbing on, behind[,] or underneath furniture"; "elopement"; and "hitting, kicking[,] or pushing his body into others." (D'Amico Decl. Ex. X (Dkt. No. 210-16).)  VBS made suggestions for certain techniques that Guerrera and P.R.'s aides implemented, including using a token board for P.R. to earn desired reinforcers, such as iPad or Kindle time.  (*See* BOCES's 56.1 ¶ 88.)  Guerrera also took other steps to prevent P.R. from engaging in the above-referenced behaviors, such as moving P.R.'s workstation to limit his amount of movement throughout the school day, rearranging the classroom furniture so that P.R. could not get to the bookcases, and incorporating movement activities into P.R.'s school day, such as by using a movement tool called a "pedalo" in the hallway.  (*See id.* ¶¶ 91–93, 95.)  Over time, however, certain reinforcers and activities became counterproductive.  For example, using the iPad as a reinforcer led to P.R. engaging in more intense behaviors—including physical aggression—when P.R. was asked to put down the iPad and continue working.  (*See id.* ¶ 94.) And while in the hallway using the pedalo, P.R. would become overstimulated, leading him to run up stairs or into an open classroom that was in session or attempt to climb on bookcases. (*See id.* ¶ 96.)

On October 29, 2015, Guerrera was planning a school Halloween party for all students in the class to attend that was scheduled for October 30, 2015. (*See id.* ¶ 97.) That same day, P.R.'s BCBAs informed Guerrera that they would not be at Otisville on October 30. (*See id.* ¶ 98.) Guerrera then called Ms. Rutherford to inform her that P.R.'s BCBAs would not be at school during the Halloween party. (*See id.* ¶ 100.) Knowing that Plaintiff Parents often chose to keep P.R. at home when his BCBAs would not be in school, Guerrera asked Ms. Rutherford to confirm whether P.R. would be in school for the Halloween party; if P.R. was going to be in attendance, Guerrera wished to prepare a schedule that would allow P.R. to be comfortable at the Halloween party, including arranging a special snack time for P.R. to accommodate his dietary restrictions. (*See id.* ¶¶ 99–101.) On October 30, 2015, Ms. Rutherford emailed Guerrera to let her know that Creese had called Ms. Rutherford to confirm that P.R.'s BCBAs would not be in school that day. (*See id.* ¶ 102.) Because of this and "[Guerrera's] concerns with [P.R.] during the Halloween party," Plaintiff Parents decided to keep P.R. at home that day. (Guerrera Decl. Ex. 1 (Dkt. No. 231-2); *see also* BOCES's 56.1 ¶¶ 102–05.)

Around this same time, Pavlik, Tiger, and Plaintiff Parents began discussing other placement options for P.R. Beginning in around March 2015, Plaintiff Parents began to urge FUFSD to place P.R. at the New Beginnings School Annex in West Milford, New Jersey ("New Beginnings"), a private school. (*See* FUFSD's 56.1 ¶ 51.) While Plaintiff Parents had not conducted a formal intake at New Beginnings or submitted an application for P.R. to attend the school, Plaintiff Parents had taken a tour, and felt that New Beginnings was the best option for P.R. within a reasonable distance from their home. (*See id.* ¶¶ 51–53.) Distance was a particularly important issue for Plaintiff Parents because Plaintiff Parents felt that P.R.'s rides to

school needed to be under 35 minutes due to his encopresis and enuresis; Plaintiff Parents provided FUFSD with a doctor's note to this effect on October 29, 2015.  (*See id.* ¶ 68.)

On November 2, 2015, Pavlik sent an email to Plaintiff Parents to discuss possible placement options for P.R.  (*See* Rushfield Aff. Ex. X, at P-25.)[6]  In that email, Pavlik wrote that she had "sent an email to Rockland BOCES to see about setting up a tour of what may be appropriate programs for [P.R.]."  (*Id.*)  The program at Rockland BOCES was a Comprehensive Application of Behavior Analysis to Schooling ("CABAS") accredited program, which at that time was partnering with Columbia University; the individual teachers were all doctoral candidates and the aides were all Master's level with experience working specifically with students with disabilities.  (*See* FUFSD's 56.1 ¶¶ 65–66.)  Pavlik also wrote that she had "put in a call to" New Beginnings and was "hoping to clarify whatever misinformation may be there." (Rushfield Aff. Ex. X, at P-25.)  Pavlik explained that she had "inquired to all Orange County special education administrators, and no district in Orange County ha[d] ever sent a student there and most ha[d] never heard of the program."  (*Id.*)  She also explained that "it is not an out-of-state approved school by the New York State Education Department," and either way, FUFSD legally had to "look at in-state options first, as per state regulations."  (*Id.*)  Plaintiff Parents responded to Pavlik's November 2, 2015 email by expressing their "strong[] disagree[ment]" with the Rockland BOCES placement, given its distance from the Rutherfords' home (approximately 45 minutes), and reiterating that "[t]he only place [Plaintiff Parents] ha[d] found

_____

[6] Exhibit X to the Rushfield Affirmation includes the exhibits from the April 1 to June 14, 2016 hearings on one of Plaintiffs' due process complaints.  The exhibits are marked with either a "P" for Plaintiffs or "D" for District and a number as assigned during the hearing.  When referring to these exhibits, the Court will refer to this marking convention.

in the area" that offered the comprehensive behavioral and social supports that P.R. needs "is the New Beginnings program." (*Id.*; *see also* FUFSD's 56.1 ¶ 65.)

Meanwhile, at Otisville, P.R.'s behaviors continued to escalate into November 2015, during which BOCES staff recorded 90 episodes of aggressive and dangerous behavior, including "climbing, screaming/yelling, biting, destroying property, hitting self, scratching, flopping, hitting others, grabbing, . . . kicking, disrupting class, spitting, running away/bolting, pinching[,] and pulling/grabbing at others' hair/face/clothing." (BOCES's 56.1 ¶ 106.)  That month, BOCES staff requested that Plaintiff Parents pick P.R. up early from school on two occasions due to his behavior. (*See id.* ¶ 107.)  On November 13, 2015, the CSE convened to discuss a Behavioral Intervention Plan ("BIP") for P.R. in light of the October FBA that VBS had conducted and to review P.R.'s program. (*See id.* ¶ 111.)  During that meeting, BOCES staff discussed with Plaintiff Parents that although the interventions that had been implemented "have significantly decreased the unsafe behaviors of climbing and running," "BOCES['s] concern is that it still takes too many staff to help redirect [P.R.]." (D'Amico Decl. Ex. BB (Dkt. No. 210-18).)  The CSE and Plaintiff Parents also discussed the appropriateness of P.R.'s placement at Otisville, and "agreed [that] this placement [would] continue as interventions continue and [P.R.] continues to respond." (*Id.*)

In December 2015, P.R.'s behaviors escalated even further.  BOCES staff recorded 143 episodes of behavior, including "screaming/yelling, biting, destroying property, hitting self, scratching, flopping, hitting others, grabbing, . . . kicking, disrupting class, spitting, running away/bolting, pinching[,] and climbing." (BOCES's 56.1 ¶ 114.)  That month, BOCES staff requested that Plaintiff Parents pick P.R. up early from school on four occasions. (*See* May 17,

2016 IHO Decision 2.)[7]  On December 11, 2015, the CSE convened again to discuss the BIP that

BOCES had by then developed based on VBS's October 2015 FBA.  (*See* BOCES's 56.1 ¶ 119.)

At that meeting, BOCES staff noted that while at the prior meeting, "a decrease in [P.R.'s more

aggressive behaviors] had been seen," "since then[,] an increase has occurred."  (*See* D'Amico

Decl. Ex. CC (Dkt. No. 210-19).)  The CSE and Plaintiff Parents also discussed that "[a]s part of

the BIP, BOCES staff is stating that they will call [Plaintiff Parents] to pick up [P.R.] [if] unsafe

behaviors cannot be contained by interventions"; BOCES staff clarified that "[t]hese are not

suspensions."  (*Id.*; *see also* D'Amico Decl. Ex. EE (Dec. 11, 2015 BIP) (Dkt. No. 210-21)

("[P.R.'s] parents have agreed to pick him up at such time as it is determined that all

interventions have been unsuccessful and [P.R.'s] behaviors continue to be unsafe to himself and

others.").)  Plaintiff Parents did not object to including this plan in the BIP.  (*See* BOCES's 56.1

¶ 122.)  Following this meeting, Guerrera and BOCES's staff continued to implement behavior

strategies with P.R., including the token economy, proximity control, fine and visual motor tasks,

and counting and breathing techniques.  (*See id.* ¶¶ 124–26.)

On December 22, 2015, P.R. was present at school and participated in the morning

Christmas activities.  (*See id.* ¶ 127.)  That day, P.R. was picked up from school at 12:50 pm,

after the Christmas activities had concluded.  (*See id.* ¶ 128.)

In January and February 2016, BOCES staff recorded 236 episodes of behavior and asked

Plaintiff Parents to pick P.R. up early on five occasions.  (*See id.* ¶¶ 129–31; May 17, 2016 IHO

Decision 2.)  On February 4, 2016, the CSE convened to review P.R.'s progress with his BIP.

(*See* BOCES's 56.1 ¶ 132.)  During the meeting, BOCES staff discussed with Plaintiff Parents

---

[7] Plaintiffs submitted the full New York state administrative record to the Court in hard
copy.

that P.R.'s "[b]ehaviors continue to be difficult," and while "[c]limbing has declined,"

"aggressive behaviors have escalated."  (D'Amico Decl. Ex. FF.)  The CSE and Plaintiff Parents

also discussed P.R.'s placement at Otisville, and "[a]ll agreed that at this time, [P.R.] requires a

different placement to address his needs."  (*Id.*)  The CSE and Plaintiff Parents agreed to refer

P.R. to the Rockland County BOCES for a "multiple program intake to see if there are any

programs appropriate there."  (*Id.*)  During that meeting, BOCES staff offered a half day

program at Otisville for P.R. to attend, but Plaintiff Parents requested home instruction until an

appropriate placement for P.R. could be found.  (*Id.*)  While Pavlik and Tiger (who, by this point,

was the Assistant Superintendent for FUFSD, (*see* BOCES's 56.1 ¶ 8)) "expressed concern" at

this request, given Plaintiff Parents' "unhappiness with home instruction" in early 2015, the CSE

ultimately agreed to recommend home instruction until another placement for P.R. was secured,

(*see* D'Amico Decl. Ex. FF).  As of February 9, 2016, P.R. no longer attended Otisville.  (*See*

BOCES's 56.1 ¶ 137.)

### d.   Second Stint of Home Instruction (February–June 2016)

For the remainder of the 2015–16 school year, P.R. received educational services at home

from the same tutor—Joan Kissinger ("Kissinger")—who had provided those services between

December 2014 and May 2015.  (*See* FUFSD's 56.1 ¶ 92.)  Specifically, P.R. was provided with

one hour of academic tutoring per day, for a total of five hours per week.  (*See id.*)  P.R. received

speech and occupational therapy four days per week at Golden Hill.  (*See id.* ¶ 94.)

During this stint of home instruction, Kissinger was not able to manage P.R.'s behaviors,

because P.R. had become physically aggressive with her.  (*See id.* ¶ 95; *see also* P.C.R. Dep.

99:9–100:14 (explaining that P.R. would "smack[]" Kissinger); AD.R. Dep. 59:14–60:22

(explaining that Kissinger "didn't work out" because she "didn't know how to manage him," and

that P.R. "str[uck]" her on multiple occasions).)  On April 1, 2016, after six weeks of tutoring,

Kissinger resigned.  (*See* FUFSD's 56.1 ¶¶ 95, 98.)  FUFSD had difficulty finding a replacement

tutor who would work with P.R. at home, but ultimately were able to secure the services of Kerry

Boylan ("Boylan"), who provided tutoring services to P.R. at Golden Hill beginning on April 13,

2016.  (*See id.* ¶¶ 95, 97.)  At that time, Boylan had early childhood and childhood teaching

certifications and was enrolled in a Master's program for special education, though she had not

yet attained the certification.  (*See id.* ¶ 97.)  Boylan was scheduled to provide tutoring to P.R.

for 1.5 hours per day, for four days per week, alongside a 1:1 aide.  (*See id.*)

In the meantime, FUFSD and Plaintiff Parents endeavored to find an appropriate new

placement for P.R.  FUFSD first contacted the Rockland BOCES—as discussed during the

February 4, 2016 CSE meeting—but were notified that Rockland BOCES did not at that time

have room in its program for P.R.  (*See* FUFSD's 56.1 ¶ 87.)[8]  FUFSD then contacted a number

of other state-approved private schools offering programs that would address P.R.'s needs,

including Abilities First, Jean Black School, ARC-Orange County, Anderson Center for Autism,

ARC-Rockland County, Cardinal Hayes School, Green Chimney's Children's Services, and

Putnam-Northern Westchester BOCES.  (*See id.*)  Abilities First accepted P.R. into its program

for the remainder of the 2015–16 school year, but Plaintiff Parents rejected this program,

believing it to be too far from their home.  (*See id.* ¶ 90.)  Instead, Plaintiff Parents continued to

believe that New Beginnings was the only appropriate placement for P.R.  (*See id.* ¶ 129.)

However, since Plaintiff Parents had first raised New Beginnings as their desired placement for

---

[8] Rockland BOCES later reached out to Plaintiff Parents to schedule an intake for
purposes of enrolling P.R. for the 2016 ESY and 2016–17 school year.  (*See* FUFSD's 56.1
¶ 91.)  However, Plaintiff Parents chose not to attend the intake and thereafter did not respond to
Rockland BOCES's attempts to reschedule, since they felt that the Rockland BOCES's program
was not appropriate for P.R. given the distance from their home.  (*See id.*; *see also* P.C.R. Dep.
170:1–173:5.)

P.R. and continued to advocate for it, FUFSD had been in contact with New Beginnings representatives to discuss New Beginnings's program, and did not feel that it would meet P.R.'s needs.  (*See id.* ¶ 53.)[9]  In speaking with New Beginnings staff, FUFSD learned that New Beginnings's specialists were not on campus every day—for example, the BCBA was only at the school once per week and when there, worked with staff and not directly with students.  (*Id.*)  Moreover, the school did not have any full-time staff certified in Applied Behavioral Analysis ("ABA"), though some staff had ABA training; the only ABA-certified staff member was the BCBA, who was only on campus once per week.  (*Id.* ¶ 54.)  As a result, FUFSD did not feel that New Beginnings was an appropriate placement for P.R.

On June 13, 2016, the CSE convened to conduct an annual review of P.R.'s program and recommend a placement for the 2016–17 school year.  (*See* D'Amico Decl. Ex. I (Dkt. No. 210-4).)  During the meeting, the CSE formally changed P.R.'s classification to Autism pursuant to an order from an Impartial Hearing Officer ("IHO"), *see infra*, though "the CSE [was] in agreement with the change."  (*Id.*)  The CSE and Plaintiff Parents then reviewed P.R.'s progress in various metrics and discussed both P.R.'s 2016 ESY and 2016–17 school year placements.  (*See id.*)  The CSE and Plaintiff Parents agreed that P.R. would attend an ESY program at BOCES, but disagreed as to P.R.'s 2016–17 school year placement.  (*See id.*)  The CSE's recommendation was for P.R. to be placed in a 6:1+2 classroom at Golden Hill that FUFSD would be creating for the 2016–17 school year.  (*See id.*)  Plaintiff Parents refused to accept this

---

[9] FUFSD represents that Pavlik was the individual who spoke with representatives of New Beginnings.  (*See* FUFSD's 56.1 ¶ 53.)  However, Tiger indicated at her deposition that she was the one who spoke with an individual named Jody at New Beginnings.  (*See* D'Amico Decl. Ex. E ("Tiger Dep."), at 73:3–18 (Dkt. No. 209-5).)  Because the identity of the individual who spoke with New Beginnings concerning P.R.'s placement is not material, this inconsistency does not affect the disposition of the instant Motions.

placement, because they thought that one of the children who would be in P.R.'s class would be

a child with Angelman syndrome, a genetic disorder that led the child to have verbal outbursts

throughout the day, which Plaintiff Parents believed would cause problems for P.R. due to his

hearing sensitivities.  (*See* P.C.R. Dep. 222:17–223:13; *see also id.* at 391:6–22; Pavlik Dep.

75:19–76:7.)[10]  On June 23, 2016, the CSE convened to continue the June 13 meeting, and

Plaintiff Parents formally refused the CSE's recommendation for P.R.'s 2016–17 placement.

(*See* D'Amico Decl. Ex. I.)  Because Plaintiff Parents did not accept the CSE's recommended

placement for P.R., the 6:1+2 class at Golden Hill was not created for the 2016–17 school year.

(*See* FUFSD's 56.1 ¶ 130.)

### e.  BOCES Central Location (June–August 2016)

During the summer of 2016, P.R. attended a program at BOCES's central location for the

ESY in a 6:1+2 class.  (*See* D'Amico Decl. Ex. B ("Stroka Dep."), at 85:25–86:12 (Dkt.

No. 209-2).)  Stroka had the opportunity to observe P.R. while he was there and observed that he

"had a tough summer."  (*Id.* at 86:4–10.)  Stroka observed P.R. to engage in behaviors that were

dangerous to himself and others, such as attempting to climb on top of tall furniture and throw

himself off.  (*See* BOCES's 56.1 ¶ 139.)  These behaviors led to several suspensions.  For

instance, on July 6, 2016, P.R. was suspended from school for one day for pulling hair, writing

on lockers, putting his hands in staff members' faces, pushing a paraprofessional's chair causing

her to fall on the floor, and standing on a chair swatting at staff.  (*See id.* ¶ 143.)  On August 2,

2016, P.R. was suspended for three days for engaging in a series of behaviors that included

hitting, biting, and kicking staff, and climbing on furniture and windowsills.  (*See id.* ¶ 152.)

---

[10] FUFSD denies that this student would have been in P.R.'s class.  (*See* FUFSD's 56.1
¶ 128.)

On July 8, 2016, Stroka and the BOCES Assistant Director of Special Education, James Higgins ("Higgins"), used a physical restraint on P.R., because P.R. had attempted to throw himself off a chair; both Stroka and Higgins are trained in Therapeutic Crisis Intervention and were certified by Cornell University to train others on the use of emergency interventions. (*See id.* ¶¶ 144, 147.) The restraint used is called a "small child" restraint, which involves sitting with the child on the ground with the child leaning against the adult seated on the floor, and Stroka explained that she used the restraint because she was concerned that P.R. was in imminent harm. (*See id.* ¶¶ 145–46.) On July 20, 2016, Stroka and Higgins met with Mr. Rutherford to discuss the physical restraint that was used on P.R. (*See id.* ¶ 149.)

In a letter from the Keith Sullivan ("Sullivan"), the Acting Summer School Principal for the program, to Tiger dated August 4, 2017, Sullivan wrote that "[P.R.] ha[d] made minimal progress toward his [BIP] goal of transitioning safely and with minimal disruption and with 1:1 [aide] in close proximity," and explained that BOCES staff had recorded 131 episodes of behavior. (D'Amico Decl. Ex. KK (Dkt. No. 210-26); *see also* BOCES's 56.1 ¶¶ 153–54.)

### f. Pendency Placement at FUFSD Golden Hill Elementary School (September 2016–May 2017)

Because Plaintiff Parents refused to accept the CSE's recommended placement for P.R. for the 2016–17 school year, FUFSD was obligated to implement a pendency program for P.R., which was the same program that was in place beginning in April 2016. (*See* FUFSD's 56.1 ¶¶ 100–01.) As such, P.R. began to receive tutoring and related services at Golden Hill starting on September 7, 2016. (*See id.* ¶ 102.) Boylan provided P.R. with 1:1 academic tutoring for three hours per day, and P.R. also received four 30-minute sessions of individual speech/language therapy and three 30-minutes sessions of individual occupational therapy per week. (*See id.* ¶¶ 103, 105.) FUFSD also provided P.R. with two hours of ABA services by a

VBS BCBA per day, services which commenced two weeks before the start of the school year. (*See id.* ¶¶ 103, 126, 131.)

P.R. traveled to and from Golden Hill via school bus, and while he did not need assistance to get off the bus upon arriving at Golden Hill, he was often resistant to getting on the school bus to go home.  (*See id.* ¶ 145.)  On several occasions, Boylan required assistance so that two people could escort P.R. to the school bus.  (*See id.* ¶¶ 145–46.)  While P.R. spent much of his day with Boylan, P.R. was never alone with Boylan or any service provider at Golden Hill; rather, he was always in the presence of at least two staff members, often including his 1:1 aide. (*See id.* ¶ 148.)

Between September 2016 and January 2017, there were several incidents involving P.R. at Golden Hill.  First, on November 15, 2016, P.R. sustained an abrasion on his lower back during his school day at Golden Hill.  (*See* Mar. 23, 2018 SRO Decision (No. 18-010) 3.)  Three adults were present in the room at the time, and the school nurse responded by applying ointment and a band-aid to the abrasion.  (*See id.* at 3–4.)  The school contacted Plaintiff Parents to report the incident on the same day, and Plaintiff Parents responded by demanding that P.R. either receive pendency services in their home or be placed at New Beginnings, because they felt that Golden Hill was unsafe for P.R.  (*See id.* at 4.)

Second, at some point while P.R. was attending Golden Hill, Ms. Rutherford was told by a friend and fellow parent, Lourdes MacLeod ("MacLeod"), that she had seen FUFSD staff use physical force on P.R.[11]  (*See* P.C.R. Dep. 263:8–265:5; A.D.R. Dep. 50:18–51:13.)  MacLeod

---

[11] It is unclear when this incident took place.  Mr. Rutherford estimated that this incident took place at some point between September and December 2016 (prior to the December 2016 holidays).  (*See* P.C.R. Dep. 264:17–265:5.)  However, MacLeod estimated it took place in either May or June of 2015 or 2016.  (*See* Reply Aff. of Mark C. Rushfield in Supp. of Mot. for Summ.

explained that one day when she was arriving at Golden Hill (where one of her daughters was then a student), she witnessed two women holding P.R.'s arms and leading him to a bus when P.R. dropped to the ground and began resisting, leading the women to attempt to pull P.R. up off the ground. (*See* Reply Rushfield Aff. Ex. A, at 28:10–17; Pls.' 56.1 Ex. 7 (Excerpts of MacLeod Deposition), at 34:3–42:15 (Dkt. No. 220-7).)

Third, while Plaintiff Parents were at Golden Hill for a CSE meeting on November 29, 2016, Plaintiff Parents heard a noise outside of the room, which Ms. Rutherford believed to be P.R. screaming. (*See* Mar. 23, 2018 SRO Decision (No. 18-010) 5 n.6; *see also* A.D.R. Dep. 195:13–22.) Plaintiff Parents claim that Ms. Rutherford attempted to leave the room to see what was going on and that the principal of Golden Hill, Deborah Lisack ("Lisack"), delayed Ms. Rutherford's exit for five to ten seconds by blocking the door; when Ms. Rutherford got into the hallway, she did not see P.R. (*See* A.D.R. Dep. 195:13–196:25; P.C.R. Dep. 273:5–275:25.) When the CSE meeting resumed, the CSE explained that FUFSD staff had been using a two-person escort to get P.R. to the school bus based on P.R.'s behaviors, and what Plaintiff Parents heard was P.R. laughing at a video just before getting on the bus. (*See* Mar. 23, 2018 SRO Decision (No. 18-010) 5 n.6.) Later that day after the meeting concluded—and for several weeks following the meeting—Plaintiff Parents sent emails to FUFSD requesting that P.R. receive all services at home due to safety concerns. (*See id.*)

On January 12, 2017, Plaintiff Parents stopped sending P.R. to Golden Hill due to their belief that P.R. was being mistreated by FUFSD staff. (*See* FUFSD's 56.1 ¶ 153.) However, Plaintiff Parents did not at that time share their concerns regarding the mistreatment of P.R. with

---

J. & in Opp'n to Cross-Mot. ("Reply Rushfield Aff.") (Dkt. No. 224) Ex. A (Excerpts of MacLeod Deposition), at 27:12–28:9 (Dkt. No. 224-1).)

FUFSD.  (*See id.* ¶ 191.)[12]  On February 6, 2017, Pavlik emailed Plaintiff Parents to attempt to

reschedule a CSE meeting that had been originally scheduled for February 2, 2017 and had been

canceled by Plaintiff Parents and expressed concern about P.R.'s 14 consecutive school day

absences since January 12, 2017.  (*See* Mar. 23, 2018 SRO Decision (No. 18-010) 5.)  Plaintiff

Parents responded on February 7, 2017, and informed Pavlik that P.R. had missed school due to

an illness and was resisting returning to school out of fear and anxiety—again requesting that

P.R.'s services be provided to him at their home or that P.R. be placed at New Beginnings.  (*See*

*id.* at 5–6)  Plaintiff Parents also attached a letter dated January 13, 2017 from one of P.R.'s

outside providers in which the provider stated that P.R. had told him, "Don't make me go to

Golden Hill.  They hurt me there."  (Jan. 10, 2018 IHO Decision 10; *see also* Mar. 23, 2018 SRO

Decision (No. 18-010) 6.)

       After receiving Plaintiff Parents' February 7, 2017 email, the then-FUFSD

Superintendent Jan Jehring ("Jehring") and Tiger investigated Plaintiff Parents' allegations that

P.R. had been mistreated by Golden Hill staff.  (*See* FUFSD's 56.1 ¶ 198.)  Jehring and Tiger

met with and questioned each staff member and any other individual who had provided services

to P.R. at Golden Hill.  (*See id.*)  Each individual confirmed that he/she was never alone with

P.R., and never saw any service provider mistreat P.R. in any way.  (*See id.* ¶ 199.)  They also

confirmed their belief that P.R. was not capable of independently expressing that he was being

mistreated or hurt and observed that P.R. exhibits echolalia.  (*See id.*)

       On March 9, 2017, the CSE convened and Plaintiff Parents again expressed their

concerns regarding P.R.'s safety at Golden Hill, and informed FUFSD (potentially for the first

---

[12] Plaintiff Parents did, however, file a report with a local police department concerning
the November 15, 2016 incident on January 5, 2017.  (*See* Mar. 23, 2018 SRO Decision (No. 18-
010) 5 n.7.)  The police apparently found the complaint to be unfounded.  (*Id.*)

time) that P.R. had told them he had been struck by Boylan.[13]  (*See* FUFSD's 56.1 ¶ 192.)  The

CSE responded by advising Plaintiff Parents that P.R. was echolalic and did not have the ability

to report that someone had hit him.  (*See id.*)  Nonetheless, Plaintiff Parents informed the CSE

that they would not allow P.R. to return to his pendency program at Golden Hill unless FUFSD

provided P.R. with a different tutor.  (*See id.* ¶ 194.)  Though FUFSD advertised for and made

many other internal inquiries for certified teachers to replace Boylan as P.R.'s tutor, FUFSD's

efforts were unsuccessful, though Boylan was willing to continue working with P.R.  (*See id.*

¶ 197.)[14]  Because Plaintiff Parents remained unwilling to accept Boylan as P.R.'s tutor, in mid-

May 2017, the CSE changed P.R.'s pendency placement from Golden Hill to Seward.  (*See id.*

¶ 206.)

---

[13] The Court notes that the record as to P.R.'s claim that he had been struck by Boylan is not clear.  FUFSD includes in its 56.1 Statement that "[Plaintiff Parents] did not make any claim to [FUFSD] that Kerry Boylan had ever hit PR until a February 7, 2017 email," but later implies that this specific allegation as to Boylan was not communicated to FUFSD until the March 9, 2017 CSE meeting.  (FUFSD's 56.1 ¶¶ 191, 192.)  Plaintiffs do not elucidate the matter. Plaintiff Parents report that P.R. began to convey to them that Boylan was abusing him as early as December 2016, though they were unable to recall the specific timeline, (*see, e.g.*, P.C.R. Dep. 349:5–20; A.D.R. Dep. 157:18–162:20), and apparently took two videos of P.R. repeating his allegation on January 4, 2017, but did not inform FUFSD of P.R.'s allegation until February 7, 2017 at the earliest, (*see* P.C.R. Dep. 350:21–24), and only provided the videos to FUFSD during discovery, (*see* FUFSD's 56.1 ¶¶ 174, 175).  In short, it is unclear to this Court when P.R. first told Plaintiff Parents that Boylan had hit him, when Plaintiff Parents communicated this allegation to FUFSD, and how much information Plaintiff Parents provided to FUFSD.

[14] FUFSD attributes part of its difficulties in finding a replacement tutor for P.R. to a public campaign Plaintiff Parents engaged in against FUFSD in early 2017, before Plaintiff Parents removed P.R. from Golden Hill.  (*See* FUFSD's 56.1 ¶ 195.)  Specifically, Plaintiff Parents created a petition on Change.org entitled "Florida School District is ABUSIVE!!" in which Plaintiff Parents alleged that FUFSD staff were abusing P.R.  (*See* Aff. of Lisa Tiger in Supp. of Mot. for Summ. J. ("Tiger Aff.") (Dkt. No. 205) Ex. D (Dkt No. 205-4).)  Plaintiff Parents circulated the petition to the public via email and posted it throughout the community. (*See* Tiger Aff. ¶ 10.)  FUFSD indicates that potential tutors were unwilling to work with P.R. based on Plaintiff Parents' activism.

> g.   Pendency Placement at FUFSD S.S. Seward Academy (May–August 2017)

P.R. received tutoring and other services at Seward for the remainder of the 2016–2017 school year and for the 2017 ESY.  While P.R. was at Seward for the ESY, there was an incident during which P.R. got away from the staff members who were supervising him, entered the Seward library, and ran around the second level atrium, refusing to leave.  (*See* FUFSD's 56.1 ¶¶ 207–08.)  While on the second-floor atrium, P.R. leaned against the railing, which was almost as tall as P.R.  (*See id.* ¶ 208.)

The CSE met on July 10, 2017, and Plaintiff Parents asked that the CSE recommend that P.R. be placed in an 8:1+4 class at Abilities First, a private school for students with special needs, for the 2017–18 school year.  (*See id.* ¶ 210.)  The CSE agreed and P.R. was placed at Abilities First.  (*See id.*)

> h.   Abilities First Annex Private School (September 2017–September 2018)

P.R. attended Abilities First for the 2017–18 school year, and while he was scheduled to attend Abilities First for the 2018–19 school year, P.R. did not attend that year.  (*See* Tiger Aff. ¶¶ 12, 17.)  After a period of unexplained absences, FUFSD contacted Child Protective Services and learned that Plaintiffs had moved to New Jersey in September 2018, where Plaintiffs currently live.  (*See id.*; *see* P.C.R. Dep. 17:25–18:7, A.D.R. Dep. 79:7–12.)

### 3.  New York State Education Department Administrative Proceedings

Throughout P.R.'s schooling in New York state, Plaintiff Parents have pursued multiple avenues for relief via due process and state complaints filed with the New York State Education Department ("NYSED").  The Court recounts certain of that voluminous administrative history here, to the extent relevant to decide the instant Motions.

<u>a.  Claims Regarding the 2014–15 School Year</u>

At some point prior to May 17, 2015, Plaintiffs filed a due process complaint alleging that FUFSD failed to provide P.R. with a FAPE for the 2014–15 school year.  (*See generally* Rushfield Aff. Ex. B ("Settlement Agreement").)  That action was ultimately withdrawn, however, pursuant to a settlement agreement between Plaintiffs and FUFSD.  (*See id.*)  As part of that agreement, the parties agreed that FUFSD would place P.R. in the 6:1+2 class at Otisville under an IEP that includes "comparable related services to those contained in [P.R.'s] September, 2014 IEP."  (*Id.* at 2.)  FUFSD also agreed to pay Plaintiffs $2,000 for "privately conducted Central Auditory Processing, Hearing[,] and Speech Language evaluations."  (*Id.*)  In exchange, Plaintiffs agreed to withdraw their then-pending due process complaint and not to file any similar suit against FUFSD "for acts and omissions through and including June 30, 2015."  (*Id.* at 3.)  Ms. Rutherford signed the agreement on May 17, 2015 and then-Superintendent Diane Munro ("Munro") signed the agreement on behalf of FUFSD on May 27, 2015.  (*See id.* at 4.)

<u>b.  Claims Regarding the 2015–16 School Year</u>

On March 28, 2016, Plaintiffs filed a due process complaint alleging that FUFSD had denied P.R. access to a FAPE when, between October 2015 and February 2016, P.R. was repeatedly removed from Otisville without an appropriate Manifestation Determination Review ("MDR") and related safeguards, which must be provided to a special education student before a suspension.  (*See* May 17, 2016 IHO Decision 1.)  On April 11, 2016, Plaintiffs—through their special education advocate Linda Montalbano ("Montalbano")—filed an amended due process complaint that raised a series of additional claims and sought, inter alia, placement at New Beginnings.  (*See* Aug. 9, 2016 IHO Decision 1–2, 18.)

On May 17, 2016, IHO Michael Lazan ("IHO Lazan") issued a decision on the issue of P.R.'s removals from Otisville without appropriate MDRs (which was required to be expedited

pursuant to relevant regulations).  (*See* May 17, 2016 IHO Decision 1.)  IHO Lazan found that, by requiring Plaintiff Parents to pick P.R. up from school, FUFSD had effectuated a disciplinary change in placement without conducting an MDR, conduct that violated 20 U.S.C. § 1415(k)(1)(e)(i), 34 C.F.R. 300.530(e), and 8 N.Y.C.R.R. 201.4(a)(3) and constituted a denial of a FAPE.  (*See id.* at 8.)  IHO Lazan awarded Plaintiffs with 50 hours of compensatory education, to be provided by a certified special education teacher who was to be paid at the provider's usual rate.  (*See id.* at 10.)  Both FUFSD and Plaintiffs appealed the decision.  (*See* July 25, 2016 SRO Decision (No. 16-041) 1.)

On July 25, 2016, State Review Officer ("SRO") Carol H. Hauge ("SRO Hauge") issued a decision on the Parties' appeals from IHO Lazan's May 17, 2016 decision.  (*See id.* at 1.)  SRO Hauge upheld IHO Lazan's May 17, 2016 decision and determined that "[Plaintiffs'] requested relief for additional education must be held in abeyance pending a determination regarding FAPE by the IHO and any appeal from the remainder of the outstanding issues being litigated in this matter."  (*Id.* at 9.)

On August 9, 2016, IHO Lazan issued a decision on the remaining issues raised in Plaintiffs' amended due process complaint, and, as relevant to the instant Motions, found that P.R.'s IEP and BIP from December 2015—which included a plan for Plaintiff Parents to pick P.R. up from school early when his behaviors became too intense—was inappropriate and constituted the denial of a FAPE.  (*See* Aug. 9, 2016 IHO Decision 14.)  IHO Lazan also found that FUFSD's provision of only one hour of academic tutoring while P.R. was on home instruction in early 2016 was inappropriate.  (*See id.* at 15.)  IHO Lazan awarded Plaintiffs with an additional 100 hours of compensatory education by a special education teacher (for a total of 150 hours, including the May 17, 2016 award) and 50 hours of ABA services to be provided by a

practitioner with at least five years of experience in providing ABA services.  (*See id.* at 19.)
However, IHO Lazan declined to order that P.R. be placed at New Beginnings, explaining that
Plaintiff Parents had not called a witness from the school and "[w]ithout a witness, [FUFSD] has
no ability to conduct a cross-examination to determine whether the recommended placement is
proper."  (*Id.* at 18.)  IHO Lazan also explained that, in any event, "hearing officers may not
order school districts to place students in non-approved schools."  (*Id.*)  However, IHO Lazan
had previously ordered FUFSD to classify P.R. as a student with Autism, and ordered on August
9 that FUFSD "find a placement for [P.R.] that provides [P.R.] with a program that is specially
designed for students with [A]utism that have severe behavioral problems and require a
significant amount of individualized attention."  (*Id.* at 2, 19.)  Both FUFSD and Plaintiffs
appealed this decision.  (*See* Oct. 6, 2016 SRO Decision (No. 16-060) 1.)

On October 6, 2016, SRO Hauge issued a decision on the Parties' appeals from IHO
Lazan's August 9, 2016 decision.  (*See id.*)  As relevant to the instant Motions, SRO Hauge
upheld IHO Lazan's decision to decline to order that P.R. be placed at New Beginnings and
reduced IHO Lazan's compensatory education award.  (*See id.* at 11–19.)  SRO Hauge explained
that "[a]lthough in certain limited circumstances, an award directing a district to prospectively
place a student in an appropriate, but non-approved school may be proper, . . . the hearing record
does not establish that the placement of [P.R.] at New Beginnings for the 2016–17 school year,
would be appropriate to meet his unique special education needs."  (*Id.* at 11.)  As to the
compensatory education award, FUFSD had challenged only the additional 100 hours of
education and 50 hours of ABA services awarded by IHO Lazan in the August 9 decision, not
the 50 hours of education awarded in the May 17 decision.  (*See id.* at 15.)  SRO Hauge agreed
with IHO Lazan's finding that FUFSD had failed to provide P.R. with adequate home instruction

31

from February to April 2016, but found that there was no "adequate evidentiary basis" or

"equitable rationale" for IHO Lazan's method of determining how much compensatory

education to award for this failure.  (*Id.* at 17–18 & n.15.)  SRO Hauge examined the record and

awarded "one hour of special education services for each school day from February 10, 2016

through April 12, 2016, or 39 hours of compensatory education services."  (*Id.* at 17–18.)  SRO

Hauge also found that there was no evidentiary basis for IHO Lazan's award of 50 hours of ABA

services and reversed this award.  (*Id.* at 18–19.)

### c.  Claims Regarding the 2016–17 School Year

Plaintiffs filed additional due process complaints on June 2, June 15, and July 8, 2016,

which were consolidated into one amended complaint filed on August 11, 2016, in which

Plaintiffs alleged deficiencies in the CSE process and P.R.'s June 2016 IEP (which had

recommended P.R.'s placement in a 6:1+2 classroom at Golden Hill).  (*See* Dec. 20, 2016 IHO

Decision 1–2.)  IHO Lazan found that FUFSD had denied P.R. a FAPE, since P.R.'s June 2016

IEP offered P.R. the same program that IHO Lazan had previously held constituted the denial of

a FAPE.  (*See id.* at 7–9.)  Plaintiffs again sought an order placing P.R. at New Beginnings, and

this time, IHO Lazan granted it, explaining that Plaintiffs had presented two witnesses from New

Beginnings who demonstrated to IHO Lazan's satisfaction that New Beginnings "will provide

[P.R.] with meaningful access to education."  (*Id.* at 9–12.)  IHO Lazan thus ordered that P.R. be

placed at New Beginnings and for FUFSD to pay P.R.'s tuition and provide transportation.  (*See

id.* at 12–13.)  FUFSD appealed this decision.  (*See* Mar. 10, 2017 SRO Decision (No. 17-006)

1.)

On March 10, 2017, SRO Hauge upheld IHO Lazan's finding that P.R. was denied a

FAPE for the 2016–17 school year, but found that "the IHO's order to prospectively place [P.R.]

at New Beginnings for the 2016–17 school year was premature" because the hearing record

"supports a finding that . . . with the completion of a new BIP, a public school setting could address [P.R.'s] needs." (*Id.* at 11–20, 21–23.)  Because of this reversal, SRO Hauge remanded the matter back to IHO Lazan "for a determination regarding whether compensatory education may be available to remedy [FUFSD's] denial of a FAPE for the 2016–17 school year." (*Id.* at 24.)

Meanwhile, on July 7, 2017, Plaintiffs filed another due process complaint alleging that FUFSD had failed to provide P.R. a FAPE for the 2016–17 school year because (1) FUFSD failed to appropriately evaluate P.R. in failing to provide funding for a private neuro-psychological evaluation and brain mapping by Dr. Susan Crum, and (2) FUFSD failed to provide a "proper" tutor for P.R., which resulted in P.R. not receiving any educational services from January to July 2017.  (*See* Jan. 10, 2018 IHO Decision 3.)  Plaintiffs filed a second due process complaint on August 7, 2017, bringing additional claims, including that P.R.'s pendency program was not properly implemented and generally inappropriate and that P.R.'s placement at Golden Hill was unsafe.  (*See id.* at 4.)  These complaints were consolidated on August 21, 2017. (*See id.* at 5.)

On October 23, 2017, IHO Lazan issued a decision pursuant to the remand, in which he awarded 150 hours of compensatory education "in the form of instruction by a certified special education teacher together with a professional behavior specialist experienced in providing services to students with [A]utism," covering the 2016 ESY and the 2016–17 school year through January 2017.  (*See* Oct. 23, 2017 IHO Decision 8–9.)  Both FUFSD and Plaintiffs appealed this decision.  (*See* Dec. 29, 2017 SRO Decision (No. 17-101) 1.)

On December 29, 2017, SRO Hauge upheld IHO Lazan's decision and the relief that he awarded.  (*See generally id.*)  In so doing, SRO Hauge rejected, inter alia, FUFSD's argument

that the time period for an award of compensatory education should only extend to November 2016 (when the CSE convened and developed a new IEP) rather than January 2017 (when the CSE updated P.R.'s BIP) and rejected Plaintiffs' argument that P.R. was entitled to compensatory education to cover an entire school year.  (*See id.* at 12–13.)

IHO James McKeever ("IHO McKeever") issued a decision on Plaintiffs' August 21, 2017 consolidated complaint on January 10, 2018.  (*See generally* Jan. 10, 2018 IHO Decision.) IHO McKeever found that given the previous decisions from IHO Lazan, the issues before IHO McKeever were limited to whether FUFSD had denied P.R. a FAPE from January to May 2017, and IHO McKeever found that: "the record demonstrates that the IEPs developed in June and November 2017, along with the BIP that was developed in January 2017, could have provided [P.R.] with a FAPE had [Plaintiff Parents'] chose[n] to place [P.R.] in the recommended program."  (*Id.* at 19.)  IHO McKeever also noted that "although [Plaintiff Parents] claim that they were forced to remove [P.R.] from his pendency program at [FUFSD] in order to protect [P.R.] from harm, nothing in the record supports their assertions."  (*Id.* at 20.)  Finally, IHO McKeever dismissed Plaintiffs' claim concerning FUFSD's evaluation of P.R., finding that FUFSD's evaluations were appropriate and that Plaintiffs failed to present sufficient evidence that an evaluation from Dr. Crum was warranted.  (*See id.* at 22–23.)  Plaintiffs appealed this decision.  (*See* Mar. 23, 2018 SRO Decision (No. 18-010) 1.)

On March 23, 2018, SRO Justyn Bates ("SRO Bates") upheld in part and reversed in part IHO McKeever's January 10, 2018 decision.  (*See generally id.*)  SRO Bates found that because FUFSD was not capable of implementing P.R.'s November 2016 and March 2017 IEPs (because FUFSD had not created the contemplated 6:1+2 class when Plaintiff Parents refused the placement), FUFSD failed to offer P.R. a FAPE under the November 2016 and March 2017

IEPs.  (*See id.* at 22–25.)  However, SRO Bates upheld IHO McKeever's determinations that

FUFSD's evaluations of P.R. were appropriate and that "the evidence in the hearing record does

not support [Plaintiffs'] request for compensatory educational services or any other relief to

cover the time period [P.R.] did not receive pendency services."  (*Id.* at 25–37.)  SRO Bates

awarded P.R. with "an additional 105 hours of services (21 hours per month for 5 months)"—

based on the same calculations underlying IHO Lazan's 150-hour award—"to be provided by

both a special education and a well credentialed, professional behavioral support consultant with

experience in working with students with [A]utism" for FUFSD's failure to offer P.R. a FAPE

from January through June 2017.  (*Id.* at 37.)

### d.  Current Status of Compensatory Educational Awards

Despite encountering difficulties in hiring qualified tutors and in arranging for the

provision of compensatory education after Plaintiffs' move to New Jersey, (*see* Tiger Aff. ¶¶ 6–

24), FUFSD was able to provide P.R. with the entirety of the compensatory services awarded to

P.R. as part of the above-described proceedings, (*see id.* ¶¶ 24–26).  P.R. is no longer owed any

compensatory services by FUFSD.  (*See* FUFSD's 56.1 ¶ 235.)

### B.  Procedural History

Plaintiffs filed their initial Complaint on December 15, 2016, bringing claims against

Defendants in addition to a group of current and former FUFSD and BOCES employees and

contractors.  (*See* Compl. (Dkt. No. 2).)  On May 12, 2017, then-Chief Judge McMahon granted

Plaintiffs' request to proceed in forma pauperis.  (*See* Dkt. No. 7.)  On June 14, 2017, the Court

granted Plaintiffs' application for the Court to request pro bono counsel.  (*See* Dkt. No. 9.)

Between July 2017 and August 2018, the litigation stalled due to Plaintiffs' repeated

failures to properly file and serve their amended complaints.[15]  While certain service issues were

still ongoing, Defendants filed their Motions To Dismiss the Second Amended Complaint

("SAC"), which brought claims against FUFSD, Munro, Jehring, Tiger, Pavlik, Boylan, and

District General and Physical Education Teacher and Bus Duty Escort Ryan Wall (collectively,

"SAC District Defendants"); and BOCES, Stroka, Brunjes, Isaacson, and Certified Special

Education Teacher Patricia Bauer (collectively, "SAC BOCES Defendants"; all collectively

"SAC Defendants").  (*See* Second Am. Compl. ("SAC") (Dkt. No. 91).)  On August 1, 2018,

SAC BOCES Defendants filed their Motion To Dismiss and accompanying papers.  (*See* SAC

BOCES Defs.' Not. of Mot. (Dkt. No. 105); Decl. of Caroline B. Lineen in Supp. of SAC

BOCES Defs.' Mot. To Dismiss (Dkt. No. 106); SAC BOCES Defs.' Mem. of Law in Supp. of

Mot. To Dismiss (Dkt. No. 107).)  On August 29, 2018, SAC District Defendants filed their

Motion To Dismiss and accompanying papers.  (*See* SAC District Defs.' Not. of Mot. (Dkt.

No. 114); Aff. of Mark C. Rushfield in Supp. of SAC District Defs.' Mot. To Dismiss (Dkt.

No. 115); Aff. of Lisa Tiger in Supp. of SAC District Defs.' Mot. To Dismiss (Dkt. No. 116);

SAC District Defs.' Mem. of Law in Supp. of Mot. To Dismiss (Dkt. No. 117).)

On September 18, 2018, Plaintiffs filed an Affirmation in Opposition to SAC BOCES

Defendants' Motion To Dismiss, which was a five-page recitation of facts from the SAC and

conclusory arguments without citation to case law.  (*See* Aff. of Angel A. Castro, III, Esq. in

Opp'n to SAC BOCES Defs.' Mot. To Dismiss (Dkt. No. 123).)  On October 2, 2018, SAC

---

[15] The Court discussed this phase of the Action's procedural history in much more detail in ruling on Defendants' Motions To Dismiss.  (*See* Op. & Order ("2019 Op.") 32–37 (Dkt. No. 133).)

BOCES Defendants filed their Reply in Further Support of Their Motion To Dismiss.  (*See* SAC BOCES Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss (Dkt. No. 126).)

On October 23, 2018, Plaintiffs filed an Affirmation in Opposition to SAC District Defendants' Motion To Dismiss, which too was a short recitation of facts from the SAC and conclusory arguments without citation to case law.  (*See* Aff. of Angel A. Castro, III, Esq. in Opp'n to SAC District Defs.' Mot. To Dismiss (Dkt. No. 129).)  On October 29, 2018, SAC District Defendants filed their Reply in Further Support of their Motion To Dismiss.  (*See* SAC District Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss (Dkt. No. 131).)

On March 29, 2019, the Court issued an Opinion & Order granting in part and denying in part SAC Defendants' Motions To Dismiss ("2019 Opinion").  (*See generally* 2019 Op.) Specifically, the Court: (1) granted SAC District Defendants' Motion To Dismiss Wall and Boylan for lack of personal jurisdiction, because neither Wall nor Boylan was properly served and Plaintiffs failed to demonstrate their entitlement to an extension to effect service, (*see id.* at 40–45); (2) denied SAC Defendants' Motions To Dismiss with respect to Plaintiffs' IDEA claims for the 2015–16 and 2016–17 school years to the extent that the SRO and IHO decisions considered the same claims, (*see id.* at 49–55); (3) granted SAC District Defendants' Motion To Dismiss Plaintiffs' IDEA claims with respect to the 2013–14 and 2014–15 school years for failure to exhaust, (*see id.* at 56–61); (4) granted SAC BOCES Defendants' Motion To Dismiss Plaintiffs' IDEA claims with respect to the 2013–14 and 2014–15 school years for failure to exhaust, with the exception of Plaintiffs' claim regarding their request for 2:1 group counseling during the 2013–14 school year, (*see id.* at 62–65); (5) denied SAC Defendants' Motions To Dismiss Plaintiffs' Section 504, ADA, and § 1983 claims for failure to exhaust, with the exception of Plaintiffs' claim against BOCES, FUFSD, Pavlik, and Brunjes regarding the

December 8, 2014 CSE Subcommittee meeting, (*see id.* at 67–73); (6) denied SAC Defendants'
Motions To Dismiss Plaintiffs' ADA and Section 504 disability discrimination claims for failure
to state a claim, (*see id.* at 75–80); (7) denied SAC BOCES Defendants' Motion To Dismiss
Plaintiffs' ADA and Section 504 retaliation claim for failure to state a claim, (*see id.* at 81–84);
(8) denied SAC District Defendants' Motion To Dismiss Plaintiffs' *Monell* claim, (*see id.* at 85–
90); (9) granted SAC District Defendants' Motion To Dismiss Plaintiffs' § 1983 claim against
FUFSD and Pavlik for alleged violations of P.R.'s due process rights for failure to state a claim,
(*see id.* at 90–92); (10) granted SAC Defendants' Motions To Dismiss all of the claims against
the individual defendants, (*see id.* at 92–94); and (11) granted SAC Defendants' Motions To
Dismiss all state law claims for Plaintiffs' failure to serve notices of their claims, as required by
state law, (*see id.* at 94–95).  This collection of holdings left Plaintiffs with (1) IDEA claims
against both BOCES and FUFSD with respect to the 2015–16 and 2016–17 school years, (2) an
additional IDEA claim against BOCES with respect to Plaintiffs' request for 2:1 group
counseling during the 2013–14 school year, and (3) various Section 504, ADA, and § 1983
claims against both BOCES and FUFSD.

 Plaintiffs filed their TAC based on the Court's opinion on May 21, 2019.  (*See* TAC.)
FUFSD and BOCES each filed an Answer on May 29, 2019, (*see* Dkt. Nos. 155, 158); BOCES
additionally interposed a crossclaim against FUFSD, (*see* Dkt. No. 158), though Defendants
stipulated to the withdrawal and dismissal of the crossclaim on September 4, 2019, (*see* Dkt.
Nos. 161, 162).

 On June 5, 2020, FUFSD filed a request for a pre-motion conference to resolve a
discovery dispute concerning Plaintiffs' failure to comply with certain document requests.  (*See*
Dkt. No. 169.)  Plaintiffs' counsel responded by informing the Court that a recent illness and

delays due to the COVID-19 pandemic had impeded the Plaintiffs' discovery efforts, (*see* Dkt. No. 171), and the Court provided Plaintiffs with an additional 30 days to resolve the dispute with FUFSD, (*see* Dkt. No. 172).  On July 29, 2020, BOCES filed a request for a pre-motion conference to resolve a separate discovery dispute concerning Plaintiffs' failure to comply with certain of BOCES's discovery requests.  (*See* Dkt. No. 176.)  The Court held a conference on August 21, 2020, and ordered Plaintiffs to complete their discovery production by August 28, 2020.  (*See* Dkt. (minute entry for Aug. 21, 2020).)

On September 24, 2020, BOCES filed a request for a pre-motion conference in anticipation of filing a motion for summary judgment, (*see* Dkt. No. 182), to which Plaintiffs responded on September 29, 2020, agreeing that "some of Plaintiffs['] claims may be resolved on summary judgment," but arguing that "those claims would be resolved in Plaintiffs' favor," (Dkt. No. 183).  In light of this agreement as to the appropriateness of summary judgment briefing, the Court directed BOCES and Plaintiffs to file a briefing schedule.  (*See* Dkt. No. 184.) On October 6, 2020, FUFSD, BOCES, and Plaintiffs filed a proposed briefing schedule in which the Parties agreed that "Plaintiffs will be the moving [parties] on any challenges by the Plaintiffs to the decisions of the [SRO] that are the subject of the [TAC]," and thus that "[FUFSD] will not be addressing challenges to the decisions of the [SRO] except in response to the Plaintiffs' motion for summary judgment concerning their challenge to those decisions."  (Dkt. No. 185.) The Court shortened the Parties' proposed briefing schedule, but otherwise so-ordered the Parties' proposal.  (*See* Dkt. No. 186.)

On December 8, 2020, Plaintiffs' counsel wrote to the Court regarding the process for filing the administrative record from Plaintiffs' proceedings before NYSED.  (*See* Dkt. No. 190.) FUFSD responded by informing the Court that Plaintiffs refused to identify which SRO

decisions Plaintiffs were challenging and noting that it would be unfair to impose the burden of digitizing and filing the full administrative record on FUFSD.  (*See* Dkt. No. 192.)  The Court issued an order on December 9, 2020 noting that "it is reasonable to ask Plaintiffs to be clear about which SRO decisions Plaintiffs are challenging" and that "[p]utting th[e] burden" of digitizing and filing the full administrative record "on [FUFSD] is unfair and seeking to pin the responsibility on the Court is misplaced"; the Court ordered counsel for Plaintiffs to determine how they wished to proceed.  (Dkt. No. 193.)  Plaintiffs' counsel wrote another letter on December 9, 2020 expressing frustration with FUFSD and the Court, asserting his entitlement to leeway given his status as pro bono counsel, and demanding that the Court "pick one of three options" with regard to submitting the full administrative record to the Court.  (Dkt. No. 194.) The Court entered an order reminding Plaintiffs' counsel that his status as pro bono counsel has no effect on Plaintiffs' obligations in prosecuting this case and instructing Plaintiffs to "proceed however they wish."  (Dkt. No. 195.)

On January 6, 2021, the Parties submitted a request for an enlargement of the current briefing schedule in which Plaintiffs' counsel informed the Court that he had "submitted the request for the administrative record to be sent directly to the Court for uploading to ECF so that all [P]arties can reference the same source in their papers."  (Dkt. No. 196.)  The Court granted the Parties' request to enlarge the briefing schedule, (Dkt No. 198), but entered an order stating that "[t]he Court will not scan the administrative record" and instructing the Parties to upload the administrative record themselves or select individual records to submit with their motion papers, (Dkt. No. 200).

FUFSD and BOCES filed their Motions for Summary Judgment, Local Rule 56.1 Statements, and accompanying papers on April 9, 2021.  (*See* FUFSD's Not. of Mot.; Rushfield

Aff.; Tiger Aff.; FUFSD's 56.1; FUFSD's Mem. of Law in Supp. of Mot. for Summ. J.

("FUFSD's Mem.") (Dkt. No. 207); BOCES's Not. of Mot.; D'Amico Decl.; BOCES's 56.1;

BOCES's Mem. of Law in Supp. of Mot. for Summ. J. ("BOCES's Mem.") (Dkt. No. 212).)  On

April 12, 2021, FUFSD filed a letter with the Court seeking dismissal of Plaintiffs' challenges to

the SRO decisions referenced in the TAC as abandoned based on Plaintiffs' failure to move for

summary judgment on those claims, as contemplated by the Parties' earlier agreement. (*See* Dkt.

No. 213.)  Plaintiffs responded by asserting that the Parties' earlier agreement was not binding

and that Plaintiffs were entitled to make these arguments in opposing Defendants' Motions for

Summary Judgment.  (*See* Dkt. No. 215.)  Plaintiffs' counsel also asserted that one of his

strategic considerations in deciding not to file a summary judgment motion was "the Court's

refusal to upload the administrative record via Pacer," (*id.*), which the Court noted was

"perplex[ing]" as "[i]t is not the Court's burden or obligation to upload documents for parties,

even parties represented by pro bono counsel," (Dkt. No. 216).  The Court permitted Plaintiffs to

file a cross-motion for summary judgment to resolve Plaintiffs' challenges to the SRO decisions,

(Dkt. No. 221), and Plaintiffs filed their Cross-Motion for Summary Judgment, Local Rule 56.1

Statement, and accompanying papers on May 21, 27, and 28, 2021, (*see* Pls.' Not. of Mot.; Pls.'

56.1; Pls.' Mem. of Law in Opp'n to Pls.' Mots. for Summ. J. & in Favor of Pls.' Cross-Mot.

("Pls.' Mem.") (Dkt. No. 222)).  Plaintiffs' brief in opposition to Defendants' Motions for

Summary Judgment and in support of Plaintiffs' Motion for Summary Judgment consists of only

ten pages, four of which contain a short preliminary statement, abridged procedural history, and

the relevant standards of review.  (*See* Pls.' Mem.)

On June 21, 2021, FUFSD filed its Reply, Local Rule 56.1 Counter-Statement, and

accompanying papers.  (*See* FUFSD's Reply Mem. of Law in Supp. of Mot. for Summ. J. & in

Opp'n to Pls.' Cross-Mot. ("FUFSD's Reply Mem.") (Dkt. No. 225); Reply Rushfield Aff.;

FUFSD's Counter 56.1.)  On June 28, 2021, BOCES filed its Reply, Local Rule 56.1 Counter-

Statement, and accompanying papers.  (*See* BOCES's Reply Mem. of Law in Supp. of Mot. for

Summ. J. & in Opp'n to Pls.' Cross-Mot. ("BOCES's Reply Mem.") (Dkt. No. 227); Reply Aff.

of Amanda E. D'Amico in Supp. of Mot. for Summ. J. ("Reply D'Amico Aff.") (Dkt. No. 228);

BOCES's Counter 56.1.)

## II.  Discussion

### A.  Standard of Review

As Defendants are moving for Rule 56 summary judgment as to Plaintiffs' Counts Three,

Four, Five, Six, Seven, and Eight (Plaintiffs' claims of discrimination and retaliation under

Section 504 and the ADA, (*see* TAC ¶¶ 259–74)) and Plaintiffs and BOCES are moving for

IDEA-related summary judgment on Plaintiffs' Counts One and Two (the claims relating to the

alleged denial of a FAPE, (*see id.* ¶¶ 255–58)), two separate legal standards apply when

resolving the different issues presented in the instant Motions.[16]

#### 1.  Rule 56(a)

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In deciding whether to award summary judgment, the court must construe the

record evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor."  *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232,

---

[16] BOCES also moves under Rule 12(b)(1) to dismiss a portion of Plaintiffs' IDEA claim against it for lack of subject matter jurisdiction.  (*See* BOCES's Not. of Mot.)  The Court refers the Parties back to the Court's 2019 Opinion for an explanation of the applicable standard of review under Rule 12(b)(1).  (*See* 2019 Op. 38.)

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

 "However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading.").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks omitted)).

### 2. IDEA

The Court's inquiry under the IDEA is limited to addressing (1) whether Defendants "complied with the procedures set forth in the Act" and (2) whether the IEP "developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982) ("*Rowley*"). Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the

IDEA context.  *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252

(2d Cir. 2009) (per curiam); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d

552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d Cir. 2012).  Instead, summary

judgment in IDEA cases is "in substance an appeal from an administrative determination, not a

summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83, n.3

(2d Cir. 2005) (quotation marks omitted); *see also G.B.*, 751 F. Supp. 2d at 570 (same).  The

Court's review therefore "requires a more critical appraisal of the agency determination than

clear-error review but falls well short of complete de novo review."  *L.O. v. N.Y.C. Dep't of

Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (quotation marks and italics omitted).  Accordingly, the

Court must "engage in an independent review of the administrative record and make a

determination based on a preponderance of the evidence."  *M.H. v. N.Y.C. Dep't of Educ.*, 685

F.3d 217, 240 (2d Cir. 2012) (quotation marks omitted).

However, such review "is by no means an invitation to the courts to substitute their own

notions of sound educational policy for those of the school authorities which they review."

*Rowley*, 458 U.S. at 206.  "To the contrary, federal courts reviewing administrative decisions

must give due weight to these proceedings, mindful that the judiciary lacks the specialized

knowledge and experience necessary to resolve persistent and difficult questions of educational

policy."  *M.H.*, 685 F.3d at 240 (quotation marks omitted).  To merit deference, the IHO and

SRO's decisions must be "thorough and careful."  *S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*,

175 F. Supp. 3d 237, 252 (S.D.N.Y. 2016) (quotation marks omitted).  The quality of the

decision can be judged on factors such as whether it is "well-reasoned" and "based on

substantially greater familiarity with the evidence and the witnesses than the reviewing court."

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (quotation marks omitted); *see*

*also L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and supported by the record." (alteration and quotation marks omitted)).  Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over the appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO.  *See M.H.*, 685 F.3d at 244.

Further, generally, "courts must defer to the reasoned conclusions of the SRO as the *final* state administrative determination."  *Id.* at 246 (emphasis added); *see also A.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (noting that "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the court must "defer to the final decision of the state authorities" (quotation marks omitted)).  However, if the Court concludes that "the SRO's determinations are insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis."  *M.H.*, 685 F.3d at 246.  Therefore, this Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  *R.E.*, 694 F.3d at 189; *see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, a *5 (S.D.N.Y. Jan. 3, 2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision depends on the quality of that opinion, or its persuasiveness." (citation and quotation marks omitted)), *aff'd*, 552 F. App'x 81 (2d Cir. 2014).

B.  Analysis

Plaintiffs bring eight causes of action against Defendants, alleging that (1) FUFSD denied

P.R. a FAPE during the 2015–16 and 2016–17 school years in violation of the IDEA, (*see* TAC

¶¶ 255–56); (2) BOCES denied P.R. a FAPE during the 2013–14 school year, inclusive of the

2014 ESY, in violation of the IDEA, (*see id.* ¶¶ 257–58); (3) FUFSD discriminated against P.R.

on the basis of his disability between 2014 and 2018, in violation of Section 504, (*see id.* ¶¶ 259–

60); (4) BOCES discriminated against P.R. on the basis of his disability between 2014 and 2018,

in violation of Section 504, (*see id.* ¶¶ 261–62); (5) FUFSD discriminated against P.R. on the

basis of his disability between 2014 and 2018, in violation of the ADA, (*see id.* ¶¶ 263–64);

(6) BOCES discriminated against P.R. on the basis of his disability between 2014 and 2018, in

violation of the ADA, (*see id.* ¶¶ 265–66); (7) BOCES retaliated against P.R. for filing due

process complaints against BOCES by refusing to place P.R. in any of its programs, in violation

of the ADA, (*see id.* ¶¶ 267–72); and (8) FUFSD "adopt[ed] policies which denied . . . P.R.

related services due to staff shortages and the failure to rectify the same by hiring staff to provide

such services to P.R. and others similar situated" in violation of the IDEA and Section 504, "as

made actionable by 42 U.S.C. [§] 1983," (*id.* ¶ 274).  FUFSD and BOCES collectively seek

summary judgment on seven of Plaintiffs' eight claims; Plaintiffs appear to seek summary

judgment on their IDEA claim against FUFSD.  (*See generally* FUFSD's Mem.; BOCES's Mem;

Pls.' Mem.)

1.  Procedural and Substantive Deficiencies

 As a preliminary matter, the Court notes the myriad of procedural and substantive issues

in Plaintiffs' submission.  Plaintiffs' submission both in opposition to both Defendants' Motions

and in support of Plaintiffs' Cross-Motion consists of Plaintiffs' brief, Plaintiffs' 56.1 Statement,

and seven exhibits, and each suffers from various deficiencies. (*See* Pls.' Mem.; Pls.' 56.1; Pls.' 56.1 Exs. 1–7.)

First, as Defendants point out, Plaintiffs' 56.1 Statement is almost wholly improper. (*See* FUFSD's Reply Mem. 1–2; BOCES's Reply Mem. 1–2; *see also generally* FUFSD's Counter 56.1; BOCES's Counter 56.1.) Local Civil Rule 56.1 requires that each statement of a material fact included in a party's 56.1 Statement "be followed by citation to evidence which would be admissible." Local Civ. R. 56.1(d). Plaintiffs' 56.1 Statement, however, includes numerous citations only to the operative complaint, (*see, e.g.*, Pls.' 56.1 ¶¶ 1–6), which "of course, is not evidence with which a party can oppose a motion for summary judgment." *Henek v. CSC Holdings LLC*, 449 F. Supp. 3d 35, 38 n.2 (E.D.N.Y. 2020) (collecting cases); *see also Walsh v. Dejoy*, No. 14-CV-7239, 2021 WL 4896979, at *8 n.1 (S.D.N.Y. July 28, 2021) ("The parties' Rule 56.1 statements contain, improperly, citations to the second amended complaint, which is not evidence.").[17] Apart from citations to the operative complaint, Plaintiffs' 56.1 Statement contains mainly bulk quotations from the various IHO and SRO decisions at issue in this case, (*see, e.g.*, Pls.' 56.1 ¶¶ 14, 19), and in Plaintiffs' brief, Plaintiffs seek to incorporate the entirety of the administrative record, (*see* Pls.' Mem. 1). But "[t]o the extent [P]laintiff[s'] counsel expected the Court to conduct an independent review of the record without any assistance from

---

[17] Similarly, the Court is perplexed by Plaintiffs' counsel's use of the phrase "Plaintiffs allege" throughout Plaintiffs' 56.1 Statement. (*See, e.g.*, Pls.' 56.1 ¶¶ 10, 20, 22.) The purpose of a 56.1 Statement is to set forth facts, not allegations, since the purpose of a summary judgment motion is to determine whether there are any genuine disputes as to any material facts that warrant moving forward to a trial. And, "[i]t is insufficient to state in opposition to summary judgment, as [P]laintiff[s] repeatedly do[] in [their] pleadings, that material facts will be adduced and prove[n] at trial. If enough evidence is not presented, there will not be a trial; it is not enough merely to promise at trial that some evidence will turn up." *Mazurkiewicz v. N.Y.C. Transit Auth.*, 810 F. Supp. 563, 566 (S.D.N.Y. 1993).

him, the Court declines to do so, as this is not a pro se case." *Henek*, 449 F. Supp. 3d at 38, n.2 (italics omitted).

Moreover, Plaintiffs' brief largely fails to engage with the arguments made by Defendants in their briefs.  (*Compare* Pls.' Mem. *with* FUFSD's Mem. *and* BOCES's Mem.) Courts routinely hold that where a plaintiff "fails to address [the] defendants' arguments against or even mention several of [his or her] claims," those claims are deemed "abandoned." *Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30, 2009) (collecting cases); *see also Scott v. JPMorgan Chase & Co.*, No. 13-CV-646, 2014 WL 338753, at *2 (S.D.N.Y. Jan. 30, 2014) ("[The] [p]laintiff's opposing [m]emorandum of [l]aw does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (citation omitted)).

Finally, the Court notes that none of the seven exhibits attached to Plaintiffs' 56.1 Statement has been properly authenticated, as Plaintiffs have failed to submit, for instance, "an affidavit or declaration attesting to [their] provenance, authorship, or authenticity," and thus are—formally speaking—inadmissible. *Delgado v. City of Stamford*, No. 11-CV-1735, 2015 WL 6675534, at *5 n.3 (D. Conn. Nov. 2, 2015) ("Judges in this district have required authentication at summary judgment. . . . Strict application of that rule here would mean disregarding many exhibits to [the] [p]laintiff's opposition."); *see also Jean v. Acme Bus Corp.*, No. 08-CV-4885, 2012 WL 4171226, at *6 (E.D.N.Y. Sept. 19, 2012) (declining to consider unauthenticated exhibits on motion for summary judgment).  However, because Defendants have not challenged the authenticity of any of the exhibits and the Court has no reason to doubt their authenticity, the Court will consider them.  *See Delgado*, 2015 WL 6675534, at *5 n.3 ("The Second Circuit has noted that 'a party is not required to authenticate documents on a summary

judgment motion where, as here, authenticity is not challenged by the other party.'" (quoting *Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008))).

The deficiencies described above provide an independent basis to grant summary judgment to Defendants on most, if not all, of Plaintiffs' claims. Nonetheless, the Court reviews the merits of Plaintiffs' arguments where possible.

### 2. IDEA Claims

At the outset, it is worth noting that "[t]he party who commences an impartial hearing—in this case, the [Plaintiffs]—bears the burden of persuasion" on IDEA claims. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *see also E.W.K. ex rel. B.K. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 884 F. Supp. 2d 39, 47 n.6 (S.D.N.Y. 2012) (explaining that "[t]he main difference between [the IDEA and New York State Education Law § 4404.3] is that the New York Education Law has been amended so that the school district bears the burden of showing that the IEP was appropriate, while under the IDEA the burden of proof rests with the party seeking the impartial hearing" (citations omitted)); *G.B.*, 751 F. Supp. 2d at 573 (same). As such, in challenging the SRO decisions here, it is Plaintiffs who bear the burden of demonstrating either (1) that Defendants failed to comply with the procedures set forth in the IDEA or (2) that the IEP developed through the IDEA's procedures was not reasonably calculated to enable P.R. to receive educational benefits by a preponderance of the evidence. *See Rowley*, 458 U.S. at 206–07; *M.H.*, 685 F.3d at 240.

### a. BOCES

Plaintiffs argue that BOCES denied P.R. a FAPE during the 2013–14 school year, inclusive of the 2014 ESY, by denying him the 2:1 group counseling that was part of P.R.'s IEP. (*See* Pls.' 56.1 ¶¶ 31–36.) It is undisputed that Plaintiffs have not administratively exhausted this claim, (*see, e.g.*, *id.* ¶ 36), however, in the 2019 Opinion, the Court held that Plaintiffs had

plausibly alleged that BOCES had failed to implement services that were specified or otherwise clearly stated in P.R.'s IEP and thus, had plausibly alleged that exhaustion with respect to this claim would have been futile, (*see* 2019 Op. 62–65).  BOCES nonetheless argues that Plaintiffs' claim fails here for two reasons.  First, BOCES argues that Plaintiffs' claim stemming from conduct before December 15, 2013 is barred by the statute of limitations.  (*See* BOCES's Mem. 4.)  Second, BOCES argues that because the undisputed evidence now in the record before the Court demonstrates that, in fact, group counseling was not included in P.R.'s IEP after November 21, 2013 for the 2013–14 school year and was not included in P.R.'s IEP for the 2014 ESY, Plaintiffs' claim as to that period of time is unexhausted, and thus, the Court lacks subject matter jurisdiction over it.  (*See id.* at 4–9.)  The Court agrees with both arguments.

At the outset, the Court briefly recounts the relevant factual timeline.  P.R.'s original IEP for the 2013–14 school year—dated April 9, 2013—provided that P.R. was to receive, inter alia, group counseling once per week.  (*See* D'Amico Decl. Ex. J.)  The undisputed record evidence demonstrates (1) that P.R. received group counseling for a period of time in the beginning of the 2013–14 school year from Isaacson, and (2) that after a November 5, 2013 CSE meeting, P.R.'s IEP was changed to include only individual counseling—a change that was formally approved by the FUFSD Board of Education on November 21, 2013.  *See supra* I.A.2.a.i.  What is not clear from the record is whether P.R. received group counseling for the entire period from the beginning of the school year through November 21, 2013—when group counseling was included in his operative IEP.  *See id.*  P.R.'s 2014 ESY was governed by an IEP dated May 22, 2014, which did not include group counseling for the ESY.  (*See* D'Amico Decl. Ex. G.)

Because "the [C]ourt must dismiss the action" "[i]f it determines at any time that it lacks subject matter jurisdiction," the Court addresses BOCES's argument as to exhaustion first.  FED.

R. CIV. P. 12(h)(3); *see also Lydonville Savings Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000) ("[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court sua sponte.  If subject matter jurisdiction is lacking, the action must be dismissed." (italics omitted)).  As the Court explained in the 2019 Opinion, "[i]t is well-settled that, prior to bringing a suit in the federal court under [the] IDEA, plaintiffs must exhaust all available administrative procedures."  (2019 Op. 46 (second alteration in original) (quoting *Scaggs v. N.Y. Dep't of Educ.*, No. 06-CV-799, 2007 WL 1456221, at *4 (E.D.N.Y. May 16, 2007)).)  "Failure to exhaust the [IDEA's] administrative remedies deprives the court of subject matter jurisdiction."  (*Id.* (alteration in original) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008)).)  However, "the exhaustion requirement does not apply in situations in which exhaustion would be futile," (*id.* at 47 (alteration omitted) (quoting *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007))), which includes circumstances in which plaintiffs claim that "'defendants failed to implement services that were specified or otherwise clearly stated in an IEP,'" (*id.* at 48 (quoting *Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.*, 827 F. Supp. 2d 130, 138 (E.D.N.Y. 2010))).  As indicated above, the Court found that Plaintiffs had adequately alleged futility in the TAC by alleging that group counseling was included in P.R.'s IEP for the entirety of the 2013–14 school year, including the 2014 ESY, and not provided by BOCES, (*id.* at 62–65), but the record that has developed since the 2019 Opinion makes clear that group counseling was not included in P.R.'s IEP for the 2013–14 school year after November 21, 2013 or his IEP for the 2014 ESY.  As such, the futility exception to the exhaustion requirement does not apply as to those time periods and the Court lacks subject matter jurisdiction to decide Plaintiffs' IDEA claim with respect to those time periods.

However, the record is foggy with respect to whether P.R. received the group counseling provided for in his then-operative IEP from the beginning of the 2013–14 school year through November 21, 2013.  Construing the facts in the light most favorable to Plaintiffs as the non-movants on this issue, *see Torcivia*, 15 F.4th at 355, the Court determines there is a genuine issue of material fact as to whether P.R. received group counseling for this entire time period and thus, the futility exception applies to Plaintiffs' claim as to this time period and the Court has subject matter jurisdiction to consider it.  This finding is ultimately cold comfort, however, because Plaintiffs' claim as to this time period fails as untimely.

The IDEA itself does not set forth a limitations period governing unexhausted claims brought directly in federal court.  *See Piazza v. Fla. Union Free School Dist.*, 777 F. Supp. 2d 669, 688 (S.D.N.Y. 2011).  "Where a federal statute does not specify the limitations period for a cause of action it creates, a court generally applies the statute of limitations from the most analogous state statute."  *Id.* (citing *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 414 (2005) and *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 144 n.7 (2d Cir. 2008)).  And, as BOCES properly notes, "[c]ourts within the Second Circuit have generally applied a three-year statute of limitations on IDEA claims where a plaintiff resorts to the judicial process without first pursuing administrative remedies." (BOCES's Mem. 4.)  *See also Piazza*, 777 F. Supp. 2d at 688–89 ("Courts in the Second Circuit considering IDEA claims that are permissibly unexhausted have followed this rule by applying a three-year statute of limitations borrowed from N.Y. C.P.L.R. § 214(2)." (collecting cases)).  Plaintiffs filed the initial Complaint on December 15, 2016, (*see* Compl.), and as such, the relevant limitations period stretches back three years to December 15, 2013.  Any IDEA claims arising from events which took place after December 15, 2013 are thus within the limitations

period and timely; any IDEA claims arising from events which took place before December 15, 2013 are untimely and subject to dismissal.[18]  And, because Plaintiffs' only remaining IDEA claim against BOCES arises from events which took place between the beginning of the 2013–14 school year and November 21, 2013, it is untimely and must be dismissed.

Accordingly, the Court grants summary judgment to BOCES on Plaintiffs' IDEA claim against BOCES.

### b.  FUFSD

Plaintiffs do not appear to challenge the substance of the SROs' findings as to FUFSD—which is unsurprising given that the Plaintiffs were typically the prevailing parties, with the SROs largely holding that P.R. had been denied a FAPE by FUFSD for various deficiencies in his IEPs.  *See supra* I.A.3.  Rather, Plaintiffs' IDEA claim against FUFSD appears to be rooted in what Plaintiffs describe as "the meager compensatory education awards" granted to Plaintiffs as remedies for the FAPE denials by SRO Hauge.  (Pls.' Mem. 7.)  As such, the Court infers that Plaintiffs challenge (1) the portion of SRO Hauge's October 6, 2016 decision which reduced IHO Lazan's August 9, 2016 award of an additional 100 hours of compensatory special education and 50 hours of ABA services to 39 hours of special education, *see supra* I.A.3.b., and (2) the portion of SRO Hauge's December 29, 2017 decision rejecting Plaintiffs' argument that P.R. was entitled to compensatory education to cover an entire year, *see supra* I.A.3.c.  Plaintiffs

---

[18] While the Court declined to rule on the statute of limitations at the motion to dismiss phase because BOCES had only summarily raised it in its briefing and it was possible that tolling applied, (*see* 2019 Op. 64 n.19), BOCES has now included more fulsome briefing, (*see* BOCES's Mem. 4), to which Plaintiffs have failed to respond, (*see generally* Pls.' Mem.). Tolling arguments are waivable, *see Dykstra v. Wyeth Pharms., Inc.*, 454 F. App'x 20, 23 n.3 (2d Cir. 2012) (summary order) (explaining that because the appellant "made no argument with respect to tolling in this appeal . . . , the issue is waived"), thus, to the extent Plaintiffs had a tolling argument, it is waived, *see Scott*, 2014 WL 338753, at *2 ("[The] [p]laintiff's opposing [m]emorandum of [l]aw does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (citation omitted)).

also urge the Court to reverse SRO Hauge's March 10, 2017 decision, which reversed IHO

Lazan's order that P.R. be placed at New Beginnings and for FUFSD to pay P.R.'s tuition and

provide transportation, while at the same time recognizing that this claim "may be moot." (Pls.'

Mem. 7.)

      The Court finds that Plaintiffs have failed to meet their burden of demonstrating that SRO

Hauge's October 6, 2016 and December 29, 2017 decisions do not merit deference. While

Plaintiffs appear to take issue with the SRO's decisions to reduce or refuse the compensatory

education awards, Plaintiffs do not identify what about the SRO's decisions was erroneous,

except the fact that they went against what the Plaintiffs requested. (*See* Pls.' Mem. 6–8.) Upon

reviewing the SRO's decisions, the Court finds them to be "thorough and careful," *S.C.*, 175

F. Supp. 3d at 252 (quotation marks omitted), and the Court will defer to her findings.

      Starting with the October 6, 2016 decision, SRO Hauge applied the correct legal standard

in determining the amount of compensatory education to which P.R. was entitled, explaining that

"an award of additional services should aim to place the student in the position he or she would

have been in had the district complied with its obligations under the IDEA." (Oct. 6, 2016 SRO

Decision (No. 16-060) 15 (collecting cases).) In determining that 39 hours of compensatory

education was sufficient to accomplish this aim, SRO Hauge went through a detailed

examination of P.R.'s history and success (or lack thereof) with home instruction, identifying the

specific periods in which P.R. did not receive any academic instruction and the methods of

instruction with which P.R. had made the most progress in managing his behaviors. (*See id.* at

15–17.) It was with these considerations in mind that SRO Hauge determined that "one hour of

special education services for each school day from February 10, 2016 through April 12, 2016"

—the period in which P.R. either did not receive any academic instruction or received inadequate

academic instruction based on Kissinger's inability to manage P.R.'s behaviors—was sufficient

to place P.R. in the position that he would have been in had he been provided with a FAPE. (*Id.*

at 17–18.) SRO Hauge explained "the hearing record reveals that [P.R.] was making some

progress with the instruction provided at [Golden Hill]," which included the services of a 1:1

aide who could manage P.R.'s behaviors, which is why SRO Hauge chose to reverse the portion

of the IHO's award "that applied to the instruction received from April 13, 2016 to the end of the

school year." (*Id.* at 18; *see also id.* at 17–18 n.15.)

SRO Hauge then examined the record with respect to IHO Lazan's award of ABA

services, and explained that "except for a single prescription provided by [P.R.'s] physician,

neither [Plaintiffs'] amended due process complaint notice nor the evidence they submitted

articulate why [P.R.] required instruction using ABA or provide support for [Plaintiffs'] claim

that ABA services were necessary to provide [P.R.] with educational benefit." (*Id.* at 18.) As

such, SRO Hauge determined that "[g]iven that an award of additional services should aim to

place the student in the position he or she would have been in had the district complied with its

obligations under the IDEA, the hearing record does not support an equitable remedy in the form

of ABA services." (*Id.* at 19.) The Court finds that "[t]he SRO's educational judgements [sic] in

taking account of [P.R.'s] overall education setting, needs, and services, rather than rotely

prescribing services from which the student would achieve no meaningful benefit, is entitled to

deference." *M.M. v. N.Y.C. Dep't of Educ.*, No. 15-CV-5846, 2017 WL 1194685, at *8

(S.D.N.Y. Mar. 30, 2017) ("Common sense and experience teaches that services that may be

valuable for, or even critical to, a child's educational achievement when provided in small to

moderate amounts may become close to useless, or even burdensome, if provided in

overwhelming quantity.").

The same logic holds true for SRO Hauge's December 29, 2017 decision.  There, SRO Hauge again identified and applied the correct legal standard, (*see* Dec. 29, 2017 SRO Decision (No. 17-101) 11–12), and again engaged in a thoughtful and thorough review of the hearing record to arrive at her decision.  IHO Lazan had chosen the date of January 27, 2017 as the appropriate date to end the period for calculating an award of compensatory education services, and Plaintiffs argued that the period should extend for the entire school year.  (*See id.* at 13.)  In denying this request, SRO Hauge explained that it was Plaintiff Parents who unilaterally removed P.R. from Golden Hill on or about January 12, 2017 and "subsequently filed two due process complaint notices that seek compensatory education services as relief for a period of time beginning in January 2017 and ending May 2017." (*Id.*)  As such, SRO Hauge upheld IHO Lazan's determination to choose January 27, 2017 as the appropriate end date.  (*Id.*)  The Court here again finds the SRO's educational judgments to be worthy of deference.  *See M.M.*, 2017 WL 1194685, at *8.

Finally, to the extent that Plaintiffs ask this Court to reverse SRO Hauge's March 10, 2017 decision reversing IHO Lazan's order that P.R. be placed at New Beginnings at FUFSD's expense and thus, to prospectively place P.R. at New Beginnings, that claim is moot.  First, the Rutherfords no longer reside in the FUFSD, or even in New York state, as such, FUFSD no longer has any authority over P.R.'s placement.  But even setting that aside, "were the Court to reverse the decision of [SRO Hauge] and hold that the IEP recommending placement at [Golden Hill] for [2016–17] was deficient, it does not follow that the Court could order placement at [New Beginnings] for [2021–22] without consideration of [P.R.'s] more recent progress and evaluations, which are not part of the record before the Court.  Indeed, the Court is simply without the information needed or the expertise required to determine whether [P.R.] should be

placed in [New Beginnings] at this juncture of [his] education." *C. v. Middletown Bd. of Educ.*, No. 20-CV-512, 2021 WL 4460252, at *4 (D. Conn. Sept. 29, 2021). Because the circumstances "render it impossible for the Court to provide any redress for the claimed injury," the Court finds that Plaintiffs' claim that SRO Hauge's decision reversing IHO Lazan's order that P.R. be placed at New Beginnings is moot. *Id.*[19, 20]

Accordingly, the Court declines to grant summary judgment for Plaintiffs on Plaintiffs' IDEA claim against FUFSD.

### 3. Section 504 & ADA Claims

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To make out a prima facie case of discrimination under either of these statutes, a plaintiff must show: "(1) [the] plaintiff is a qualified individual with a disability; (2) [the] plaintiff was excluded from participation in a public entity's services, programs[,] or activities or was otherwise

---

[19] To the extent Plaintiffs seek enforcement of the IHO and SRO decisions awarding Plaintiffs with compensatory education, (*see* Pls.' 56.1 ¶¶ 10, 22, 30), this claim fails, because it is undisputed that FUFSD has provided P.R. with the entirety of the compensatory services awarded to P.R. and that P.R. is no longer owed any compensatory services by FUFSD, *see supra* I.A.3.d.

[20] To the extent Plaintiffs seek to challenge SRO Bates' March 23, 2018 decision, (*see* Pls.' 56.1 ¶ 27), that claim—for which, again, Plaintiffs have the burden—is abandoned for failure to "even mention" it in their brief, *see Robinson*, 2009 WL 3154312, at *4.

discriminated against by [the] public entity; and (3) such exclusion or discrimination was due to [the] [plaintiff's] disability." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016); *see also Piotrowski ex rel. J.P. v. Rocky Point Union Free Sch. Dist.*, 462 F. Supp. 3d 270, 284 (E.D.N.Y. 2020) ("Section 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities." (quoting *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir. 2001))); *Ortiz v. Westchester Med. Ctr. Health Care Corp.*, No. 15-CV-5432, 2016 WL 6901314, at *9 (S.D.N.Y. Nov. 18, 2016) (holding that "the same legal standards govern the disability provisions of the ADA [and] [Section 504]"). "As the standards for actions under these provisions of the ADA and [Section 504] are generally equivalent," courts in the Second Circuit frequently "analyze such claims together." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015); *see also K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 343, 357 (S.D.N.Y. 2005) (same) (collecting cases).

Moreover, to succeed on a claim of discrimination under either statute, Plaintiffs must adduce "proof of bad faith or gross misjudgment" by Defendants when administering disability services. *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014). Because the ADA and Section 504 "address discrimination against disabled students, rather than incorrect or erroneous special education treatments, as in the case of [the] IDEA," there must be "something more than a mere violation of the IDEA . . . in order to show a violation of [either statute] in the context of educating children with disabilities." *Scaggs v. N.Y. Dep't of Educ.*, No. 06-CV-799, 2007 WL 1456221, at *15 (E.D.N.Y. May 16, 2007) (quotation marks omitted); *see also C.R. v. N.Y.C. Dep't of Educ.*, 211 F. Supp. 3d 583, 594 (S.D.N.Y. 2016) ("Since Section 504 relief is conditioned on a showing of discrimination, it requires something more than

proof of a mere violation of IDEA—i.e., more than a faulty IEP." (italics and citation omitted)).

A plaintiff is not required to "show defendants acted with animosity or ill will." *R.B. ex rel. L.B. v. N.Y.C. Bd. of Educ.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000). Rather, "there must be evidence that a school district acted with deliberate or reckless indifference to the student's federally protected rights." *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010) (collecting cases); *see also A.K. v. Westhampton Beach Sch. Dist.*, No. 17-CV-866, 2019 WL 4736969, at *14 (E.D.N.Y. Sept. 27, 2019) ("Even where [the] [p]laintiffs allege systemic IDEA violations, bad faith or gross misjudgment is required [to succeed on a claim of disability-based discrimination under the ADA or Section 504]."). Therefore, claims of discrimination under Section 504 and the ADA and claims of deprivation of a FAPE, although "complementary," "address different injuries and thus require different proof." *Gabel ex rel. L.C. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005). Whereas "denial of *access* to an appropriate educational program on the basis of a disability is a Section 504 [and ADA] issue, . . . dissatisfaction with the *content* of an IEP would fall within the purview of [the] IDEA." *Id.* at 333–34 (emphasis in original).

Finally, retaliation claims under both the ADA and Section 504 are analyzed under the same three-step burden-shifting framework employed in analyzing Title VII claims. *See Wong v. Bd. of Educ.*, 478 F. Supp. 3d 229, 253 (D. Conn. 2020). A plaintiff "must initially establish a prima facie case of retaliation by showing that: (1) [he or she] engaged in an activity protected by the ADA; (2) the defendants were aware of this activity; (3) the defendants took adverse action against [the] plaintiff; and (4) a causal connection exists between the alleged adverse action and the protected activity." *M.A. v. N.Y. Dep't of Educ.*, 1 F. Supp. 3d 125, 148 (S.D.N.Y. 2014) (italics omitted) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)); *see*

*also A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*, 840 F. Supp. 2d 660, 686 (E.D.N.Y. 2012)

(describing same standard for claims under Section 504).[21] "If [the] plaintiff[] establish[es] a

prima facie case, the burden shifts to [the] defendants to articulate a legitimate, non-retaliatory

reason for the allegedly adverse conduct, which [the] plaintiff[] must then rebut by pointing to

evidence that would reasonably suggest that the defendants' proffered explanation is merely

pretextual and that retaliatory animus was the motivating factor in the adverse action." *M.A.*, 1

F. Supp. 3d at 148 (italics omitted).

### a.  BOCES

#### i.  Discrimination

Plaintiffs appear to argue that BOCES discriminated against P.R. in violation of the ADA

and Section 504 by (1) excluding P.R. from the Otisville's 2015 Halloween and Christmas

celebrations and (2) acting with bad faith or gross misjudgment in denying P.R. a FAPE during

the 2013–14, 2014–15, and 2015–16 school years, including the 2014 and 2016 ESYs.  (*See* Pls.'

Mem. 8–9; Pls.' 56.1 ¶¶ 37–44.)  While BOCES seems to concede—or at least does not contest

for purposes of its Motion—that P.R. is an individual with a disability for purposes of Section

504 and the ADA and that BOCES is covered by these statutes, BOCES argues that Plaintiffs

cannot establish a prima facie case for discrimination against BOCES because there is no

evidence that BOCES excluded P.R. from any of BOCES's programs or denied him the benefits

of its programs on the basis of his disability.  (*See* BOCES's Mem. 10.)  Further, BOCES argues

that Plaintiffs cannot put forth any evidence that BOCES staff acted in bad faith or with gross

---

[21] Plaintiffs only bring a claim for retaliation under the ADA.  (*See* TAC ¶¶ 267–72.)
However, because the standards for retaliation claims under the ADA and Section 504 are
analogous, the Court refers to cases analyzing retaliation claims under both statutes.

negligence or reckless indifference toward P.R. when administering his disability services.  (*See id.*)  The Court agrees.

Plaintiffs' claims that P.R. was "excluded from participation in [BOCES's] services, programs[,] or activities," *B.C.*, 837 F.3d at 158 (quotation marks omitted), are limited to Plaintiffs' claims concerning the 2015 Otisville Halloween and Christmas celebrations. However, no reasonable juror could conclude based on the record that P.R. was excluded from these activities, which is fatal to his claims.  First, the record demonstrates that it was Plaintiff Parents, not BOCES, who chose to keep P.R. out of school on the day of Otisville's 2015 Halloween celebration.  *See supra* I.A.2.c.  While Guerrera did call Plaintiff Parents to inquire whether P.R. would be in attendance, Guerrera attested that "[a]t no time did [she] instruct [Plaintiff Parents] to keep P.R. from home on the day of the Halloween party."  (Guerrera Decl. ¶ 11.)  To the extent Guerrera may have expressed concerns regarding P.R.'s behavioral issues, Guerrera attested that this was in the context of explaining to Plaintiff Parents that she needed to know if P.R. would be in attendance so that she could "prepare a schedule that would allow [P.R.] to be successful at the Halloween party."  (*Id.* ¶ 10.)  Plaintiffs have adduced no evidence to the contrary apart from their unsupported allegation in the TAC—repeated via Plaintiffs' 56.1 Statement—that "school staff instructed [Plaintiff Parents] to keep P.R. home during [the 2015 Otisville] Halloween Party."  (TAC ¶ 83; Pls.' 56.1 ¶ 37.)  Plaintiffs' claim is even weaker with respect to Otisville's 2015 Christmas celebration, as the record reflects that, in fact, P.R. attended the Christmas celebration.  *See supra* I.A.2.c.  "Therefore, the record shows that there was simply no 'exclusion,' as required for a discrimination claim."  *K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16-CV-3138, 2019 WL 6907533, at *8 (S.D.N.Y. Dec. 19, 2019) (alteration omitted) (finding that a school district's recommendation that a student with bipolar disorder and ADHD

temporarily not ride the school bus based on previous incidents did not constitute discrimination under Section 504 or the ADA).

Plaintiffs' claim that BOCES acted with bad faith or gross misjudgment in denying P.R. a FAPE throughout his tenure at BOCES institutions fares no better. Plaintiffs' claim with respect to the 2013–14 and 2014–15 school years and 2014 ESY appears to be that BOCES "failed to provide P.R. with the 2:1 group counseling sessions that were in his IEP," (Pls.' 56.1 ¶ 42), however, as explained in the 2019 Opinion and above, Plaintiffs have failed to exhaust their claim that this conduct constituted the denial of a FAPE, (*see* 2019 Op. 64–65, 96–97 (finding claims as to 2014–15 school year to be impermissibly unexhausted and dismissing them with prejudice)), *see supra* II.B.2.a., and Plaintiffs are "not permitted to evade the IDEA's exhaustion requirement merely by tacking on a request for damages." *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 487 (2d Cir. 2002).

Even assuming arguendo that BOCES did fail to provide P.R. with group counseling during the 2013–14 and 2014–15 school years or the 2014 ESY (for instance, for a period of time between the start of the 2013–14 school year and November 21, 2013, *see supra* II.B.2.a.) and this conduct constituted the denial of a FAPE, Plaintiffs have not proffered facts to demonstrate that BOCES acted with "bad faith or gross misjudgment" at any point during this time period. *C.L.*, 744 F.3d at 841. Rather, the record demonstrates that BOCES went to great lengths to provide P.R. with the services he needed and, more generally, to manage his challenging behaviors and prevent him from harming himself. *See supra* I.A.2.a. P.R. was provided with group counseling as per his operative IEP for the first several months of the 2013–14 school year, and that counseling only ceased when Isaacson raised concerns about P.R.'s readiness for group counseling and Plaintiff Parents objected to Isaacson providing P.R. with counseling at all.

*See supra* I.A.2.a.i.  The CSE then removed group counseling from P.R.'s IEP for the 2013–14 school year only after—with the above considerations in mind—the CSE and Plaintiff Parents agreed that Isaacson would no longer counsel P.R. and BOCES determined that the only other available counselor was Pavlik, who could not provide group counseling because there were no other FUFSD students then at Warwick.  *See id.*  Faced with the same circumstances the following school year, when group counseling was added back into P.R.'s IEP, BOCES came up with the solution of having Pavlik accompany P.R. to his gym class so that she could work with P.R. to develop his social skills in a group setting—presumably, the goal of group counseling.  *See supra* I.A.2.a.ii.  No reasonable juror could find that this chain of events belies a "deliberate or reckless indifference" to P.R.'s federally protected rights, as required for Plaintiffs to succeed on their discrimination claim.  *Schreiber*, 700 F. Supp. 2d at 564; *cf. B.D. v. DeBuono*, 130 F. Supp. 2d 401, 439 (S.D.N.Y. 2000) (finding that the plaintiffs had assembled evidence "tending to show gross negligence or reckless indifference" on the part of the defendants where the evidence demonstrated that the defendants "were aware of the benefits of a larger number of hours of ABA therapy and intentionally withheld more than ten hours from those plaintiff children [with Autism] for whom a greater number of hours was a necessity").

Turning to the 2015–16 school year and 2016 ESY, Plaintiffs' claim appears to be rooted in the fact that BOCES repeatedly sent P.R. home from school early due to his behaviors during the 2015–16 school year and suspended him on multiple occasions during the 2016 ESY.  (*See* Pls.' 56.1 ¶¶ 38, 39, 43, 44.)  First, Plaintiffs' claim as to the 2016 ESY fails because it does not appear that this claim is exhausted.  *See Polera*, 288 F.3d at 487.  But even setting exhaustion aside, Plaintiffs have failed to demonstrate that the suspensions would constitute a denial of a FAPE.  Given that New York state and federal law provide for a procedure by which students

with disabilities can be suspended, *see, e.g.*, 20 U.S.C. § 1415; 34 C.F.R. 300.530; 8 N.Y.C.R.R. 201.4, it is clear that a suspension on its own does not constitute the denial of a FAPE.  And, Plaintiffs have offered no argument, evidence, or authority to support their claim that this constitutes the denial of a FAPE, let alone one involving "bad faith or gross misjudgment," *C.L.*, 744 F.3d at 841, considering that the record evidence shows that P.R. was suspended due to his increasingly aggressive and dangerous behaviors.  *See supra* I.A.2.e.  *See also Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion.").

While IHO Lazan and SRO Hauge did determine that P.R.'s removals from Otisville without appropriate MDRs and other safeguards during the 2015–16 school year constituted the denial of a FAPE, Plaintiffs' claim for discrimination on this basis still fails because Plaintiffs have again failed to demonstrate that BOCES acted with "bad faith or gross misjudgment."  *C.L.*, 744 F.3d at 841; *see also Schreiber*, 700 F. Supp. 2d at 565 (finding that "there is no basis for a reasonable fact finder to include that the [school district] acted with deliberate or reckless indifference or with gross negligence" despite findings that the district "ultimately failed to provide a FAPE for [the student] for [three] school years" (collecting cases)).  The record reflects the fact that BOCES staff had been struggling to manage P.R.'s behaviors for several months (despite the use of many different techniques and reinforcers with the assistance of BCBAs) and had already begun to encourage Plaintiff Parents to consider other, more appropriate placements for P.R. when BOCES staff came up with the idea of contacting Plaintiff Parents to pick P.R. up early when his behaviors became unmanageable as a last resort.  *See supra* I.A.2.c.  Thus, "[r]ather than demonstrate any level of negligence or recklessness, the record shows that

[BOCES staff] tried repeatedly to work together . . . to control or diminish the number and extent of [P.R.'s] emotional and physical outbursts." *K.C.*, 2019 WL 6907533, at *9.  While Plaintiffs "may have experienced frustration" with this particular strategy with which BOCES attempted to manage P.R.'s behaviors—which was clearly neither sustainable nor ultimately effective—"that alone does not establish that [BOCES] acted with gross negligence or reckless indifference." *Id.*

Accordingly, the Court grants summary judgment to BOCES on Plaintiffs' Section 504 and ADA discrimination claims against BOCES.[22]

### ii.  Retaliation

Plaintiffs appear to argue that BOCES retaliated against Plaintiffs "[b]y refusing to place P.R. in any of its programs after [Stroka] learned about [P]laintiffs' due process complaint against BOCES."  (Pls.' 56.1 ¶¶ 57–58.)  BOCES seems to concede—or at least does not contest for purposes of its Motion—that (1) filing a due process complaint is an activity protected by the ADA, (2) BOCES was aware of this activity, and (3) exclusion from BOCES's programs would constitute an adverse action.  (*See* BOCES's Mem. 15–16.)  However, BOCES argues that Plaintiffs have failed to establish a prima facie case of retaliation because Plaintiffs "fail to present any evidence of the requisite causal connection."  (*Id.* at 16.)

The Court agrees with BOCES, not least because Plaintiffs own alleged timeline of events is not supported by the record evidence.  Plaintiffs allege that BOCES learned of Plaintiffs' due process complaint against BOCES "for its role in depriving P.R. access to a FAPE in the 2015–16 school year" on May 17, 2016, and thereafter, BOCES "refus[ed] to place P.R. in any of its programs."  (Pls.' 56.1 ¶¶ 57–58.)  However, the undisputed evidence demonstrates

---

[22] To the extent Plaintiffs attempted to raise any other discrimination claims against BOCES by referring to various other allegations from the TAC in Plaintiffs' 56.1 Statement, these claims fail on procedural grounds as unsupported by evidence and abandoned. *See supra* II.B.1.

that P.R. was placed in and attended a BOCES program for 2016 ESY, a decision that was made

on June 13, 2016—nearly a month after BOCES allegedly learned of Plaintiffs' due process

complaint. *See supra* I.A.2.d.–e. Moreover, as BOCES rightly points out, there is undisputed

evidence that BOCES staff had expressed concerns regarding the appropriateness of its programs

for P.R. since as early as the Fall of 2013, and Plaintiff Parents themselves agreed in February

2016 that Otisville was not an appropriate placement for P.R. *See supra* I.A.2.a., I.A.2.c. (*See

also* BOCES's Mem. 16.) As such, Plaintiffs have failed to put forth any evidence to "show that

the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer

retaliatory intent." *Treglia*, 313 F.3d at 720; *A.M.*, 840 F. Supp. 2d at 686–87 (granting summary

judgment for the Department of Education on the plaintiffs' retaliation claim where "the

plaintiffs provide[d] no admissible evidence, but rather only assert[ed]" in their brief that the

student's "admission by lottery" to a particular school was denied "in retaliation for the parent's

request for reasonable accommodations"); *cf. Lillbask ex rel. Mauclaire v. Sergi*, 193 F. Supp. 2d

503, 515–16 (D. Conn. 2002) (denying summary judgment on the plaintiff's retaliation claim

where there was a genuine issue of fact as to whether the student was placed in a particular

school based on the defendants' "intent to . . . punish" the plaintiff-parent based on her "zealous

advocacy" on behalf of her child where the defendants had repeatedly sought to portray the

plaintiff-parent as "hostile").

Accordingly, the Court grants summary judgment to BOCES on Plaintiffs' ADA

retaliation claim.

b.  FUFSD

Plaintiffs appear to argue that FUFSD discriminated against P.R. by acting with bad faith

or gross misjudgment in denying P.R. a FAPE via a series of events between 2014 and 2018.

(*See* Pls.' Mem. 8–9; Pls.' 56.1 ¶¶ 45–56.) While FUFSD provides substantive arguments in

opposition to certain of these supposed claims, (*see* FUFSD's Mem. 18–23), the Court need not even reach them.  Plaintiffs' claims of discrimination against FUFSD consist of a laundry list of vague and speculative allegations such as "[FUFSD] allegedly refused to ascertain and implement the reasonable accommodations necessary to provide P.R. with access to FAPE," "Plaintiffs allege a pattern of selecting improper placements for P.R.," "[FUFSD] allegedly did not offer to re-evaluate P.R. to better understand his unique needs," and "Plaintiffs allege that [FUFSD] officials had a historical approach of isolating P.R. in an empty school basement, which they knew to be injurious and unproductive."  (Pls.' 56.1 ¶¶ 45, 46, 50, 56 (quotation marks omitted).)  These are incredibly serious allegations and if borne out, would likely demonstrate bad faith or gross misjudgment by FUFSD, which is why the Court allowed them to proceed past the motion to dismiss stage of this litigation.  (*See* 2019 Op. 77–81.)  However, Plaintiffs have failed to point to any evidence to support these allegations, *see supra* II.B.1., and the Court finds them to be divorced from the voluminous and undisputed record such that even identifying them is challenging, *see supra* I.A.2.  As such, the Court need not go any further in granting judgment for FUFSD on Plaintiffs' Section 504 and ADA discrimination claims.  *See Harlen Assocs.*, 273 F.3d at 499 ("Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion."); *see also Henek*, 449 F. Supp. 3d at 38, n.2 ("To the extent [the] plaintiff's counsel expected the [c]ourt to conduct an independent review of the record without any assistance from him, the [c]ourt declines to do so, as this is not a pro se case.").

Accordingly, the Court grants summary judgment to FUFSD on Plaintiffs' Section 504 and ADA discrimination claims against FUFSD.

### 4.  Section 1983 Claims

Finally, Plaintiffs appear to argue that FUFSD "violated P.R.'s right[s] under [§] 1983 by: (a) adopting inappropriate policies and procedures; (b) engaging in a widespread practice that constituted custom or usage; (c) failing to supervise and train their employees to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with such employees, and (d) failing to adopt appropriate policies and procedures[] with respect to[] the development of IEPs, the provision of special education services, and the provision of related services."  (Pls.' 56.1 ¶ 59.)  Somewhat more specifically, Plaintiffs allege that FUFSD had a "policy of overloading hired related services providers and/or not hiring an adequate amount of providers to service the needs of their entire student population"; "knew CSE members would face students who would be given out of district placements but failed to institute a policy or train employees and members of [CSEs] to properly vet out of district placements to ensure they are capable of providing related services included in the placed [students'] IEP[s]"; and "knew . . . that [FUFSD] needed additional related service providers and failed to remedy this issue by hiring additional staff."  (*Id.* ¶¶ 60–62.)  FUFSD argues that Plaintiffs "have acknowledged that they have no evidence to support their claims of official policy, longstanding practice[,] or custom," which is fatal to their claim.  (FUFSD's Mem. 24–25.)  The Court agrees with FUFSD.

As the Court explained in the 2019 Opinion, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  (2019 Op. 87 (alteration in original) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).)  "Thus, 'to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation;

(4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'"

(*Id.* (alteration in original) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)).)

"In other words, a municipality may not be liable under § 1983 'by application of the doctrine of

respondeat superior.'"  (*Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986)).)

Here, Plaintiffs have failed to adduce any evidence of a municipal policy, let alone one which,

when applied to P.R., led to a deprivation of P.R.'s constitutional or statutory rights.  *See Harlen*

*Assocs.*, 273 F.3d at 499 ("[M]ere speculation and conjecture is insufficient to preclude the

granting of the [summary judgment] motion.").

At best, Plaintiffs point to a handful of single, unrelated incidents for each alleged

"policy," but "[p]roof of a single incident of unconstitutional activity is not sufficient to impose

liability under *Monell*," *Smith v. City of New York*, 388 F. Supp. 2d 179, 188 (S.D.N.Y. 2005)

(quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)), and besides which, most

of the "incidents" that Plaintiffs vaguely point to are unsupported by the record.  For instance,

Plaintiffs appear to argue that FUFSD's inability to find an appropriate tutor for P.R. from

January to May 2017 constituted a policy of failing to hire the staff needed to meet the needs of

P.R. and other similar students.  (*See* Pls.' 56.1 ¶ 62.)  However, the record reflects that by

January 2017, P.R. had already been provided with two different tutors, who ultimately did not

work out for various reasons; Kissinger quit when she was unable to manage P.R.'s behaviors

and P.R. had become physically aggressive with her, and Plaintiff Parents refused to accept

Boylan as a tutor after P.R. allegedly told them Boylan had hit him.  *See supra* I.A.2.d., I.A.2.f.

After these two tutors stopped providing services to P.R., FUFSD went to great lengths to hire

additional tutors, including posting numerous solicitations for applications, inquiring among

special education teachers already in FUFSD's employ, and even offering higher pay—efforts

which were not ultimately successful.  (*See* FUFSD's 56.1 ¶ 226; *see also generally* Tiger Aff.)

No reasonable juror could find that this evidence demonstrates a policy of failing to hire the

necessary staff; to the contrary, this evidence demonstrates a policy of making every reasonable

effort to hire the necessary staff.

Accordingly, the Court grants summary judgment to FUFSD on Plaintiffs' § 1983 claim.

<u>III.  Conclusion</u>

For the foregoing reasons, BOCES's Motion for Summary Judgment is granted,

FUFSD's Motion for Summary Judgment is granted, and Plaintiffs' Cross-Motion for Summary

Judgment is denied.  The Clerk of Court is respectfully directed to terminate the pending

motions, (Dkt. Nos. 203, 208, 223); enter judgment for BOCES on all claims against BOCES;

and enter judgment for FUFSD on all claims against FUFSD, with the exception of Plaintiffs'

IDEA claim against FUFSD.

While the Court agrees with FUFSD's arguments on Plaintiffs' IDEA claim against

FUFSD for the reasons explained above, FUFSD has not moved for summary judgment on this

claim, (*see* FUFSD's Mem.), and the Court declines to grant summary judgment for FUFSD sua

sponte, *see Spiel Assocs., Inc. v. Gateway Bookbinding Sys., Ltd.*, No. 03-CV-4696, 2010 WL

546748, at *12 (E.D.N.Y. Feb. 16, 2010) ("Although [the defendant] has not moved for

summary judgment on [one of the plaintiff's claims], the [c]ourt invited the parties to submit

letter briefs as to whether summary judgment dismissing the claim would be warranted.  'District

courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so

long as the losing party was on notice that she had to come forward with all of her evidence.'"

(italics and alteration omitted) (quoting *Celotex*, 477 U.S. at 326))); *see also M.A.*, 1 F. Supp. 3d

at 148 n.12 (adopting recommendation in IDEA case that "[although] [the defendant] did not

move for summary judgment" that certain unexhausted claims be dismissed, explaining that the

"prejudice associated with [the] sua sponte grant of summary judgment is minimized if [the] party against whom it is granted had notice and opportunity to defend against the arguments against it, or if the party had no additional evidence to bring" (italics and quotation marks omitted)); *Dempsey v. Town of Brighton*, 749 F. Supp. 1215, 1220 (W.D.N.Y. 1990) ("It is well settled that summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion under Rule 56." (collecting cases)), *aff'd*, 940 F.2d 648 (2d Cir. 1991), *cert. denied*, 502 U.S. 925 (1991).  As such, FUFSD shall file a letter with the Court by no later than two weeks from the date of this Opinion explaining why FUFSD is entitled to summary judgment on Plaintiffs' IDEA claim against FUFSD.  Plaintiffs shall have two weeks to respond thereafter.  There will be no extensions.

SO ORDERED.

Dated:    February 4, 2022
          White Plains, New York

_____
            KENNETH M. KARAS
          United States District Judge